Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 1 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COUNTY
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3
 4   JULIUS GOLDRING,
 5        Plaintiff,
                                      Civil Action File
 6   vs.                             No. 1:18-cv-1191-WMR
 7   ATLANTA POLICE DEPARTMENT
     OFFICERS VLADIMIR HENRY
 8   and JUAN RESTREPO, in their
     individual capacities,
 9
          Defendants.
10   --------------------------
11
12            VIDEOTAPED DEPOSITION OF
13            INVESTIGATOR VLADIMIR HENRY
14
15                  10:36 a.m.
16                April 9, 2019
17
18               55 Trinity Avenue
19                Atlanta, Georgia
20
21
22
             Nancy G. Lucas, CCR, 1366-B
23
24
25
```

**Page 2**

```
 1            APPEARANCES OF COUNSEL
 2   On Behalf of the Plaintiff:
 3        ZACK GREENAMYRE, ESQUIRE
          Mitchell & Shapiro, LLP
 4        3490 Piedmont Road, NE
          Suite 650
 5        Atlanta, Georgia  30305
          (404) 812-4747
 6        zack@mitchellshapiro.com
 7        JEFFREY R. FILIPOVITS, ESQUIRE
          Filipovits Law Firm
 8        2900 Chamblee Tucker Road
          Building 1
 9        Atlanta, Georgia  30341
          (770) 455-1350
10        jrfilipovits@gmail.com
11   On Behalf of the Defendants:
12        REGINALD BERNARD McCLENDON, ESQUIRE
          VALORRI CHARAE JONES, ESQUIRE
13        City of Atlanta Department of Law
          55 Trinity Avenue, SW
14        Suite 5000
          Atlanta, Georgia  30303
15        (404) 441-7500
          rbmcclendon@atlantaga.gov
16        vcjones@atlantaga.gov
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
              INDEX TO EXHIBITS
     Exhibit                                    Page
     P-1    Oath of Office                        18
     P-2    Individual Officer Profile            61
     P-3    Photograph                            64
     P-4    Isoflex Stress Ball ad                76
     P-5    Isoflex Massage Stress Ball ad        76
     P-6    Memo re Investigative Disposition    109
            dated 6/20/16

     P-7    Memo re Complaint dated 6/27/16      113

     P-8    Witness statement                    117

     P-9    Affidavit for Arrest                 118

     P-10   Offense Report                       119

     P-11   Indictment                           120

     P-12   APD Employee Statement               121

     P-13   Register of Actions                  122

     P-14   Official Report                      123

     P-15   Property Log                         124

     P-16   Officer Discipline History           125

     P-17   APD Policy Manual excerpt            131
            Property and Evidence Control
     P-18   APD Policy Manual excerpt            135
            Drug Testing and Destruction

     P-19   Offense Report dated 2/28/15         142

     P-20   Offense Report dated 8/14/15         145

     P-21   Drawing by witness                   147
```

**Page 4**

```
 1            Videotaped Deposition of
              Investigator Vladimir Henry
 2                April 9, 2019
 3        MR. GREENAMYRE:  This will be the videotaped
 4   deposition of Defendant Vladimir Henry in the
 5   matter of Julius Goldring versus Vladimir Henry, et
 6   al., Case Number 1:18-cv-1191-WMR, pending in the
 7   Northern District of Georgia.
 8        The deposition is taken pursuant to notice and
 9   by agreement of the parties for all purposes
10   allowable under the Federal Rules of Civil
11   Procedure.
12        Will you please swear the witness.
13        INVESTIGATOR VLADIMIR HENRY, being first duly
14   sworn, was examined and testified as follows:
15   EXAMINATION
16   BY MR. GREENAMYRE:
17        Q.  Mr. Henry, have you ever had the pleasure of
18   giving a deposition before?
19        A.  No.
20        Q.  Okay.  First time?
21        A.  Yes.
22        Q.  So I want to -- I'm sure you've talked to your
23   attorneys about this, but I just want to give you a
24   couple of ground rules on the record so that we can make
25   this go as smoothly as possible.
```



Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 5

1      A.    Okay.
2      Q.    One key thing to remember is that it's --
3  although it seems like a normal conversation, it's not.
4  Everything we're saying is being taken down by the court
5  reporter and everything that you say is under oath;
6  understood?
7      A.    Yeah.
8      Q.    Although it is natural in normal conversation
9  to do so, please try to wait until a question is
10 finished before you answer and I'll try and do the same,
11 try not to cut you off or talk over each other, even if
12 you know where I'm going and I know where you're going;
13 okay?
14     A.    Okay.
15     Q.    That may be especially difficult with me,
16 because sometimes I ask a question and then pause in the
17 middle trying to figure out where I'm going with the
18 question, so I apologize for that, but try and work with
19 me.
20     A.    Okay.
21     Q.    Please try and give verbal answers, yeses and
22 nos, instead of uh-huh or huh-uhs or shaking your head.
23 Even though we do have the video, it's helpful to
24 clearly state what your answer is to a question.
25     A.    Okay.

Page 6

1      Q.    And if I prod you and say, Is that a yes,
2  something like that, it's not me trying to be rude.
3  It's just trying to make the court reporter's record
4  clear.
5      A.    Okay.
6      Q.    At some points in the deposition, you know,
7  not intentionally, but I will ask a confusing question,
8  and that's on me.  Will you let me know if a question
9  that I ask you is in any way confusing?
10     A.    Okay.  I can --
11         (Court reporter requested clarification.)
12         THE WITNESS:  I said, Okay.  I will let him
13     know.
14 BY MR. GREENAMYRE:
15     Q.    Okay.  And if you answer a question without
16 saying anything about it, you would agree with me that
17 it would be fair to assume that you understood the
18 question?
19     A.    Yes.
20     Q.    You can take a break any time you want.  You
21 know, I'll try and move through this as quickly as
22 possible, but it will take a little bit of time.  So if
23 you need to take a break, no problem.  Just let me know.
24     A.    Okay.
25     Q.    If you -- let's say I ask you, you know, tell

Page 7

1  me everything that you know about this; right?  And you
2  say thing one, thing two, thing three.  If sometime
3  later in the deposition you remember, you know, thing
4  four and thing five, will you let me know, you know,
5  while we're here today that you remembered that?
6      A.    Okay.
7      Q.    And, you know, so we can bounce around a
8  little bit.  And then just say, Oh, I remembered
9  something, you know, and then tell me something.  Okay?
10     A.    Okay.
11         MR. GREENAMYRE:  Valorri, have you -- is the
12     deponent going to read and sign?
13         MS. JONES:  Yes, we are.
14         MR. GREENAMYRE:  Okay.  Perfect.
15     Q.    (By Mr. Greenamyre) All right.  So let's get
16 started.  Tell me about your educational background.
17     A.    Graduated from college, received a bachelor's
18 degree in psychology and a master's degree in
19 counseling.
20     Q.    Where did you go to high school?
21     A.    I went to high school at Archbishop
22 Curley-Notre Dame High School.
23     Q.    Where is that at?
24     A.    In Miami.
25     Q.    What year did you graduate?

Page 8

1      A.    1990.
2      Q.    1990.  And then you went to college and got a
3  BA in psych.  Where was that from?
4      A.    Florida A&M University in Tallahassee.  Also I
5  got my master's there as well.
6      Q.    Okay.  And were the years that you got
7  your bachelor's degree and then your master's degree?
8      A.    I believe my bachelor's in 1996.  And my
9  master's, I received, I believe, 1998.
10     Q.    What jobs since -- since graduating from
11 undergrad have you had other than law enforcement jobs?
12     A.    You want me to list all of them or --
13     Q.    Tell -- tell me generally and then I may ask
14 some more detailed questions.
15     A.    All right.  I was a juvenile probation
16 officer.  I was a substance abuse counselor, a assistant
17 principal, a child advocate -- this is not in order.
18     Q.    That's fine.
19     A.    Child advocate, juvenile child advocate at
20 juvenile court.  Let's see.  I was also a behavioral
21 specialist.
22     Q.    In an educational setting or --
23     A.    It was a mental health setting.  Oh, case
24 manager with DFCS.  That's all I remember right now.
25     Q.    When did you first become a law enforcement

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 9

1   officer?
2         A.   In the City of Miami with Miccosuke PD.
3         (Court reporter requested clarification.)
4         THE WITNESS:  Miccosuke Police Department.
5   BY MR. GREENAMYRE:
6         Q.   Can you spell that for the court reporter?
7         A.   Oh, wow.  I don't know if I can remember
8   spelling that.  It's --
9         (Court reporter requested clarification.)
10        THE WITNESS:  It's an Indian reservation.
11   Miccosuke.
12   BY MR. GREENAMYRE:
13        Q.   And what year was that?
14        A.   I believe it was 2011 to 2012.
15        Q.   So all the jobs we were just talking about
16   were between 1996 and 2011?
17        A.   Yes.
18        Q.   Okay.
19        A.   I'm sure there's a few others that I'm
20   missing.
21        Q.   Okay.  Let me go just through them briefly and
22   0get a little bit more details.  For -- when you were a
23   probation officer, was that in Florida?
24        A.   Yes.  That was in Miami.
25        Q.   Was that with Miami-Dade County?

Page 10

1         A.   It was within the city of Miami, but I believe
2    it dealt with Dade County only, with the juveniles.  And
3    I think the facility was called JACs at the time.
4         (Court reporter requested clarification.)
5         THE WITNESS:  Yes.  I think it was called --
6         it was the Juvenile Assessment -- I forgot what the
7         C stands for, but it was called JACs, J-A-C-s, like
8         a juvenile assessment center for the juveniles when
9         they're processed -- if they was arrested, they've
10        been processed, or runaways, or missing, they come
11        through the system.  They'll come to the center.
12        We will get them processed.
13   BY MR. GREENAMYRE:
14        Q.   It was a processing center, not a detention
15   center?
16        A.   Exactly.  Yeah.  This is a stop that they make
17   before they go to the detention center or they're
18   released to their parents.
19        Q.   And approximately what years were you working
20   there?
21        A.   That was right after I graduated, if I'm not
22   mistaken, so 1998.
23        Q.   Okay.  About how long?
24        A.   I think until 2000, if I'm not mistaken.
25        Q.   Where did you go from there?

Page 11

1         A.   Then I went to a assistant principal position
2    at Archbishop Curley.
3         Q.   Your alma mater?
4         A.   Yes.
5         Q.   Is that a private school, I guess?
6         A.   Yes.  It is a private school.  It's under the
7    archdiocese of Miami.
8         Q.   Catholic high school?
9         A.   Yes.
10        Q.   What years approximately did you work as
11   assistant principal?
12        A.   I believe until 2003.
13        Q.   Did you come in as assistant principal or did
14   you have any other role with them?
15        A.   I was just volunteering as a coach, weight-
16   lifting coach, just volunteering my time, because I knew
17   the coaches and some of the teachers there.
18        Q.   But you weren't a teacher first?
19        A.   No.
20        Q.   Okay.  Did you get any teaching credential or
21   anything like that to be an assistant principal?
22        A.   My master's degree was -- sufficed with them,
23   plus they're familiar with me anyway.
24        Q.   Yeah.  You know, each state has its different
25   rules and they change all the time.

Page 12

1         A.   Yeah.  Especially with the archdiocese, if you
2    have a master's or a degree in education.
3         Q.   When I was a teacher, you had to be enrolled
4    in some program, but you didn't actually ever have to
5    get a certificate.
6         A.   Yeah.
7         Q.   Okay.  So that takes us to 2003.  Where did
8    you go from -- let me back up.  So what -- what was the
9    reason that you left being juvenile probation officer to
10   become an assistant principal?
11        A.   I accepted the Archbishop Curley job.
12        Q.   So just a better job?
13        A.   Yes.
14        Q.   Okay.
15        A.   Yes.  If you want to back up, the substance
16   abuse counseling and the behavioral specialist was
17   before --
18        Q.   Okay.
19        A.   -- the juvenile probation officer job.
20        Q.   What -- so substance abuse counseling, what
21   year was that?
22        A.   I believe 1997.
23        Q.   Okay.
24        A.   And the behavioral specialist, I believe, in
25   1996.

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 13

1    Q.   And who was your employer for each of those?
2    A.   The behavioral specialist was with a company
3  called Vashti, V-a-s-h-t-i --
4    Q.   Uh-huh.
5    A.   -- Vashti.  I don't remember the rest of
6  the -- but it was a -- basically a home for behavioral
7  problem teenagers, that they were placed in the center.
8  And I was basically the behavioral specialist logging --
9  or monitoring their behavior for whatever reason they
10  came in, through either the court system or their
11  family -- family had a psychiatrist or psychologist
12  admitting their kids into that center.
13    Q.   Was this a center that the kids or their
14  parents would pay for, or was it paid for by -- by the
15  state or --
16    A.   I believe some -- it was through the state --
17  through the state, because I know they received grants,
18  Vashti.
19    Q.   Or, at least, you know, it could be coming
20  from grants, wherever, but it wasn't something that the
21  kids or their families were expected to come
22  out-of-pocket for?
23    A.   No.  Not to my knowledge, no.
24    Q.   And who was your employer for the substance
25  abuse?

Page 14

1    A.   It was Jefferson Correctional facility.
2    Q.   Was that a prison in Florida?
3    A.   Yes.  It was a women's prison.  And the
4  psychologist had a grant to do a substance abuse
5  counseling program through the facility.  So that's how
6  he was able to get that program in there.  And I was
7  hired through that, but we were under the umbrella of
8  Jefferson Correctional facility.
9    Q.   Okay.  This is a Department of Corrections
10  prison for people who have been convicted of crimes?
11    A.   Yes.
12    Q.   From leaving Archbishop Curley High School,
13  where did you go next?
14    A.   Came here, moved here to Atlanta.  Then I
15  received -- I did Clayton County Juvenile Court.  Did a
16  little bit of child advocate part-time and then went to
17  DFCS, Fulton County DFCS.
18    Q.   What approximate years did you work in Clayton
19  County in the juvenile court?
20    A.   It was 2003 to 2004, if I'm not mistaken.  You
21  have to forgive me the timeline.
22    Q.   That's fine.  We're just looking for
23  approximations.
24    A.   No problem.  And right after that, did DFCS
25  for about three years.

Page 15

1    Q.   So '04 to --
2    A.   '07 approximately.  And then went back to
3  Clayton County Juvenile Court, because I kept in contact
4  with everyone there.  And they wanted me back as a
5  guardian ad litem, child advocate, dealing with
6  juveniles and children being abused, sexually or
7  physically abused.
8    Q.   So from 2000 -- I guess when did you -- when
9  you did you stop working as a guardian ad litem in
10  Clayton County?
11    A.   2011, just about around that time.  2010.  May
12  have been 2010.  Can't remember.  And then went to
13  Miami.
14    Q.   So from -- we'll get there in just a second.
15  Sorry.  I know this is taking a second, but from 2003 to
16  2011, you were employed by the State of Georgia?
17    A.   Yes.  But Clayton County was under Clayton
18  County.
19    Q.   Okay.  Even when you were a guardian ad litem?
20  Was that under Clayton County or --
21    A.   Yes.
22    Q.   -- was that under the State of Georgia?
23    A.   Clayton County.  Fulton County DFCS position
24  was under the State of Georgia.
25    Q.   For any of the jobs that we've talked about so

Page 16

1  far, were you ever fired or did you resign in lieu of
2  termination?
3    A.   You said to resign to avoid -- to avoid --
4    Q.   Termination.
5    A.   No, no.
6    Q.   So never fired, never resigned instead of
7  being fired?
8    A.   Right.
9    Q.   Okay.
10    A.   Just resigned for a better job or for
11  relocation.
12    Q.   Understood.  And then what was the -- what was
13  your reasoning or, you know, why go from being a
14  guardian ad litem in Clayton County to being a police
15  officer for an Indian tribe in Miami?
16    A.   I always wanted to be a police officer.  Got
17  comfortable with most of the jobs and made positive
18  impacts on people's lives that -- vice versa, plus it
19  impacted my life, especially dealing with the community
20  and children and and families.
21         And it was about that time.  I wasn't getting
22  any younger, so decided to sign up for the police
23  academy in Miami, passed and received -- took off for
24  the first job I received -- I was able to get.
25    Q.   Why Miami instead of the Atlanta metro area?

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 5 of 59

April 09, 2019

Page 17

1    A.  Well, we were moving -- we were -- the plan
2  was to move back to Miami, family matters.  And so we
3  decided to do that.  And then we quickly changed our
4  mind.  Miami has changed, especially the -- the finance
5  of housing.  So Atlanta was hiring, put in for it,
6  received it.
7    Q.  Perfect.  And that was -- what was your hire
8  date?
9    A.  2012, the ending of 2012.  December 27th,
10  2012, that was my hire date.
11    Q.  When did you become POST certified?
12    A.  The -- entered the academy -- I was POST
13  certified in 2014 -- don't know exactly -- in the
14  beginning of that year.  I don't know exactly the date.
15    Q.  So you had to go through basic training and
16  all that all over again?
17    A.  Yes.  I just missed the lateral movement.
18  They canceled that.  So I had to go through the whole
19  academy again.
20    Q.  Sorry to hear that.
21    A.  Yeah.  I was told afterwards when I accepted
22  the job.
23    Q.  All right.  More background.  Have you ever
24  been involved in a legal proceeding that was personal to
25  you, where you were a party?

Page 18

1    A.  No.
2    Q.  So never -- I don't know -- no divorce ever?
3    A.  No.
4    Q.  Bankruptcy?
5    A.  No.
6    Q.  Lawsuit where you were a plaintiff or
7  defendant?
8    A.  No.
9    Q.  Besides this one?
10    A.  Yes.
11    Q.  And never been arrested or charged with any
12  crime --
13    A.  No.
14    Q.  -- other than a traffic violation?
15    A.  That's it, yes.
16    Q.  In Florida, are traffic violations crimes or
17  are they civil infractions?
18    A.  It's a civil infraction.  Pay a fine.
19  Sometimes you have to show up to court.
20    Q.  Unlike here in Georgia, you know, where
21  speeding or jaywalking is a criminal offense?  It's a
22  misdemeanor punishable by up to a year in prison?
23    A.  Oh, yeah.  I mean -- yes.  I mean, it's like
24  that in Florida as well.
25    Q.  Oh, it is.  So it is a criminal offense?

Page 19

1    A.  Yes, yes.  I'm sorry.
2       (Plaintiff's Exhibit 1 was marked.)
3  BY MR. GREENAMYRE:
4    Q.  So I just passed you what has been marked as
5  Exhibit 1 which is your oath of office when you were
6  sworn in to be an Atlanta Police Department officer.
7  Does that look right?
8    A.  Yes.
9    Q.  And are you familiar with this document?
10    A.  Yes.
11    Q.  And as you can see in the document, it says
12  that, among other things, you will preserve, protect and
13  defend the Constitution of the United States of America
14  and the Constitution of the State of Georgia.  Do you
15  see that?
16    A.  Yes.
17    Q.  And in the lower paragraph, it states that you
18  will abide by the rules governing the Atlanta Police
19  Department, among other things.  Do you see that?
20    A.  Yes.
21    Q.  I understand your story about the incident
22  that we're going to talk about is probably different
23  from my client's, but with regard to this document and
24  your understanding of the rules governing law
25  enforcement officers in the City of Atlanta and under

Page 20

1  the United States and Georgia Constitutions, would you
2  agree that falsifying the results of a drug test to
3  arrest or prosecute someone for drugs without probable
4  cause violates the Constitution and City of Atlanta
5  policy?
6    A.  Yes.
7    Q.  And would you agree that making an arrest or a
8  prosecution --
9       MS. JONES:  I'm going to object to the form of
10  the question.
11    Q.  (By Mr. Greenamyre) You can still answer
12  unless she tells you not to answer.  Would you agree
13  that making an arrest or a prosecution because someone
14  was transgender would violate the Constitution and City
15  of Atlanta policy?
16    A.  If I understand?
17    Q.  Do you agree with that?
18    A.  If I agree with that?  Yes.
19    Q.  And in addition to violating the Constitution
20  and City of Atlanta policy, those acts may also be
21  criminal acts.  Would you agree with that?
22    A.  Yes.
23    Q.  So when you were hired by APD, what was your
24  first role after completing academy and basic training
25  and all that?

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 6 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

Page 21

1    A.   I was assigned to Zone 5 as a police officer.

2    Q.   And where within the city is Zone 5?

3    A.   It's in Downtown/Midtown area.

4    Q.   And what -- for what period of time were you
5    assigned to Zone 5 in Midtown and Downtown Atlanta?

6    A.   From when I was sworn in after field training
7    around 2014 and through -- until I was recently promoted
8    as an investigator on October 2018.

9    Q.   So 2014 until 20 -- October of 2018, you're
10   working --

11   A.   The Zone 5 area.

12   Q.   Zone 5.  And what's your -- what's your role
13   as a Zone 5 officer?

14   A.   As a Zone 5 officer?

15   Q.   Yeah.

16   A.   Patrol an area.

17   Q.   Patrol --

18   A.   Patrol an area.  Answer 911 calls.  Of course,
19   reduce the crime rate, you know, the crime spree that's
20   going on in the city.  That's basically it.

21   Q.   So you're -- when you're on patrol, are you in
22   your car, on foot?

23   A.   In car.

24   Q.   In car, primarily?

25   A.   Yes.

Page 22

1    Q.   I take it that Restrepo, Officer Restrepo, who
2    is also a defendant in this case, is working with the
3    horses, at least on occasion, these days.  Are you --
4    have you ever done that during the period from 2014
5    until 2018?

6    A.   No.

7         (Off-the-record discussion.)

8    BY MR. GREENAMYRE:

9    Q.   And on your patrol in your car from 2014 to
10   2018, are you primarily working alone or with another
11   officer?

12   A.   During my -- well, it all depends.

13   Q.   Tell me -- tell me about it.

14   A.   Usually ride alone.  If I'm the mobile watch,
15   ride alone, assigned to a certain beat area.  A beat
16   area is basically a section of the Midtown area or
17   Downtown area.

18        Then I moved on to the crime suppression unit
19   and the field investigative team.  We usually ride
20   together and we partner up.

21   Q.   You said crime suppression and --

22   A.   Field investigative team.

23   Q.   So you said primarily you would be alone until
24   you started working with the crime suppression or field
25   investigative team; is that right?

Page 23

1    A.   Yeah.  Basically, yes.  During holidays or
2    special events, we are paired up together during the
3    mobile watch.

4    Q.   Okay.  Can you tell me a little bit about some
5    of the terms you were just using?  You said the crime
6    suppression team?

7    A.   Yes.

8    Q.   What's that?

9    A.   The crime suppression team is basically a team
10   that was organized in the Midtown area for -- to patrol
11   the Midtown area, to prevent crimes in that Midtown
12   area.

13        Basically we do sometimes quality-of-life
14   details or patrol a certain area or show presence in
15   that certain area, depending on the crime spree or
16   what's going on, like break-ins or a armed robbery
17   spree, whether it was carjacking in the area.  So we'll
18   patrol that area and show presence and be active.

19        Sometimes doing community policing, you know,
20   reaching out to gas station owners, making sure
21   everything is all right.  People walking from one club
22   to their cars or Fox Theatre-type-of-thing event, talk
23   to the extra-job officers there.

24        Churches having any events, you know, we'll
25   talk to the church members or talk to the officers

Page 24

1    that's running the extra job in that area.

2         And just, you know, policing the area, making
3    sure everything is okay, making sure that civilians is
4    getting to their cars safely or showing presence and
5    make sure nothing occurs in that area.

6    Q.   So a lot of things you were saying sound like
7    they may not be that different from, you know, if you're
8    just on patrol on a beat?

9    A.   Right.

10   Q.   But the difference between being on patrol on
11   beat and the crime suppression team is going to be that
12   you're working with another officer in the car and --
13   and what else?  I guess maybe a little bit more
14   targeted?

15   A.   Yeah.  Sometimes we answer to more serious
16   crimes, like armed robbery --

17   Q.   Answer calls?

18   A.   Yeah.  Armed robbery, a carjacking, shooting,
19   fight in progress.  We'll usually answer those calls
20   and, you know, try to set a perimeter up to capture the
21   person or the perpetrators.

22        We'll usually be the first one on the scene
23   and start the rolling of the investigation, get answers
24   from the victim, see if -- you know, the description of
25   the perpetrator, see if we can set a perimeter, get on

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 25

1  the radio, give them the exact information that was
2  given by the victims.
3       Let's see.  What else?  Then we set a
4  perimeter and try to search for that perpetrator or
5  perpetrators.  Sometimes we get a description of a
6  vehicle, we get a description of the perpetrators and we
7  try to canvass the area and see if we can find them.
8  And that's basically it.
9       Q.   Okay.  So how is that different -- or maybe
10  tell me a little bit about what you're doing in the
11  field investigative team and how that's different.
12       A.   It's different -- it basically prepares us to
13  be an investigator.  We do a lot of investigator's
14  stuff.  Basically, say, for example, we will flag
15  warrants.  We'll do search warrants.  We learn how to do
16  different things that an investigator does and a --
17  combination of what an investigator does and an officer
18  -- patrol officer does.
19       If we're able to -- let's see what else we
20  did.  We also do quality of life.  They will use us at a
21  certain event to patrol the area, to show presence,
22  to -- to maintain peace in the area during events.
23       Q.   Tell me what you mean -- you said "quality of
24  life" a couple of times.  So I've been meaning to ask
25  you about that.  What does that mean in the context of

Page 26

1  policing?
2       A.   Basically, we would look at panhandlers that's
3  being aggressive towards civilians.  Especially during
4  an event, people coming from out of town, they're
5  aggressively panhandled.  So we'll sometimes be in the
6  area, do undercover work to see how -- you know, we do a
7  detail when it comes to panhandling.
8       We also check the parking lots, making sure
9  there is no crimes occurring in the parking lot.
10       Q.   People sleep in there?
11       A.   People sleep in there, but people loiter in
12  the area of the parking lot.  This is how we notice
13  the -- notice the behavior of perpetrators.  They loiter
14  around the parking lot, make --
15       (Court reporter requested clarification.)
16       THE WITNESS:  They make believe that that's
17  their car, but they're actually breaking into it,
18  and they sit in the car.  We'll try to notice
19  things like broken glass on the floor or noticing
20  someone, you know, walking around that they look at
21  different cars.  Then we say, Okay.  Maybe that's
22  not their car.  Then we'll approach them and give
23  them a warning and ask them to leave.
24       What else?  Drug deal around the area,
25  sometimes we'll do undercover work on that.  We do

Page 27

1  sales and, you know, buys, and then we capture the
2  perpetrator.  What else?
3  BY MR. GREENAMYRE:
4       Q.   I guess, other current quality of life -- you
5  know, when I think of quality-of-life issues, and
6  correct me if I'm wrong, but, you know, I also think
7  about urinating in public.
8       A.   Yes.  That as well.
9       Q.   You know, drinking in public?
10       A.   Drinking in public, yes.  Unruly when it comes
11  to someone that's intoxicated and about to walk into the
12  street hurting themselves because they're intoxicated --
13       Q.   Jaywalking kind of situation?
14       A.   Well, it depends if they're -- yeah, you could
15  say that, because sometimes they're drunk and we'll try
16  to get -- start a Grady EMS with them because they're
17  totally wasted, totally intoxicated.  And usually
18  sometimes they pass out in the street or on the sidewalk
19  and stuff like that.  But usually they do sometimes
20  jaywalk or dart into traffic.
21       Q.   Sounds like from a lot of these
22  quality-of-life issues are related to Atlanta's homeless
23  population.  Would you agree with that?
24       A.   You could say that, yes.  Shaking down the
25  main hotel district area.

Page 28

1       Q.   So another thing you mentioned is you would
2  work a beat within Zone 5 on patrol?
3       A.   Yes.
4       Q.   What -- did you work a large number of beats
5  or were you mostly, you know, working the same beat day
6  after day to -- you know, to get to know the people in
7  the area?
8       A.   Yes.  I was first working the area of
9  Greyhound station --
10       Q.   Garnett?
11       A.   Yes.  Garnett area, yes.  Peachtree-Forsyth
12  area.  Then I was assigned to 506 Beat, which is the
13  area of Monroe up to Grady High School, going up to
14  Ponce, I believe, or Juniper area where the Fox Theatre
15  is.
16       Q.   All the way to Peachtree and the Fox?
17       A.   Yes.  Around that area.
18       Q.   And that would have been the area where you
19  met with Miss Goldring?
20       A.   I believe so, yes.
21       Q.   Did you -- so you said you first started out
22  Downtown and then you moved -- your beat got switched to
23  Midtown; is that right?
24       A.   Yeah.  I was assigned to that area, yes.
25       Q.   And the -- what precinct was that --

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 8 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 29

1    A.   Zone 5 precinct?
2    Q.   Yeah.
3    A.   Over there at CNN Center.
4    Q.   So for all of Zone 5 is going to be at the CNN
5  precinct?
6    A.   That's the main precinct, yes.
7    Q.   And that's physically inside the CNN Center --
8    A.   Yes.
9    Q.   -- just off the food court?
10    A.   Yes.
11    Q.   So when you said that you, you know, were
12  generally on patrol, but then sometimes you were put
13  into, you know, crime suppression team or field
14  investigative team or mobile watch, were you assigned to
15  those various teams on and off or was that, you know,
16  you did patrol for a while and then you moved on to
17  joining one of those teams?
18    A.   It's like a promotion but without the increase
19  in pay, so from mobile watch to Midtown crime
20  suppression and then to the field investigative team.
21    Q.   Okay.  I don't think we talked about mobile
22  watch.  What's the difference between mobile watch and
23  crime suppression team versus field investigative team?
24    A.   Mobile watch is basically answer 911 calls,
25  answer accident calls.  I mean, you patrol the area.

Page 30

1  It's more -- I won't say it's more, but, you know, we do
2  community policing -- all three, community policing,
3  because you know the area; you know the business owners;
4  you know the homeless that's walking around, the ones
5  that are not causing trouble versus the ones that's
6  causing trouble; you know the -- the people in the
7  neighborhood basically.  And mobile watch is just you
8  just answer those calls and the 911 calls and that's
9  basically it.
10    Q.   Is that what you mean by community policing,
11  that you -- you know the -- you work in same area day in
12  and day out and you try to get to know the folks in that
13  area?
14    A.   Yes.
15    Q.   And for -- jumping back a second, the quality
16  of life kind of things that we were talking about
17  earlier, I've also heard those same kind of, you know,
18  offenses and approach to policing those offenses
19  described as "broken windows".  Are you familiar with
20  that term?
21    A.   Broken window?
22    Q.   Windows.
23    A.   No.  What do you mean?
24    Q.   I think it's a theory of policing that maybe
25  originated in New York that, you know, if you police

Page 31

1  lower-level things and things that are visible, like you
2  said, broken glass or, you know, people drinking in
3  public, that it makes people feel safer and, you know,
4  contributes to a safer city.  Something like that.
5    A.   Don't -- don't understand that.  I --
6    Q.   That's not a term that you've heard?
7    A.   Yeah.  I don't think I've heard that theory.
8    Q.   All right.  Understood.  I noticed that you --
9  when you came in here today, you're not bearing a body
10  camera.  Do you generally wear a body camera as part of
11  your work with the Atlanta Police Department?
12    A.   Yes.  Not as an investigator, but during my
13  time of -- in the streets with mobile watch Midtown --
14  well, we didn't get our body camera until I became a
15  field investigator because we were the last zone to
16  receive our body camera.  So I probably used that body
17  camera within one year maybe.
18    Q.   Okay.  Let me back up and hit a couple of
19  those points.
20    A.   Uh-huh.
21    Q.   So you generally wore a body camera once it
22  was issued to you until you became an investigator in
23  October of 2018; is that right?
24    A.   Yes.  But I do wear it during my extra job.
25    Q.   Okay.  So if you're working a secondary job,

Page 32

1  something like that?
2    A.   Yes.  Yes.  I would have my body camera on.
3    Q.   And what -- this would have been good
4  background to do earlier.  What -- what kind of
5  secondary jobs do you work?
6    A.   Midtown Blues, various jobs, security for a
7  club or concerts.  I've done so many.  Traffic detail
8  during an event.
9    Q.   Generally employed by a business for -- you
10  know, either working outside of a restaurant or bar or
11  for a specific event or to direct traffic; is that
12  right?
13    A.   Yes.
14    Q.   So when about do you think you were issued a
15  body camera?
16    A.   Probably 2017.  I can't tell you if it was the
17  beginning or the ending, but I know it was around that
18  time, 2017.  It was around 2017.  I don't know exactly
19  when.
20    Q.   Okay.  For when you were in-car, were your --
21  was your car equipped with a dashboard camera?
22    A.   No.  Sometimes -- some cars were; some cars
23  were not.
24    Q.   Okay.
25    A.   Depends on the model.  And a lot of our



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 9 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

Page 33

1  vehicles, dash cams was broken and was out of date.
2      Q.   Did you have a car that you generally drove
3  day in and day out?
4      A.   No.
5      Q.   Were there a series of cars that you drove --
6      A.   Yes.
7      Q.   -- or was it totally random?
8      A.   It's random.  Whatever car is available, we
9  drive, use it.  You wasn't assigned to a certain
10 vehicle -- or I wasn't.
11     Q.   So on the date of this incident, which I'll
12 represent to you is October 10th, 2015, what kind of
13 vehicle were you in on that day?
14     A.   A patrol vehicle.
15     Q.   It was a marked APD patrol vehicle?
16     A.   Yes.
17     Q.   So the dark blue vehicle with the red and
18 silver trim?
19     A.   Yes.
20     Q.   And did that vehicle have a dashboard camera?
21     A.   I don't think so.
22     Q.   But you don't know for sure one way or
23 another?
24     A.   Most -- most of our vehicles in Midtown did
25 not have a camera on our dashboard.  So you could say

Page 34

1  no.
2      Q.   So you're saying that since most of them
3  didn't have camera, you're guessing that this one didn't
4  have a camera?
5      A.   Exactly.
6      Q.   Was it that the cars in Midtown didn't have
7  cameras or that they were often broken?
8      A.   Often broken.
9      Q.   So you're saying that this camera -- or this
10 car that you were in probably had a camera but it
11 probably wasn't working?
12     A.   It was either it wasn't working or one was
13 never in there or implemented in there.
14     Q.   Is there a way from looking at the
15 documentation of the incident with our client that we're
16 here to talk about today that you could determine what
17 vehicle you were in at the time?
18     A.   No.
19     Q.   So there is no way of knowing at this point
20 what car you and Mr. Restrepo were in on October 10th,
21 2015?
22     A.   Not to my knowledge.  I don't know how -- I
23 don't go over the radio and say what car we are.  So I
24 can't think of any other way, what car we was driving
25 in.

Page 35

1      Q.   It wouldn't be listed in the police report
2  or --
3      A.   No.
4      Q.   What about a daily activity log?
5      A.   Perhaps, yes.
6      Q.   You got to imagine there's some way for the
7  department to know who's diving what car at what time?
8      A.   Yes.
9      Q.   So one way might be -- might be daily activity
10 log; right?
11     A.   Yes.
12     Q.   What other ways would the department know
13 who's driving what car at what time?
14     A.   Sign-in sheets.  Sometimes we did sign-in
15 sheets for the vehicle that we were using.  I don't know
16 during that time if we did that or not.  I can't
17 remember.  But that's one way.
18     Q.   What other ways?
19     A.   Sign-in.  Police reports, some officers do
20 that, put that on the police report.  Some --
21     Q.   But you were saying you don't do that?
22     A.   No.  I didn't do that.  That's basically it
23 that I can think of.
24     Q.   What does Atlanta Police Department policy say
25 to do when an officer encounters or is using equipment

Page 36

1  that is defective?
2      A.   Defective?  Either --
3      Q.   Or broken?
4      A.   We usually put it in the log to get it fixed
5  in the shop basically.
6      Q.   Does Atlanta Police Department policy tell you
7  to, you know, create some kind of record or log when
8  equipment that you're using or supposed to be using is
9  damaged, broken or defective?
10     A.   Yeah.  Depending if it could be fixed or not.
11 I'm sure there is some history that it was attempted to
12 be fixed, but it just was not able to be fixed, because,
13 if that's the case, all of our vehicles would have
14 dashboard -- the camera working.
15     Q.   Okay.  So you're saying you wouldn't generally
16 file any kind of, you know, log to get your equipment
17 fixed if that equipment was the dash cam because all of
18 the dash cams are broken?
19     A.   No.  What I'm saying is at some point in time
20 we probably did do that, if there's some history.  If I
21 didn't do it, someone else did.  But since that vehicle
22 was out of date, it was old, mostly they was just --
23 just couldn't be fixed.
24     Q.   So once you --
25     A.   The new vehicles that came in, the Ford

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 37

1  Taurus, they were automatically -- cameras were in
2  there.  And if it was broken, they were able to fix it
3  with no problem at the shop, my understanding.
4      Q.   Okay.  But what you're saying is, you know,
5  for the vehicle you were using in October 2015, when you
6  had the interaction with our client, probably did not
7  file any kind of paperwork saying that the dash camera
8  was damaged, defective or broken --
9      A.   I wouldn't say that, but I can't remember if I
10 did or not.  But I know most our vehicles did not have a
11 camera or it was just broken.
12     Q.   Okay.  So at that point you're not filing
13 paperwork every single day every time you pick up a
14 car --
15     A.   No.  Not every day, no.
16     Q.   At the point where you're working with
17 Mr. Restrepo and you interact with Miss Goldring, you
18 said you were a part of the crime suppression team --
19     A.   Yes.
20     Q.   -- at that point?
21     A.   Yes.
22     Q.   And so you're -- you're in the car with
23 Restrepo --
24     A.   Yes.
25     Q.   -- on that day?

Page 38

1      A.   Yes.
2      Q.   Who's driving and who's a passenger?
3      A.   If I'm not mistaken, I was driving.  I
4  probably was driving.
5      Q.   But you're not a hundred percent sure?
6      A.   I mean, I can't remember, but I believe I was
7  driving.
8      Q.   Going back to do just a little bit more
9  background --
10     A.   Yes.
11     Q.   -- in the crime suppression team in and around
12 October of 2015, in the Midtown beat you were
13 describing, what are your typical cases on a typical
14 day?
15     A.   It could be -- I mean, it could be a variety
16 of things.  It could be armed robbery.  It could be a
17 traffic offense.  It could be -- depends, you know, what
18 we're able to catch and what we found, depending on the
19 call.  If you catch a perpetrator breaking in a car, it
20 could be that.
21          Quality-of-life cases, such as someone
22 drinking in public, you know, causing disorderly in a
23 business or in a street area, starting a fight,
24 carjacking, aggravated assault.  It could be a variety
25 of things.

Page 39

1      Q.   Just depends on what you see?
2      A.   Basically what we see or what we answer, what
3  we --
4      Q.   What you see and where you're told to go?
5      A.   -- are dispatched to.  Yeah.  What we're
6  dispatched to.  Or depending on the detail we're doing.
7  So --
8      Q.   So I would imagine on any day you're working a
9  shift, especially in Midtown, you're going to see
10 dozens, if not hundreds, of violations or crimes
11 committed in front of you, whether it's speeding or not
12 coming to a complete stop at a stop sign or jaywalking,
13 anything like that; right?
14     A.   Yes.
15     Q.   Okay.  And, obviously, it doesn't make sense
16 for a variety of reasons to arrest every single person
17 that you see commit one of those offenses; right?
18     A.   I mean, can you repeat the question?
19     Q.   So if you see hundreds of people violating the
20 law every day in relatively, you know, lesser ways --
21 we're talking stop signs; speeding, you know, just going
22 a few over; jaywalking; something like that -- obviously
23 you can't arrest every single person that does that;
24 correct?
25     A.   Correct.

Page 40

1      Q.   How do you -- you know, just as a general
2  matter, how do you personally decide when you're going
3  to make an arrest for a low level offense like that?
4      A.   I mean, if it's a traffic offense like taking
5  a stop sign, give them a ticket.  Move on.
6          But if they go through the stop sign and hit
7  someone and endanger someone's life, you know, that
8  could be reckless driving.  That's a traffic offense
9  that's arrestable and we deal with that.
10         But most of the cases, we go out there, do our
11 job.  If someone violates -- commits a crime, we arrest
12 them with probable cause.
13     Q.   What about when you see, you know, jaywalking?
14 How do you determine whether you're going to issue a
15 citation, make an arrest, look the other way, whatever?
16     A.   Usually I arrest them.
17     Q.   Your testimony is that when you see someone
18 jaywalking, you arrest them usually?
19         MR. McCLENDON:  Objection to form.  Asked and
20 answered.
21     Q.   (By Mr. Greenamyre) You can answer.
22         MR. McCLENDON:  You can answer.
23         THE WITNESS:  Oh, I can answer?  Okay.  Yeah.
24 Usually, yes.  If I see a crime being committed,
25 and I am a police officer, you know, if a crime is

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 41

1  committed, then yes.
2      Q.  (By Mr. Greenamyre) Why arrest someone for
3  jaywalking instead of issuing them a citation or look
4  the other way?
5      A.  Well, like I said, it's pedestrian on the
6  roadway, it can be a pedestrian traffic device, it could
7  be a -- what else -- other traffic -- darting into
8  traffic, usually offense, a traffic offense, and we
9  arrest them.
10     Q.  The question was not what are the different,
11 you know, criminal offenses that, you know, could fall
12 under the, you know, lay umbrella of jaywalking, but it
13 is why do you, as an officer, choose to exercise your
14 discretion to make arrests in those circumstances
15 usually, as opposed to issuing a citation or having a
16 warning or anything else?
17         MR. McCLENDON:  Objection to form.
18         THE WITNESS:  It's an arrestable offense.  I
19     swore under oath as a police officer to do my job.
20     And if someone commits a crime and it was an
21     offense that's an arrestable offense, I place them
22     under arrest.
23     Q.  (By Mr. Greenamyre) I thought your testimony
24 was a moment ago that, you know, if someone runs a stop
25 sign and they don't hit anybody, they just roll

Page 42

1  through --
2      A.  That's a traffic offense, the basic ticket.
3  Usually it's not, you know, an arrestable offense unless
4  it's a reckless driving offense.  You know, reckless
5  driving or someone just taking a stop sign or driving a
6  one-way the wrong way because they were lost or whatnot,
7  I'll give them a ticket.  But it could be someone drunk
8  driving a one-way the wrong way.  That's a different
9  situation.
10     Q.  Understood.
11     A.  So --
12     Q.  So it sounds like you're -- there's a
13 distinction between an arrestable offense and a
14 non-arrestable offense.  And you're saying that -- you
15 know, just a stop sign alone is generally not an
16 arrestable offense, but the crimes associated with
17 jaywalking are generally arrestable offenses.  Is that
18 kind of what you're saying?
19         MR. McCLENDON:  Objection to form.
20     Q.  (By Mr. Greenamyre) You can answer unless he
21 tells you not to.
22     A.  Okay.  So you're asking -- repeat the question
23 again.
24     Q.  Yeah.  I'm trying to understand what you're
25 saying.  And it sounds like you created a distinction

Page 43

1  between an arrestable offense and non-arrestable
2  offense.  And so you will arrest people for arrestable
3  offenses and you won't arrest people generally for
4  non-arrestable offenses; is that right?
5      A.  It depends on the situation at times, because
6  it could lead -- I mean, one situation could lead to
7  another.  So usually when I -- like, for example, I
8  mentioned a traffic offense, someone taking a stop sign,
9  I give them a ticket.
10         If they are, of course, under the influence,
11 that's a different story.  If it's a pedestrian on the
12 roadway, usually it's an offense, an arrestable offense,
13 that I usually go ahead and arrest them for.
14     Q.  And I guess -- so I'm sorry if I'm asking
15 similar questions or again and again.  I'm just trying
16 to understand.  So this is on me, but try and help me
17 out.
18         So take the example of a stop sign violation.
19 They don't come to a complete stop.  They go through it
20 at two or three miles an hour, not under the influence,
21 not -- nobody else at the intersection, anything like
22 that; right?  So you said in that circumstance you would
23 generally write a ticket; right?
24     A.  Using my discretion, write a ticket, yes.
25     Q.  Because you said that that was not an

Page 44

1  arrestable offense; is that right?
2      A.  No.  Basically --
3         (Court reporter requested clarification.)
4         THE WITNESS:  It's usually on situation.  I
5     mean, I'm sorry if you don't understand, but if
6     it's, say, someone's taking that stop sign, didn't
7     mean to, like you said, two or three miles per
8     hour.
9      Q.  (By Mr. Greenamyre) Stick with that example.
10     A.  Use my discretion, I'll give them a ticket, as
11 long as they're not under the influence or they're not
12 causing -- you know, doing any reckless driving.  And if
13 it's alcohol or drugs, you know, suspend their license.
14 If no other violation has been occurred under that
15 traffic stop, then use my discretion and just give them
16 a ticket and move on.
17     Q.  Would you agree with me that there is no
18 policy in the City of Atlanta police department or rules
19 under Georgia state law that require you to make an
20 arrest for jaywalking, pedestrian in the roadway, any of
21 those offenses that you discussed?
22     A.  Right.  It's usually at the discretion of the
23 police officer.  If a crime is committed, then we make
24 that arrest.
25     Q.  And so my question is, why do you exercise

Page 45

1  your discretion differently to make an arrest for
2  something like jaywalking, as opposed to a stop sign
3  violation like we talked about where there is no DUI,
4  you know, don't come to a complete stop, nobody's
5  endangered by their action in that specific incident?
6      A.   I mean, if it's my discretion, I mean, if
7  someone violates a crime, if someone does the
8  jaywalking, usually make an arrest.
9      Q.   Okay.  And that's -- do you know whether
10  that's something that is generally done by Atlanta
11  Police Department officers or is that exercise of
12  discretion that you described unique to you?
13      A.   No.  It's -- if we're doing a quality-of-life
14  detail, we usually make -- you know, we concentrate on
15  those qualities of life or we just do a detail around
16  that area, a high crime area at times.  We make those
17  arrestable offenses when it comes to jaywalking or
18  pedestrian on the roadway or darting into traffic.
19      Q.   Or, you know, spitting on the sidewalk,
20  anything --
21      A.   That's a violation, arrestable offense as
22  well.
23          (Court reporter requested clarification.)
24          THE WITNESS:  Offense, yes.  A city offense,
25  you know, a city ordinance.

Page 46

1  BY MR. GREENAMYRE:
2      Q.   How many times would you estimate you have
3  arrested someone while employed as a City of Atlanta
4  police officer for jaywalking?
5      A.   I mean, the exact times, I don't how many
6  times, but I'm sure there's been several times.
7      Q.   If you can give me a range.
8      A.   I can't give you no range because I wouldn't
9  know the exact range or even approximate range.
10      Q.   More or less than a hundred?
11      A.   Probably say -- probably so.  But I don't know
12  the exact --
13      Q.   The question was more or less.  Or probably
14  about a hundred?
15      A.   You could say less.
16      Q.   You would guess less than a hundred?
17      A.   Probably so.
18      Q.   But you're not sure that it's less --
19      A.   I'm not sure.
20      Q.   -- than a hundred?
21      A.   No.
22      Q.   More than 50?
23      A.   The, like, exact?  I mean -- I mean, I don't
24  know, to be honest with you.
25      Q.   Would your guess be between -- somewhere

Page 47

1  between 50 and a hundred?
2      A.   Fifty or more --
3          (Court reporter requested clarification.)
4          THE WITNESS:  Possibly.
5  BY MR. GREENAMYRE:
6      Q.   Fifty or more possibly?  Is that what you
7  said?
8      A.   Yes.
9      Q.   And how many more people did you arrest for
10  jaywalking in the first instance, was, you know, the
11  reason for the stop and then you decided to arrest them
12  and then maybe new charges were added after they were
13  being -- after the decision to arrest?
14      A.   Could be -- I mean, I don't know the range,
15  but it's a lot -- that happens a lot.
16      Q.   So maybe 50 to a hundred, ballpark, not
17  holding you to it, of arrests for jaywalking and then a
18  number on top of that for jaywalking plus other
19  offenses?
20      A.   Perhaps, yes.
21      Q.   When you arrest someone for jaywalking in the
22  City of Atlanta on your beat in either Midtown or
23  Downtown, how long do you expect them to stay in jail?
24      A.   In a city offense, usually they are able to
25  sign out, sign themselves out through a signature bond

Page 48

1  to the city jail, pay a fine.
2          If they are repeat offenders, I think they
3  have -- you know, they spend a couple of days.  If they
4  have added charges, like obstruction, eluding police,
5  it's probably a little bit more.
6      Q.   So you said that nowadays if someone is just
7  arrested for jaywalking alone --
8      A.   Yes.
9      Q.   -- generally they can get released --
10      A.   The next day.
11      Q.   -- after being booked on a signature bond?
12      A.   Yes.  The next day.
13      Q.   It is my understanding that's a relatively
14  recent change and, you know, as of at least 2015, there
15  was a bail schedule in place for arrests of low level
16  offenses, such as, you know, pedestrian in the roadway.
17  Is that your understanding?
18      A.   It's a city offense and they go through the
19  city jail.  So the city jail usually has the process of
20  they go through the fingerprinting process and
21  everything and sometimes they'll have to wait to see the
22  judge through the court the next day.  Or they pay the
23  fine or sign themselves out and they'll just get a court
24  date later.
25      Q.   And if let's say the bail for pedestrian in a

Case 1:18-cv-01191-WMR  Document 54  Filed 07/17/19  Page 13 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

Page 49

1  roadway under state law or Atlanta city ordinance is
2  $200, right --
3      A.  Uh-huh.
4      Q.  -- just as an example, it's your understanding
5  that if the person who's arrested for jaywalking doesn't
6  have $200 to make bail, they have to at least wait until
7  their first court date before they can be released?
8      A.  Well, city jail and Fulton County jail, I
9  believe they're totally different.
10     Q.  Let's talk city jail.
11     A.  City jail is like city ordinance.  They still
12 have to pay a fine.  They'll pay the fine.  Maybe
13 they're given that fine after the court hearing or maybe
14 before.  They will just have to come to court to pay for
15 that fine.
16         Fulton County jail, I believe, are state
17 charges.  I believe that's where they have to wait to
18 have a certain amount to set a bail.
19     Q.  And my question -- my question is just that,
20 you know, if someone -- especially, you know, for the
21 kind of quality-of-life infractions we're talking about,
22 you know, let's say we have a homeless person and
23 they're jaywalking and they're not going to be able to
24 come up with $200, how long would you expect them to
25 stay in the Atlanta City Detention Center as of 2015

Page 50

1  before they are released?
2      A.  I don't know.
3      Q.  Okay.  Could be days, could be weeks?
4      A.  Could be.  Usually I see them out the next
5  day, but I don't know the circumstances.
6      Q.  And same thing approximately for if you charge
7  under state law and they go to Rice Street, they'll
8  spend a day --
9      A.  Yes.
10     Q.  -- multiple days, weeks in Rice Street?
11     A.  Yes.
12     Q.  How many transgender or cross-dressing persons
13 would you say that you have arrested for jaywalking or
14 any of those related offenses?
15     A.  I don't know.  I mean, I don't know.
16     Q.  That's fair enough.  More than just our
17 client, Miss Goldring?
18     A.  More?  I mean --
19     Q.  Or is she the only one?
20     A.  I mean, I can't tell you.  I don't know.  I
21 really don't.
22     Q.  All right.  So from 2012 when you get hired by
23 APD -- you said you started actually on the street as a
24 patrol officer starting in 2014?
25     A.  Yes.

Page 51

1      Q.  From that period, from when you start in 2014
2  to when you make the arrest of Miss Goldring, what's the
3  largest quantity of drug you have confiscated in which
4  you were lead or co-lead officer?
5      A.  I've made several drug arrests that dealt
6  with cocaine.  You could say several, from cocaine to
7  heroin to weed, crack cocaine.  We have made several
8  arrests, either as primary or co-primary or, you know,
9  secondary officer.
10     Q.  Got you.  So you said you've in that period,
11 you know, a little less than two years, you made arrests
12 for marijuana, powder cocaine --
13     A.  Crack --
14     Q.  -- crack cocaine, heroin?
15     A.  Mollys.
16     (Court reporter requested clarification.)
17         THE WITNESS:  Mollys, like ecstasy.
18 BY MR. GREENAMYRE:
19     Q.  But the original question, what was the
20 largest quantity of drug that you confiscated in one of
21 your cases?
22     A.  I've done a trafficking for marijuana.  I
23 don't know the quantity.  I'm sorry.  I don't know the
24 exact quantity of it.
25     Q.  What is the trafficking threshold?  That's an

Page 52

1  ounce or more?
2      A.  Yeah.  Yes.
3      Q.  More than 28 grams?
4      A.  Yes.  I can't tell you -- what else?
5      Q.  What is the largest amount of powder cocaine
6  you've found on someone in the period from 2014 to
7  October 2015?
8      A.  Besides this one I was in with Miss Goldring,
9  I can't tell you.  But I know I wasn't the primary
10 officer.  So I don't know the exact quantity of it.  But
11 I was the secondary or I was involved in helping with
12 the investigation or with the case.  So don't know the
13 quantity of it, but I know it's a lot.
14     Q.  So you found a lot of cocaine on one other
15 occasion in which --
16     A.  Yes.
17     Q.  -- you were a supporting officer?
18     A.  Yes.
19     Q.  Who was the lead officer on that case?
20     A.  I can't remember.  I know there's been there
21 other cases with -- besides cocaine.  I mean, marijuana.
22 Then there's ecstasy.  Officer --
23     (Court reporter requested clarification.)
24         THE WITNESS:  Butler.
25 BY MR. GREENAMYRE:

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 53

1    Q.   B-u-t-l-e-r?
2    A.   Yes.  Officer Restrepo, Officer Petrie,
3  Officer --
4    Q.   So I'm asking just for the name of the officer
5  where you found a significant quantity of cocaine, if
6  you can remember what officer was involved in that
7  incident.
8    A.   I can't remember.
9    Q.   Okay.  And do you know how much -- you said
10  you don't know the exact weight.  Are we talking several
11  grams, several ounces?
12    A.   Enough for trafficking.
13    Q.   What is the trafficking threshold for cocaine?
14    A.   About 28 grams or -- numbers -- I believe it
15  was more than 26 or 28 -- I can't remember -- I think
16  grams.
17    Q.   More than an ounce?
18    A.   Yes.
19    Q.   And so when I first asked you that question,
20  you said other than this case we're talking about with
21  Miss Goldring.
22    A.   (Witness nods head.)
23    Q.   At this point you'll agree with me that what
24  was in her purse in the stress ball has not cocaine?
25    A.   Was not cocaine?

Page 54

1    Q.   Yeah.
2    MR. McCLENDON:  Objection to form.
3    Q.   (By Mr. Greenamyre) You can answer.
4    A.   According to the analysis of the drug test, it
5  was cocaine.
6    Q.   What analysis are you talking about?
7    A.   The drug kit that we used.
8    Q.   Okay.  So you're saying that the drug kit said
9  to you, it was cocaine, but my question is you know now --
10    A.   Right.
11    Q.   -- that that drug kit is wrong and that there
12  was no cocaine?
13    MR. McCLENDON:  Object to the form.  Calls for
14  speculation.
15    MR. GREENAMYRE:  Well, let me finish the
16  question.
17    Q.   (By Mr. Greenamyre) You know now that the
18  substance that was in Miss Goldring's stress ball did
19  not contain any cocaine; correct?
20    MR. McCLENDON:  Objection to form.  Calls for
21  speculation, but you can answer.
22    THE WITNESS:  Yes.
23    Q.   (By Mr. Greenamyre) So you know now that
24  that's not the case; correct?
25    A.   Yes.

Page 55

1    Q.   Just making sure.  Based on your training and
2  experience as an officer, what amounts or quantities of
3  powder cocaine is it typically distributed in?
4    A.   Is typically --
5    Q.   Distributed in.
6    A.   Distributing?
7    Q.   Or how -- what amounts are typically bought
8  and sold for powder cocaine based on your training and
9  experience?  In terms of the grams.
10    A.   Usually the small -- we see a lot of small
11  baggies of --
12    Q.   Half gram, gram?
13    A.   Yeah.  Half gram that is being sold.  We've
14  confiscated someone with a bag -- you know, with a pouch
15  with bags of small ounces of cocaine.  So that's how
16  it's usually sold with powder cocaine.  Are you asking
17  about specifically powder cocaine?
18    Q.   Exactly.
19    A.   Yes.
20    Q.   Yeah.  So if someone has a large quantity of
21  powder cocaine that they're selling, oftentimes that
22  will be broken up into small half-gram or gram bags?
23    A.   Yes.  Or some of them has been placed in
24  plastic bags, alcohol, the Hennessey wrap that you put a
25  Hennessey bottle in.  We've seen that.  They put cocaine

Page 56

1  in that.
2    What else?  Of course, lacing it.  Sometimes
3  we've caught people with laced marijuana and cocaine and
4  they sell it like that sometimes.  That's my experience
5  how I've seen it distributed.
6    Q.   All right.  Take me through kind of the life
7  cycle of a case where you make a drug arrest, you know,
8  kind of -- let's start in broad strokes -- from arrest
9  to you, you know, prosecution or dismissal.  From your
10  perspective, what happens?
11    A.   Okay.  If we make an arrest and we found --
12  recover drugs on a person, we test the drug.  Then we
13  send it off.  Of course, we put on the report if it was
14  positive or negative.  Then we either charge them
15  appropriately.
16    With my experience, especially with crack
17  cocaine or marijuana, and we can tell just by look or
18  smell with marijuana.  And then we test -- usually have
19  the test kit with us on the field or --
20    Q.   Sorry to interrupt, but you said you have
21  experience especially with marijuana and crack cocaine?
22    A.   Uh-huh.
23    Q.   Would you say that those are the, you know,
24  most common --
25    A.   Common --

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 57

1    Q.   -- drug offenses?
2    A.   Yes.  Yes.
3    Q.   Okay.  All right.  So then you said, you said
4    you test it, charge them appropriately --
5    A.   Yes.
6    Q.   -- arrest them --
7    A.   Send the drugs to -- for analysis, further
8    analysis, and seal it up and put it in property.  Do a
9    warrant for that offense, the appropriate charge; have
10   it signed by the judge.  And that's all we basically
11   know when it comes to the drug at that time.
12        If it's -- usually we get an analysis from the
13   test center at GBI during the hearing of someone.  They
14   give us a -- I mean, I only experienced that maybe once,
15   that it was concluded that that drug was -- tested
16   positive, confirmed.  But usually by the time of the
17   hearing, I -- we don't get that update.
18   Q.   Do you go -- when they have a bail hearing or
19   a first appearance, are you called to testify at those
20   hearings?
21   A.   Usually not.  Just do a grand jury or
22   sometimes preliminary hearing.
23   Q.   Did you ever appear in court for Miss
24   Goldring's case?
25   A.   No.  Not that I can remember, no.

Page 58

1    Q.   And how are you told whether to appear in
2    court on a given date?  Does the ADA give you a call?
3    A.   Subpoena or ADA gives me a call.
4    Q.   You said something a second ago.  You said
5    once or twice you'll get confirmation at a hearing that
6    the drug tested positive?
7    A.   I probably just remember that one time I
8    received a confirmation that -- during the hearing that
9    the drug was confirmed.
10   Q.   How do you -- how do you normally learn the
11   results of a GBI toxicology analysis?
12   A.   Either the DA, ADA, will give me that
13   information, depending on the cases, the high value of
14   the cases.
15        I know certain units, like narcotics unit,
16   will have access -- communication access with those GBI
17   analyses.  They'll give them that information, from my
18   understanding, but other than that, that's it.
19   Q.   Does the GBI contact you about the results of
20   a drug test?
21   A.   Like I said, certain units, they probably do
22   that with investigators.
23   Q.   The question is, do they contact you?
24   A.   No.  No.  I've never been contacted by GBI.
25   Q.   What kind of official or formal training

Page 59

1    specific to drugs do you have?
2    A.   Besides being in the streets dealing as a
3    police officer with the amount of drugs that we
4    encounter with some drug cases, training through police
5    academy for certain drugs.  My time as a substance abuse
6    counselor, I took a lot of training with substance --
7    with drugs.  That's all about it.
8    Q.   So I think you said three things, three
9    categories of things.  You said, you know, just on the
10   street, you know, day in, day out, you're exposed to
11   drugs.
12        Second was, you said, police training.  And by
13   that do you mean, you know, your basic training --
14   A.   Yeah.
15   Q.   -- that you had to go through twice?
16   A.   Yeah.  Basic training and the academy.
17   Q.   Okay.  Got you.  And then you had further
18   training when you were a substance abuse counselor in
19   1997 working on a grant at Jefferson Correctional
20   women's prison?
21   A.   Yes.
22   Q.   Okay.  For the substance abuse training, what
23   training were you given as far as identifying suspected
24   drugs?  Or were you mostly trained in counseling someone
25   who had a drug dependency?

Page 60

1    A.   That, and also we did video training and live
2    training at a facility.  They'll have drugs, you know,
3    certain drugs laid out that we were able to see the
4    difference.
5    Q.   This was part of your training at --
6    A.   Substance abuse.
7    Q.   -- at substance abuse?
8    A.   Substance abuse, yes.  Yes.  The difference
9    between crack cocaine and small rocks of soap or a
10   pebble.  The difference from powder cocaine to powder or
11   just baking soda sometimes.
12   Q.   That was some -- some kind of training that
13   you received --
14   A.   As a substance abuse counselor.
15   Q.   Did you receive training like that through the
16   police academy or basic training?
17   A.   We seen videos of it.
18   Q.   But not hands-on?
19   A.   I did see that hands-on, yes.  There is a lot
20   of cases where they do fake sales, like --
21        (Court reporter requested clarification.)
22        THE WITNESS:  Yeah.  Or they will try to
23   sell -- you know, make quick money.  They'll try to
24   sell fake drugs to someone, a sucker.  Someone
25   that's coming out -- from out of town on the bus,

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 61

1      they will sell them fake drugs.
2 BY MR. GREENAMYRE:
3      Q. And you're saying you saw this in the police
4 academy or this was on the street?
5      A. I saw that hands-on. That's hands-on.
6      MR. GREENAMYRE: Okay. Just trying to make
7      sure I understand.
8          (Off-the-record discussion.)
9      (Plaintiff's Exhibit 2 was marked.)
10 BY MR. GREENAMYRE:
11      Q. So back on the record. I'm handing you what
12 has been marked as Plaintiff's 2. Looks like your POST
13 profile as of October 2018. Does that look right to
14 you?
15      A. Yes.
16      Q. And as I was looking through this, I didn't
17 see any specific training that looked like it was geared
18 towards drug identification or drug detection. Does
19 that sound right now to you?
20      A. Yes.
21      Q. So no -- I don't know -- ARIDE or anything
22 like that that would show up on POST --
23      A. No. Just the video that they showed at the
24 academy and we did scenarios.
25      Q. So looking at the second page of this, for the

Page 62

1 years 2012 and 2013, were these years where you were
2 initially employed by the Atlanta Police Department but
3 hadn't become a sworn officer yet?
4      A. Yes.
5      Q. What were you doing during -- during those,
6 you know, two years?
7      A. A recruit and police academy. Before you join
8 the police academy, you are assigned a certain area to
9 be a recruit and do some job duties there until you get
10 accepted into the academy.
11      Q. All right. Let's talk for a second about
12 police reports generally; okay?
13      A. Okay.
14      Q. Would you agree with me that police reports
15 must be accurate, complete and honest?
16      A. Yes.
17      Q. And by "accurate", meaning you got to relay
18 the facts as close to the truth as is possible; right?
19      A. Yes.
20      Q. Okay. And they need to be complete, meaning
21 they need to contain all the important details about the
22 incident; right?
23      A. Yes.
24      Q. And they got to be honest, meaning that you
25 got to -- any kind of falsehood is inappropriate?

Page 63

1      A. Yes.
2      Q. Okay. Let's jump forward a little bit to the
3 facts of the incident itself. When you first see Miss
4 Goldring, what do you see?
5      A. Saw two individuals crossing the street
6 without using a crosswalk, walking while moving vehicles
7 are passing through. One of those was ours. And we
8 stopped them and continued on and placed them in
9 custody, and going down the line did the investigation
10 part with the person who was with Miss Goldring who
11 falsified his name. So we had to investigate that.
12      Q. We'll get -- we'll get into all that in a
13 second, but -- and at some point I will ask you to tell
14 me the whole thing and then I'll ask you some more
15 specific questions. So apologies if I cut you off.
16      So your testimony is you see two individuals?
17      A. Yes.
18      Q. Are they -- and you can tell they are in the
19 same party? They're walking together?
20      A. Yes.
21      Q. Are they holding hands or embracing in any
22 way?
23      A. I could not remember if they were holding
24 hands or embracing each other.
25      Q. Was there anything to indicate that they were

Page 64

1 in some kind of romantic relationship or were they just
2 walking by each other or you don't know?
3      A. Just walking with each other.
4      Q. Were there any other people that were walking
5 with them?
6      A. Not that I'm -- that I can remember.
7      Q. And your testimony was that you were driving
8 at the time this happened?
9      A. I believe so.
10      Q. And that you -- what was it that you said
11 about you were driving in close proximity to Goldring
12 and the person she was with?
13      A. Yes. Approximately -- probably a
14 hundred-fifty feet, maybe a hundred. I'm not exactly
15 sure how far I was, but we just noticed them walking in
16 the middle of the street without using a crosswalk while
17 other cars were going through the street.
18      (Plaintiff's Exhibit 3 was marked.)
19 BY MR. GREENAMYRE:
20      Q. I'm handing you what's been marked as
21 Plaintiff's Exhibit 3, which is an aerial map of the
22 intersection of Piedmont and 3rd Street in Atlanta. Do
23 you recognize that to be that intersection?
24      (Off-the-record remarks to witness by his attorney.)
25      MR. GREENAMYRE: Valorri, I don't think you

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 17 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

Page 65

1    can whisper into your client's ear during a
2    deposition.
3         MS. JONES:  I can whisper into my client's
4    ear.
5         MR. GREENAMYRE:  No, you can't, not when a
6    question is posed.
7         MS. JONES:  That's fine.  Yes, I can.  Yes, I
8    can.
9         MR. GREENAMYRE:  You absolutely cannot.
10   Q.   (By Mr. Greenamyre) But go ahead.
11   A.   Okay.
12        MS. JONES:  Well, you know what?  We can take
13   a break and we can step out.
14   Q.   (By Mr. Greenamyre) Answer -- answer the
15   question.
16        MS. JONES:  Hold on one second.  We can take a
17   break and step out.
18   Q.   (By Mr. Greenamyre) The question is posed.
19   Answer the question.  Once you answer the question, you
20   can step outside.
21        MR. GREENAMYRE:  But then we're going to make
22   some comments about you not being allowed to confer
23   with the witness about their testimony during the
24   course of the deposition.
25        MS. JONES:  This is not about his testimony.

Page 66

1    This is -- this is my witness.  This is my client.
2    But you know what?  You can answer it.  Go ahead.
3    Q.   (By Mr. Greenamyre) The question was just
4    simply, do you recognize this to be that intersection?
5    A.   Overhead like this, no.  I don't recognize it
6    to be exact, but not over area -- I mean, aerial, no.
7    Q.   Okay.
8    A.   I don't recognize it like that.
9    Q.   Do you see where it says Piedmont Road on it?
10   A.   Piedmont Avenue, yes.  I'm trying to envision,
11   and yes, I see that.
12   Q.   So Piedmont at that area of town is a one-way
13   that runs north; correct?
14   A.   Piedmont -- yes.
15   Q.   Okay.
16   A.   Yeah.
17   Q.   And so 3rd is going to be running east-west?
18   A.   Correct.
19        MR. GREENAMYRE:  The -- if you had it oriented
20   so that the sticker is at the bottom, then we're
21   going to be looking north-south like a regular map,
22   I believe.  Let me switch the sticker so that's
23   correct.
24        (Off-the-record discussion.)
25   (The label on Plaintiff's Exhibit 3 was repositioned.)

Page 67

1    BY MR. GREENAMYRE:
2    Q.   All right.  So I'm handing you what's been
3    re-marked as three.  The text you can see is -- at least
4    here (indicating), is facing upwards which is the
5    direction of north.
6    A.   Okay.
7    Q.   And I'll represent to you that this part of
8    the building is the Chevron station right there at the
9    intersection of 3rd and Piedmont just north of Ponce, if
10   that helps you get oriented.
11   A.   Chevron?
12   Q.   Yep.
13   A.   And this is the other gas station?
14   Q.   I think that's actually an apartment building,
15   and the other gas station, the BP, would be just off the
16   map.
17   A.   Okay.
18   Q.   Looking at this map, can you tell me where
19   Miss Goldring and Mr. Ford crossed the street and the
20   direction in which they crossed the street?
21   A.   Don't remember exactly where.  I don't
22   exactly -- I don't remember exactly where.
23   Q.   Did they cross 3rd Street improperly or did
24   they cross Piedmont improperly?
25   A.   They were going -- if I remember, they were

Page 68

1    going diagonally towards traffic where cars were moving,
2    because, I mean, they wasn't using a crosswalk because
3    -- but all I remember, cars were moving, they went into
4    the traffic.  One car slowed down, we slowed down,
5    that's when we stopped.  Exactly where, exactly -- I
6    don't remember exactly where.
7    Q.   Do you know whether they were supposedly
8    improperly crossing Piedmont or improperly crossing 3rd
9    Street?
10   A.   No, I can't remember.
11   Q.   Okay.  And there is no -- no video that would
12   exist from your body camera which didn't exist at the
13   time?
14   A.   Right.
15   Q.   From Restrepo's body camera?
16   A.   He didn't have one either.
17   Q.   And your car didn't have a camera at the time?
18   A.   Correct.
19   Q.   What have you reviewed in preparation for your
20   deposition today?
21   A.   My report.
22   Q.   What other documents besides your police
23   report?
24   A.   That's it.
25   Q.   Okay.  So just the, you know, couple of pages

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 69

1  of your police report?

2      A.   Yes.

3      Q.   So take me through what you remember from the

4  time you see them and you decide that you're going to

5  stop them.  Who makes the decision to stop them?  Was it

6  you or Officer Restrepo?

7      A.   We made a collective decision, if I'm not

8  mistaken.

9      Q.   And was it something that you talked about or

10 you just said --

11     A.   No.  We saw them violating a traffic offense

12 by crossing the street while vehicles were moving.  And

13 that's when we stopped them.

14     Q.   So at that point, had you made the decision

15 that you were going to most likely arrest both of them?

16     A.   Yes.

17     Q.   And then you make contact with them.  Tell me

18 about the first -- or how you made contact with Miss

19 Goldring and Mr. Ford.

20     A.   I remember stopping them, asking them to stop.

21 Then I'm asking for ID, placed them in custody, run

22 their names, especially with Mr. -- the other gentleman

23 that was with Miss Goldring.  Found out that his name

24 was not coming back, was not on file.

25          Then we got a fingerprint scanner, a mobile

Page 70

1  fingerprint scanner we had.  We fingerprinted -- I

2  forget his name, but we fingerprinted his --

3      Q.   Mr. Ford.

4      A.   Mr. Ford.  We fingerprinted his, you know, his

5  fingerprints.  We was able to place it in there -- I'm

6  sorry -- through the scanner and then it came back with

7  the name of Mr. Ford and he had a warrant flagged out of

8  New York and full extradition.

9      Q.   So you -- you said, you know, before you asked

10 them their names and all this, you placed them into

11 custody.  What do you mean by having placed them into

12 custody at that point?  Put handcuffs on?

13     A.   Yes.

14     Q.   Put them in the back of the car?

15     A.   No.

16     (Court reporter requested clarification.)

17          THE WITNESS:  We did not put them in the back

18     of the car immediately.

19 BY MR. GREENAMYRE:

20     Q.   So at this point, they are both outside of the

21 car?

22     A.   Yes.

23     Q.   And your testimony is -- is -- let me start

24 over.  Your testimony is that these two people were

25 walking together and there weren't two other females

Page 71

1  walking with them?

2      A.   I can't remember if there was anybody else

3  walking with them.

4      Q.   You have no recollection of two other people

5  walking with them?

6      A.   With them, no.

7      Q.   And there would have been no reason for you to

8  have only stopped and arrested two of them if all four

9  people had jaywalked?

10     A.   Exactly.  We would have gotten all four of

11 them or all -- whoever there was.

12     Q.   However many it was?

13     A.   Yes.

14     Q.   And they would have all been arrested?

15     A.   Yes.

16     Q.   At what point in the interaction did you learn

17 that Miss Goldring was homeless or had been staying in a

18 shelter recently?

19     A.   Don't remember her stating she was homeless or

20 anything like that.  Don't remember that.

21     Q.   So you didn't know that she was homeless?

22     A.   No.

23     Q.   Or -- or, you know, had stayed in a shelter

24 recently?

25     A.   Not that I can remember, no.  I don't remember

Page 72

1  that conversation.

2      Q.   What does Atlanta Police Department's policy

3  on inventory searches say?

4      A.   When we make an arrest, say someone's driving

5  a vehicle, we inventory the vehicle before we get them

6  towed away.

7          Same thing with their property.  We inventory

8  their property.  Before we send it off to property, we

9  got to make sure there's nothing that's -- you know,

10 like lighter fluids or something that's hazardous or

11 something -- food.  So we have to inventory their

12 property.

13     Q.   So when someone is arrested and they're

14 carrying a purse, you're going to look through all of

15 the things that are inside that purse; is that right?

16     A.   Yes.

17     Q.   And what are -- are you making a log or an

18 inventory of everything that's inside the purse or are

19 you just looking for certain items?

20     A.   Certain -- I mean, we just look through it.

21 There's no log or anything like that, unless someone

22 asks for a log.  You know, like, if we're dealing with a

23 large amount of money, we'll do that inventory at times.

24 But we didn't do no log and sometimes we don't do a log.

25 We just inventory and make sure there's no items that's

Case 1:18-cv-01191-WMR  Document 54  Filed 07/17/19  Page 19 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry                                         April 09, 2019

Page 73

1    not acceptable to property.
2         Q.   And in order to do this kind of inventory
3    search of someone's purse, for example, they need to be
4    under arrest?  You're going to arrest them?
5         A.   Yes.
6         Q.   And you would agree with me that there was no
7    probable cause or reasonable suspicion to believe that
8    there was any contraband inside Miss Goldring's purse
9    when you first looked into it?
10        A.   Yeah.  That's -- that's -- that's the primary
11   thing for inventories, like I said.
12        Q.   Right.  You don't -- you don't -- with
13   inventories you don't need reasonable suspicion or a
14   probable cause?
15        A.   Right.
16        Q.   But my question is, you would agree with me
17   that you didn't have reasonable suspicion or probable
18   cause to believe that there were -- was contraband
19   inside Miss Goldring's purse before you started looking
20   into it?
21        A.   I mean, there's no -- no.  At that time, no.
22        Q.   So you would agree with me?
23        A.   Yeah.
24        Q.   Who first started looking in Miss Goldring's
25   purse?

Page 74

1         A.   If I'm not mistaken, Restrepo.
2         Q.   But you're not positive one way or the other?
3         A.   I'm -- it probably was him.  It's likely.
4         Q.   Restrepo was the one who first started looking
5    in it?
6         A.   Yes.
7         Q.   Who was the first person to make any comment
8    or notice the stress ball?
9         A.   I believe Restrepo and Miss Goldring, they
10   were having a conversation about it.
11        Q.   Okay.  So you weren't the first person to
12   notice it?
13        A.   No.  Not that I can remember, no.
14        Q.   What did the stress ball look like?
15        A.   Looked like a regular stress ball that had a
16   clip, I believe, on it.
17        Q.   Some kind of metal ring at the top?
18        A.   Yes.  That was -- I mean, it was not sealed
19   all the way, if I'm not mistaken.
20        Q.   What do you mean it had a metal clip that
21   wasn't sealed all the way?
22        A.   The stress ball wasn't sealed all the way
23   basically.  Usually those stress balls are sealed up and
24   you cannot easily open them or close them.  I mean, but
25   that's what I remember at the time.

Page 75

1         Q.   So it had a metal clip on it?
2         A.   I believe it did, yes.
3         Q.   Was the metal clip -- are you saying it was
4    loose or --
5         A.   It was -- yes, you could say that.
6         Q.   Okay.  If that's the case, why was the stress
7    ball -- back up.  Was the stress ball leaking substance?
8    Could you, you know, turn it over and was any substance
9    coming out?
10        A.   I don't honestly remember if there was any
11   substance or anything like that.  I just -- I don't
12   remember that.
13        Q.   No substance was found in Miss Goldring's
14   purse, you know, in the bottom of her purse?
15        A.   I can't remember.
16        Q.   There was no notation of any substance being
17   found in Miss Goldring's purse, would you agree with
18   that, in your police report?
19        A.   You said there was no --
20        Q.   You would agree with me that there was no
21   notation made or comment made about any substance being
22   found in the purse in your police report?
23        A.   Correct.
24        Q.   Okay.  And then who cut the stress ball open?
25        A.   I think Restrepo.

Page 76

1         Q.   Why did Restrepo cut the stress ball open if
2    the clip was loose that it could be -- was so loose?
3         A.   I don't remember.  I just know Restrepo and
4    Miss Goldring had a conversation about it.  I don't know
5    the whole extent of the conversation.
6         Q.   But you'd agree with me that if there was a
7    way to examine something without destroying the
8    property, it's generally better to do that rather than
9    destroy the property?
10        A.   Yeah.
11        (Plaintiff's Exhibits 4 and 5 were marked.)
12   BY MR. GREENMYRE:
13        Q.   I'm handing you what's been marked as
14   Plaintiff's Exhibits 4 and 5.  Exhibit 4, you see where
15   it says Richard's Variety Store?  On Exhibit 4?
16        A.   Yes.
17        Q.   And Exhibit 5, you see where it says -- looks
18   to be Amazon?
19        A.   Yes.
20        Q.   Okay.  Was this basically the -- what the
21   stress ball looked like?
22        A.   Round like that, yes.
23        Q.   Same kind of metal clip that you see at the
24   tops of these balls?
25        A.   Something like that, yes.  I can't fully

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 77

1  remember the exact description of the -- what type of
2  clip it was.  And I know it was white, I think, she had.
3      Q.  The outside bag was white?
4      A.  Yeah, white or cream color, something like
5  that.  Gray.  I can't remember, but it was not dark
6  color.
7      Q.  Would you agree with me that Officer Restrepo
8  asked Miss Goldring where she got the stress ball?
9      A.  I believe he did say that, yes.  I can't
10  remember.
11      Q.  And would you agree with me that Miss Goldring
12  told --
13          MS. JONES:  I'm going to object to the form of
14      the question.
15          MR. GREENAMYRE:  Let me finish the question
16      and then we can make the record.
17          MS. JONES:  I'll object to the form of the
18      question.
19      Q.  (By Mr. Greenamyre) Would you agree that Miss
20  Goldring told you and Officer Restrepo she got the
21  stress ball from a shelter that she was staying at?
22      A.  I don't remember.
23      Q.  You don't know one way or another?
24      A.  No.  I mean, I just don't remember the
25  conversation.  I was focused, concentrating on Mr. Ford.

Page 78

1      Q.  Do you remember having -- do you remember any
2  conversation you had with Miss Goldring at any point
3  about where the stress ball came from?
4      A.  No.  I don't remember.
5      Q.  That -- on that day when this happened, you
6  would agree with me that you and Officer Restrepo did
7  not have any field test kits on your person at the time?
8      A.  At that time, yes.
9      Q.  The only field testing that was done was done
10  at the Zone 5 precinct inside CNN Center?
11      A.  Yes.
12      Q.  Where on the -- where was the stress ball cut
13  open at the scene?
14      A.  Where?
15      Q.  Yeah.  Was it on the hood of the car?
16      A.  I believe so.  I know it was outside.
17      Q.  Outside the car --
18      A.  Yes, outside the car.
19      Q.  -- on -- do you know whether it was the hood
20  or the trunk?
21      A.  I don't remember.
22      Q.  Can you think of any other place it would be
23  besides either --
24      A.  No.
25      Q.  -- the hood or the trunk?

Page 79

1      A.  Yeah.
2      Q.  Did you put down any kind of bag or anything
3  to capture the substance when you cut it open?
4      A.  I don't remember what -- if we used a bag.  I
5  really don't remember.
6      Q.  Tell me in as much detail as you can what the
7  substance on the inside of the stress ball looked like
8  at that time.
9      A.  It looked like powder substance.  It could --
10  I mean, it just looked like powder substance.  That's
11  all I can remember, that it looked like powder
12  substance.
13      Q.  Color, was it -- what color was it?
14      A.  White.
15      Q.  Pure white?
16      A.  I mean, it was dark, but it was white.  I
17  mean, I can't say if it was off-white or if it was
18  mixed with other --
19          (Court reporter requested clarification.)
20          THE WITNESS:  -- off-white, but it was white.
21  BY MR. GREENAMYRE:
22      Q.  You said you couldn't tell whether it was
23  white or mixed with other colors?
24      A.  Right.
25      Q.  Was it yellowish?  Or tan?

Page 80

1      A.  No.  It was just white.
2      Q.  Just white?
3      A.  Yeah.
4      Q.  Did you or Officer Restrepo smell the
5  substance?
6      A.  No.  Smell the substance?  No, not that I
7  remember smelling the substance.
8      Q.  Did you or Officer Restrepo taste the
9  substance?
10      A.  No.  We're not trained to do that.
11      Q.  You and Officer Restrepo -- did you or Officer
12  Restrepo touch the substance with your fingers?
13      A.  No, not that I remember.  We're trained not to
14  do that as well, but not that I remember me -- I mean,
15  sometimes that accidentally happens with any other case
16  of substance, but I honestly don't remember touching it
17  doing this (indicating) with it, no.
18      Q.  Okay.  So you didn't touch it and, you know,
19  put it to your tongue?
20      A.  No.
21      Q.  You're trained not to do that?
22      A.  Right.
23      Q.  You didn't take it in your fingers and kind of
24  feel what the texture was?
25      A.  No, not that I remember.

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 81

1    Q.   Can you tell me how fine of a texture we're
2  talking about?
3    A.   Of --
4    Q.   I mean, could you tell, you know, whether it
5  was kind of like sugar or like sand or flour?
6    A.   Like flour substance, like powder.
7    Q.   Okay.  Maybe like powdered sugar --
8    A.   I wouldn't --
9    Q.   -- in terms of texture?
10   A.   -- sugar, but it was just powder.  I don't
11  know -- I couldn't tell you the -- the touch, I couldn't
12  tell you, but just by looking at it, it looked like just
13  powder substance.
14   Q.   Could you tell whether it was, like,
15  crystalline at all?
16   A.   No.  I don't think it was crystalline.
17   Q.   Okay.  Did you weigh the powder at the scene?
18   A.   Not at the scene, no.
19   Q.   Not until you got to the precinct?
20   A.   No.  I had to go to property to weigh it.
21   Q.   Okay.  Is property at the precinct?
22   A.   At the annex building.  No.  It's off of
23  Donald Lee Howell [sic].  They have a scale over there.
24   Q.   But you could tell it was a significant
25  quantity of --

Page 82

1    A.   Yeah.
2    Q.   -- cocaine?
3    A.   Yes.  A significant amount of --
4    Q.   Yeah.
5    A.   -- yeah.
6    Q.   Yeah.  And in the end it was -- ended up being
7  approximately 60 grams, according to your arrest warrant
8  affidavit?
9    A.   I --
10   Q.   Approximately?
11   A.   Yeah.  I'd have to look at it.  I don't
12  remember the exact amount.
13   Q.   And we'll mark this later, but just so you can
14  see.
15   A.   Okay.
16   Q.   All right.  So 60 grams approximately,
17  according to this?
18   A.   Yes.
19   Q.   Based on your knowledge and experience,
20  approximately how much could someone sell 60 -- or
21  what's the street value of 60 grams' worth of powder
22  cocaine?
23   A.   I don't know exactly.  I mean, I would have to
24  be guessing, but I don't know exactly, but that's a
25  significant amount.

Page 83

1    Q.   Thousands and thousands of dollars?
2    A.   I would say so, yes.
3    Q.   Did you ever call in by radio while you were
4  at the scene that you needed to test a substance?
5    A.   No.
6    Q.   Did you ask that a test kit be brought to you?
7    A.   Not that I remember.  I don't remember.
8  Sometimes we do that, but I don't remember if we did it
9  at that time.
10   Q.   So you don't know one way or another whether
11  you asked for a test kit to be brought?
12   A.   Yeah.  Not at that time.  I don't remember.
13   Q.   But in the end, no -- if you did ask, no test
14  kit was brought to you?
15   A.   No.  We were planning to go the precinct
16  anyway.  So the test kits were there.  So we was going
17  to test it there.  So I don't think at that time it
18  would have made sense for us to ask for it.  But, like I
19  said, I don't remember if Restrepo asked or if I asked,
20  but at that time I don't remember me asking for one.
21   Q.   Why go to the precinct with Miss Goldring and
22  Mr. Ford instead of to Rice Street?
23   A.   Because they were -- we had to confirm and we
24  had a wagon that was running, someone who would
25  transport the perpetrators to the jail.

Page 84

1        And we also wanted to test the kit -- I mean,
2  the powder substance that was in the stress ball, we
3  wanted to test that.
4        And also do the tickets, you know, do the
5  proper process of doing the tickets of the charges that
6  we have to write, we wanted to do that at the precinct.
7    Q.   What determines whether you would take an
8  arrestee, you know, straight to the jail as opposed to
9  taking them to the precinct first?
10   A.   If there is no further investigation, we
11  just -- if there is a charge and there is no other
12  additional charge or additional further investigation,
13  we'll take them straight to the jail.  Or we'll have our
14  wagon driver meet us at the scene, the location, and
15  they will transport them to the jail.
16   Q.   Okay.  But your testimony was that you had
17  some other investigation to do at the precinct separate
18  from testing the substance in this instance.  What was
19  that?  Or was that the only investigation --
20   A.   Yeah.  That's the only investigation and meet
21  the wagon driver there.  We -- with Mr. Ford, we did the
22  investigation there.  So we couldn't just leave without
23  knowing who he was.  And we had to confirm the warrant
24  as well through ACIC.
25   Q.   All right.  Tell me about the drug test kit or

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 22 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 85

1  kits that you used in this instance to test the
2  substance.
3      A.   We -- it's a drug kit that's in a box.  We
4  take out the kit itself.  We have to make sure it's the
5  right drug kit.  There's different drug kits.  There's a
6  seal, a black seal, on that kit that you take off.
7      Q.   Before we get into that, did you -- no.  That
8  was great.  I don't mean to cut you off.  If you need to
9  say anything else to supplement that answer, please do.
10     A.   Uh-huh.
11     Q.   But I want to go into a bunch of detail on the
12 kit itself, but, first, I want to understand, did you
13 use just one kit or did you use a number of different
14 drug test kits?
15     A.   I used one kit there, the precinct, and used
16 another kit at the --
17         (Court reporter requested clarification.)
18         THE WITNESS:  The annex building, the one
19     that's on Donald Lee Howell [sic].
20 BY MR. GREENAMYRE:
21     Q.   So you only tested this substance for being
22 cocaine; correct?
23     A.   Yes.
24     Q.   You didn't test it for anything else?
25     A.   No.

Page 86

1      Q.   And you only used one kind of drug test?
2      A.   Yes.
3      Q.   Is that correct?
4      A.   Yes.
5      Q.   Same drug test kit you used at the precinct as
6  you did at the annex building?
7      A.   Yes.
8      Q.   And before I cut you off, you were beginning
9  to describe what that test kit looks like.
10     A.   Yes.
11     Q.   Do you know what the name of that drug test
12 kit is?
13     A.   I think it was NARK.
14     Q.   Uh-huh.  N-A-R-K?
15     A.   I believe so.  N-A-R-K or N-A-R-C.  I can't
16 remember, but, yeah.  It's been a while.
17     Q.   And what did the drug test kit look like?
18     A.   It's a small pouch, has a black seal on it and
19 has like one of those small black -- how would I
20 describe it?  Something that -- it's an item that you
21 use to pick up the substance and place it inside the
22 pouch versus using your fingers or any other item.
23 That's what it was made for.  Use that small, black item
24 like a -- I wouldn't say a straw, but --
25     Q.   A scoop?

Page 87

1      A.   A scoop, yeah.  And you just pick up the
2  substance, place it in the kit, seal it back with that
3  black item, the opener, seal it.  And then crack the --
4  the glass substance that's inside the kit and shake it
5  and just wait for the results.
6      Q.   Okay.  Can you -- I know that the kit itself
7  is small, but, you know, to help us out, can you draw a
8  little bit about what approximately this looks like?
9      A.   The kit?
10     Q.   The kit itself.
11     A.   (Witness complies.)
12     Q.   Make it big, if you can -- maybe you could
13 start on the other side -- just so we can get a little
14 bit more detail.
15     A.   So you want me to draw the shape of it or the
16 size -- I mean, because --
17     Q.   The shape of it, draw it, but make it bigger
18 than just the small, little kit.
19     A.   It's like about this size (indicating).
20     Q.   Okay.  Yeah.  So make it big -- draw it bigger
21 than what it actually is.
22     A.   (Witness complies.)  That's the black,
23 something like that (indicating).
24     Q.   Okay.  And you said there was some glass
25 substance on the inside?

Page 88

1      A.   Yeah, like this.  Something like that
2  (indicating).
3      Q.   Okay.  Anything else on the -- so that part at
4  the top, is that the --
5      A.   That's the black seal --
6      Q.   -- the clamp or the seal?
7      A.   Yes.  Yes.
8      Q.   Okay.  And is there any other -- anything else
9  about the test kit that you remember?
10     A.   The scoop is within --
11         (Court reporter requested clarification.)
12         THE WITNESS:  The scoop.
13 BY MR. GREENAMYRE:
14     Q.   Is within the seal?
15     A.   I believe so, yes.
16     Q.   And where do you put the powder?  Do you put
17 it inside those, you know, glass --
18     A.   You just pour it in there.
19     Q.   Just pour it in the bottom?
20     A.   Yes.
21     Q.   How much did you put into -- how much of the
22 substance did you put into the pouch?
23     A.   I can't remember, but I -- sometimes grabbing
24 that small -- I mean, small portion of it with that
25 scoop is usually not enough.  So I don't remember how

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 23 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 89

1 many times I placed it in -- I mean, how many scoops I
2 placed in there.
3      Q.   You put multiple scoops in there?
4      A.   Yeah.  You can say maybe two or more, but it
5 wasn't one.
6      Q.   Okay.  And it would be -- I mean, can you
7 estimate in term of grams how many grams you would have
8 put in there?
9      A.   No.  I mean, I (witness makes sound) don't
10 know.
11      Q.   Okay.  More than a gram?
12      A.   I mean, say .1 grams.  I'm not --
13          (Court reporter requested clarification.)
14          THE WITNESS:  I'm saying it's possibly maybe
15 .1 grams.  I'm just not exactly sure of the amount.
16 BY MR. GREENAMYRE:
17      Q.   Okay.  Less than a gram?
18      A.   Perhaps.
19      Q.   But maybe more than a gram?
20      A.   Yeah.
21      Q.   Okay.  Can you draw on the pouch how much
22 powder you put in, like how high --
23          (Brief telephone interruption.)
24          THE WITNESS:  Sorry.  This phone has a mind of
25 its own.  Go ahead.

Page 90

1 BY MR. GREENAMYRE:
2      Q.   Can you draw on that pouch approximately how
3 far you filled it up with the powder?
4      A.   Filled it up?
5      Q.   Yeah.
6      A.   You don't fill it up.
7      Q.   Right.  But I'm saying, you know, was it just,
8 you know, to here (indicating) or was it up to here
9 (indicating).  How far did it go up --
10      A.   Once you drop it in, I mean, that would be
11 significant a lot if it would be up to here
12 (indicating).
13      Q.   Uh-huh.
14      A.   But it was just a small amount that you just
15 place it in --
16      Q.   Okay.
17      A.   -- and it falls in between.
18      Q.   Okay.  And then what -- once you had the
19 substance in there, what do you do next?  You said you
20 crush the glass parts?
21      A.   Right.
22      Q.   How do you do that?
23      A.   Just crush it (indicating).
24      Q.   So you just -- you know.  You have -- I guess
25 there are three of them; is that right?

Page 91

1      A.   Right.  And you just crush them --
2      Q.   You crush them all together?
3      A.   Yes.
4      Q.   All three at approximately the same time?
5      A.   Yeah.  I mean, just -- yeah.  You could say
6 that.
7      Q.   And then what -- what did the -- what happened
8 next that let you know that it was positive for cocaine?
9      A.   Waited until the color substance shows that
10 it's positive.  And the color was -- was dark enough for
11 it to make it be positive of that substance that
12 you take -- you tested, which was cocaine.
13      Q.   So you're saying that at some point it changed
14 colors?
15      A.   Yes.
16      Q.   What color did it change to?
17      A.   Like a bluish-purple color it changed to.
18      Q.   And this is the -- I take it that the -- is
19 there some kind of liquid at some point in --
20      A.   Yes.
21      Q.   -- in this pouch?
22      A.   Yes.
23      Q.   Is that contained in those glass pieces?
24      A.   I believe so, yes.
25      Q.   And you're saying that at some point the

Page 92

1 liquid turned bluish purple?
2      A.   Yeah.  A bluish-purple color.
3      Q.   Was it like a -- you know, once you shook it
4 up, was it essentially one color, it was just bluish
5 purple, kind of like a -- I don't know -- whatever you
6 want to call that, like a fuchsia or something like
7 that?
8      A.   Yeah.  Dark enough for it to be positive for
9 cocaine.
10      Q.   Okay.  When you say it was "dark enough for it
11 to be positive for cocaine", what did you mean by that?
12      A.   I mean the color, the color of the drug -- I
13 mean, that they have placed, I believe if it's darker
14 than pink, then it's positive.  And it was more purplish
15 in color.  So it was darker than that negative color.
16      Q.   Okay.  So if --
17      A.   If it was -- if it was exactly that color of
18 negative, it will be negative.  But it was not that
19 color, which, if I'm not mistaken, is pink in that drug
20 kit.
21      Q.   Okay.  So your understanding is that if it
22 just showed pink, that would be a negative?
23      A.   Yes.  According to that, yeah.
24      Q.   And if it showed purple or bluish -- bluish
25 pink --

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 24 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

Page 93

1      A.   A darker color than the bright pink, yes, it
2  would be positive.
3      Q.   So a darker pink, it was going to be positive?
4      A.   Yes.
5      Q.   Did you compare the -- did you have anything
6  to compare the color to -- how were you determining
7  whether this is a bright pink or a dark pink?
8      A.   There is a color stuff that's on kit itself.
9  I didn't remember exactly where, but there's usually a
10 place around this area (indicating), somewhere like
11 that.
12     Q.   Okay.  So you -- you're saying that there are
13 different colors you'll see on the packaging itself?
14     A.   Yeah.
15     Q.   So there will be a pink and then a, you know,
16 maybe purplish?
17     A.   Right.  Bluish color.
18     Q.   Bluish purplish?
19     A.   Yes.
20     Q.   And if it's pink, that means negative?
21     A.   Yes.
22     Q.   And if it's purple, that means it's --
23     A.   Darker than the --
24     (Court reporter requested clarification.)
25        THE WITNESS:  I'm sorry.  Darker than that

Page 94

1  pinkish color, it is positive.
2  BY MR. GREENAMYRE:
3      Q.   In your warrant application and the police
4  report, you refer to this as just a positive test;
5  right?
6      A.   Yes.
7      Q.   Then I understand that Miss Goldring made a
8  complaint to OPS.  OPS did an investigation into this.
9  Does that sound right so far?
10     A.   Yes.
11     Q.   And at that time you gave a statement in which
12 you said it was a faint positive?
13     A.   Faint positive, it's darker than the color
14 pink, that's, yeah, basically it.  Sometimes it's faint.
15 Sometimes it could be real dark, dark, dark color.
16 Depends on the quality any of the substance, maybe.
17     Q.   Okay.  So your testimony is that it was a
18 faint positive?  It wasn't a strong positive?
19     A.   It was just positive because of the color.  It
20 could be a -- you understand?
21     Q.   What I'm trying to understand is, you know, in
22 your police report and in the warrant application, you
23 said it was positive and to OPS you said it was a faint
24 positive.  Do you still agree that it was a faint
25 positive?

Page 95

1      A.   Yeah, the color was.  Yes.
2      Q.   But still positive?
3      A.   Yes.
4      Q.   Have you ever heard the phrase "presumptive
5  testing"?
6      A.   Presumptive --
7      Q.   "Presumptive testing".
8      A.   No.
9      Q.   Do you know what that phrase means in the
10 context of a drug test kit?
11     A.   No.
12     Q.   Have you ever received any training on how to
13 use the NARK drug test kit besides, you know, following
14 the instructions on the packaging?
15     A.   No.  No training whatsoever.
16     Q.   Okay.  What do you understand the rate of
17 false positives on drug test kits to be?
18     A.   The rate?
19     Q.   Yeah.
20     A.   I do not know.
21     Q.   Do you know what I mean when I say "false
22 positives?
23     A.   Yes.
24     Q.   Like what happened in this case?
25     A.   Yes.

Page 96

1      Q.   Supposedly.  But you don't know how often that
2  happens?
3      A.   No.
4      Q.   So thinking back to October 2015, under what
5  circumstances would there be a field test that showed a
6  positive result for a substance, but no probable cause
7  to believe that the substance was a narcotic?
8      A.   I don't understand.  Ask me the question
9  again, please.
10     Q.   Are there any circumstances, based on your
11 training and experience when you were an officer in
12 October of 2015, where there would be NARK field test
13 showing a positive result for a substance, but
14 nevertheless no probable cause to believe that the
15 substance was a narcotic?
16     A.   Are you asking me how many times that happened
17 or --
18     Q.   I'm asking, are you aware of any
19 circumstances, or any circumstances that you can think
20 of, under which you get a positive result for a drug
21 test, but there's still, you know, as an objectively
22 reasonable police officer, that there is insufficient
23 probable cause to believe that that substance is
24 actually a narcotic?
25     A.   Again, for example -- can I say an example?

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 97

1      Q.   Examples are perfect.  That's --
2      A.   Okay.  Someone makes an arrest, not a drug
3  arrest, but just a regular arrest, and finds substance,
4  what seems to be a drug substance, they test that drug
5  substance and it turns out to be positive, then yes,
6  I've heard that -- of those circumstances.  Is that an
7  example that you're --
8      Q.   No.  I'm saying are there any circumstances
9  where you do a field test, the field test comes back
10  positive, but you're still not going to make an arrest
11  because you don't believe that the substance is actually
12  a narcotic?
13      A.   No, not that I -- to my knowledge, no.
14      Q.   Okay.  For example, let's say you have a cup
15  of tea, loose-leaf tea, you brew the tea, and then you
16  test the tea leaves for marijuana.  Right?
17      A.   Uh-huh.
18      Q.   If that shows positive -- if the field test
19  kit shows positive for marijuana on the tea leaves, do
20  you have probable cause to believe that the tea is
21  marijuana?
22      A.   Yes.  Because of the drug kit that shows that
23  it is a actual drug, positive.
24      Q.   Another example.  You go into someone's
25  kitchen, you go into their cupboard, you find their

Page 98

1  baking soda.  You test the -- put a little bit of the
2  baking soda into a NARK field test kit for cocaine and
3  it shows positive for cocaine.  Do you have probable
4  cause to believe that the baking soda container contains
5  cocaine?
6      A.   If you got a search warrant to go in --
7          (Court reporter requested clarification.)
8          THE WITNESS:  If you've got a search warrant
9      to go in that cubby to -- depending on the search
10     warrant, what we're looking for and we're looking
11     for drug items, and you believe that the drug item
12     is hidden in a -- in that cubby, we'll drug --
13     we'll test it.  I mean, I've heard of that.
14  BY MR. GREENAMYRE:
15     Q.   Let's take a different circumstance.  You
16  don't have probable cause to believe anyone is
17  associated with the drug trade or anything like that,
18  but nevertheless, something has drawn your suspicion and
19  you ask for consent to search someone's house.  This
20  happens from time to time?
21     A.   Not with my experience.
22     Q.   Okay.  But you would admit that, you know,
23  sometimes officers approach --
24     A.   If we --
25          (Court reporter requested clarification.)

Page 99

1          THE WITNESS:  If we get consent, usually that
2      is the case.
3  BY MR. GREENAMYRE:
4      Q.   And I think she's just interjecting because
5  you know where I'm going, but wait until I finish, just
6  for the record.
7      A.   Okay.
8      Q.   So officer gets consent to go inside a house?
9      A.   Yes.
10     Q.   And search the house?
11     A.   Yes.
12     Q.   Officer goes inside the cupboard, finds baking
13  soda, puts a little baking soda into the NARK test kit,
14  and, lo and behold, it comes back positive for cocaine.
15  Based on your understanding as of October of 2015, do
16  you have probable cause to arrest that person for
17  possession of cocaine?
18     A.   Make sure we had consent to go in that cubby.
19     Q.   Correct.  Assuming that the search is good.
20     A.   Yeah.  If the search is good, yes.
21     Q.   You have probable cause?
22     A.   Yes.
23     Q.   Let's say you go -- the same issue.  Let's say
24  that there is consent to go into a store and search.
25  You go into a Richard's Variety Store and you see their

Page 100

1  stress balls.  You think, Oh, that looks suspicious.
2          You open up their stress ball, you take a
3  little bit of the powder from that stress ball, put it
4  in a NARK test kit, it shows up positive for cocaine.
5  Do you think that there is, on those facts, probable
6  cause to arrest anyone for possession of cocaine or sale
7  of cocaine?
8      A.   If we believe that there was -- I mean, that's
9  a -- if we believe that it was cocaine in there, yes.
10  If we find the cocaine, if it looks suspicious, we've
11  got some tip that they're selling drugs out of that
12  Richard's Variety Store, yes.  If --
13     Q.   All right.  Let's -- I understand what you're
14  saying now, but let's stay with the facts that there is
15  no suspicion of the store itself.
16     A.   Okay.
17     Q.   But law enforcement still wants to go in,
18  search, see what's going on.  The store owner has no
19  problem.  They give their consent.
20     A.   Okay.
21     Q.   And then you see this stress ball, which, you
22  know, maybe looks suspicious?
23     A.   Okay.
24     Q.   At that point, do you -- you open it up, test
25  it using the field test kit, do you have probable cause

Case 1:18-cv-01191-WMR Document 54 Filed 07/17/19 Page 26 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 101

1  for arrest for cocaine?
2      A.  If it's illegal drugs, yes.
3      Q.  According to the test kit?
4      A.  Yes.  Illegal drugs, yes.
5      Q.  How many times have you used the NARK field
6  test kit for cocaine?
7      A.  For cocaine?
8      Q.  Yeah.
9      A.  Powder cocaine or crack --
10     Q.  Powder cocaine.
11     A.  -- or a combination?  Just powder cocaine?
12     Q.  (Nods head.)
13     A.  Several times.
14     Q.  Are we talking --
15     A.  I don't know the exact.
16     Q.  More than 50, less than 50?
17     A.  I don't know about more than 50.  I'd say less
18  than 50.
19     Q.  You said there was maybe a difference between
20  powder cocaine and crack cocaine.  Do you use a
21  different NARK --
22     A.  No.
23     Q.  -- test kit?
24     A.  Same -- same kit.
25     Q.  And you've used that test kit, you know, less

Page 102

1  than 50 times?
2      A.  It's hard to say, but we can approximate.
3  Less than 50, we can approximate.
4      Q.  More than ten times for sure?
5      A.  Yeah.  More than ten times.
6          (Court reporter requested break.)
7          MS. JONES:  Yeah.  We're going to need to call
8  Officer Restrepo to let him know that we're still
9  going.
10         MR. GREENAMYRE:  Yeah.  We can take a -- let
11  me just -- I'm about at a stopping point.  I think
12  you've already answered these questions.
13         MS. JONES:  I'm sure he has.
14         MR. GREENAMYRE:  Thank you, Valorri.  All
15  right.  Let's stop.
16         (Brief recess.)
17  BY MR. GREENAMYRE:
18     Q.  We're coming back from a brief break.  For the
19  record, did you review any documents during this break?
20     A.  No.
21     Q.  Did you discuss the facts of this case or your
22  testimony with your attorney during this break?
23     A.  I mean, no.
24     Q.  Okay.  So when we left off, we were talking
25  you administering the NARK test kit; right?

Page 103

1      A.  (Witness nods head.)
2      Q.  And at that time you described how you put the
3  suspected cocaine into the pouch, you crushed all three
4  glass cylinders at the same time, you shook it; is that
5  right?
6      A.  Yes.
7      Q.  And then it came back darker than bright pink
8  which was a faint positive; right?
9      A.  Yes.
10     Q.  Is that what you did both times you conducted
11  the field test of the suspected cocaine?
12     A.  Yes.
13     Q.  And both times the result was the same?
14     A.  Yes.
15     Q.  Tell me physically where you are when you are
16  conducting this testing.
17     A.  I was sitting in the precinct.  It's called
18  the -- it's a room where computers are.  There is a
19  table, vending machine, TV, a chair -- bench, I should
20  say, where we place perpetrators handcuffed to the
21  bench.  And I was sitting facing the -- the vending
22  machine.  I remember that.  And that's where I did the
23  drug kit testing, on that table.
24     Q.  So the precinct kind of has two big rooms;
25  right?  You walk in --

Page 104

1      A.  Two big --
2      Q.  -- and you get the two big rooms at the
3  precinct?
4      A.  Yes.  It's, I mean, one big room.
5      Q.  So there is -- let me back up a little bit.
6  So you walk into the precinct, you get to the front desk
7  and you go to left and you get to the room with the
8  computers and TVs --
9      A.  Yeah.
10     Q.  -- that you were talking about; right?
11     A.  Yes.
12     Q.  And if you go to the right, you get to the
13  room where, you know, there is the -- y'all do roll call
14  and stuff like that; is that correct?
15     A.  Oh, that's -- I wouldn't consider that as a
16  room, but that's where they do conduct roll call, yes.
17     Q.  Okay.  Is that just kind of like an open area?
18     A.  Yeah.  It's an open area, yeah.
19     Q.  And there's lockers and supervisor's office
20  kind of --
21     A.  Around it, yes.
22     Q.  Okay.  Got you.  So this is the big, like,
23  what you would call room in the precinct?
24     A.  Yes.
25     Q.  So you have in that room -- you're kind of

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 105

1   you -- you have a bench where Miss Goldring and Mr. Ford
2   are handcuffed?
3       A.   Yes.  I don't remember if both of them was
4   there.  But yes.
5       Q.   Okay.  But that's generally what would happen?
6       A.   Yes.
7       Q.   And you're doing the field test the first time
8   in that room?
9       A.   Yes.
10      Q.   And do you have like a desk or a table or
11  something that you're doing it at?
12      A.   Yes.  A table.  It was a table this size
13  (indicating), somewhat.
14      Q.   And it's just in the middle of the room?
15      A.   Yes.
16      Q.   And you could see Miss Goldring and Mr. Ford
17  if they were seated at the bench from where you're doing
18  the drug testing kit?
19      A.   Yes.
20      Q.   Because it's just the same room, it's right
21  there?
22      A.   (Witness nods head.)
23      Q.   Right?
24      A.   Yes, it is.
25      Q.   Where is Officer Restrepo during this time

Page 106

1   while you're doing the field test kit?  Is he in the
2   room with you?
3       A.   No.  He is in the office doing the warrants.
4       Q.   Okay.  He's writing out the narrative for the
5   warrants?
6       A.   Yes.
7       Q.   But he didn't actually sign the warrants, did
8   he?  That was you?
9       A.   If I'm not mistaken, I believe he did.  I
10  don't remember, to be honest with you.  I would have to
11  see the one that's up, because he was -- I know for sure
12  he was the one who was conducting the warrant, doing the
13  process, filling out the name and the demographic of the
14  perpetrators and he was the one who spoke to the judge.
15  And I did the report and doing the drug testing.
16      Q.   Okay.  So you're saying he was the one that
17  went to the judge?
18      A.   Yeah.  You know, it was a video cam.
19      Q.   Right.
20      A.   Yeah.
21      Q.   That's what I mean.  He was the one who talked
22  to the judge?
23      A.   Uh-huh.
24      Q.   Yes?
25      A.   Yes.

Page 107

1       Q.   And he -- you didn't talk to the judge?
2       A.   No.  Not that I remember, no.
3       Q.   And the -- Officer Restrepo didn't physically
4   go before a judge, but had a phone call --
5       A.   Video cam, yes.
6       Q.   Video --
7       A.   You call the judge and then the judge will
8   call the video cam that's programmed in the computer.
9       Q.   Okay.  Who else was in that room that we were
10  just talking about besides Miss Goldring, Mr. Ford and
11  you while you're doing the drug testing?
12      A.   I don't remember.  I know it was people there,
13  but I don't remember exactly who there was at the time.
14      Q.   People come and go?
15      A.   Yes.
16      Q.   Are there any video cameras in that room?
17      A.   You know what?  I -- that's a good question.
18  To be honest with you, I don't know.
19      Q.   Do you know whether there were video cameras
20  as of October 2015?
21      A.   I do not know, to be honest with you.  I know
22  there's cameras outside the precinct.
23      Q.   Did you ever ask anyone for help or a second
24  opinion in conducting the field drug test of the
25  substance in the stress ball?

Page 108

1       A.   No.  Not that I remember, no.
2       Q.   How long did you shake the pouch when you were
3   conducting the field test at the CNN precinct?
4       A.   I don't know how long I shake it.  I usually
5   just shake it, like, once, you know, three.  I don't
6   know the exact, but it's not real long where you
7   continue to shake, continue to shake, continue to shake,
8   but just a quick shake and that's it.
9       Q.   A few seconds?
10      A.   Yeah.  For a few seconds, yes.
11      Q.   Not more than 30 seconds?
12      A.   No.
13      Q.   Did you ever hear another officer say
14  something to the effect of, "Give it up, buddy", while
15  you were conducting the field drug test?
16      A.   No.
17      Q.   So no -- no officer said anything like that or
18  any other statements like that that would indicate that
19  it wasn't actually a positive test?
20      A.   No.  People were talking to each other over
21  me.  I don't know who was talking to who.  I was focused
22  on doing what I needed to do.
23      Q.   Right.  But nobody ever said, "That's a
24  negative test"?
25      A.   No.

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 109

1    Q.   So when this was investigated by OPS, do you
2  remember what the outcome of that investigation was?
3    A.   I believe it was nothing was found,
4  unsustainable.  Nothing was found, if I'm not mistaken.
5    Q.   So what -- I guess there are different -- a
6  series of different outcomes that an OPS investigation
7  can have.  You can be exonerated; right?
8    A.   Uh-huh.
9    Q.   Yes?
10    A.   Yes.
11    Q.   A complaint can be sustained?
12    A.   Yes.
13    Q.   Not sustained?
14    A.   Yes.
15    Q.   Or unfounded?
16    A.   Yes.
17    Q.   Do you know what the complaint was in this
18  instance?
19    A.   No, I do not.  I do not remember receiving
20  anything, so I can't -- I don't remember.
21        (Plaintiff's Exhibit 6 was marked.)
22  BY MR. GREENAMYRE:
23    Q.   So I'm handing you what's been marked as
24  Plaintiff's Exhibit 6, which appears to be a memorandum
25  from Lieutenant -- how do you pronounce that last name?

Page 110

1  Zenelaj?
2    A.   I believe so.  That's how I would like --
3  that's how I would pronounce it, Zenelaj.
4    Q.   All right.  Plaintiff's Exhibit 6 appears to
5  be a memorandum from Lieutenant Zenelaj to Major Durant
6  about the OPS investigation that we were just talking
7  about.  Does that appear correct to you?
8    A.   Yes.
9    Q.   And we see under Roman numeral I,
10  Investigative Disposition, where it says Not Sustained?
11    A.   Yes.
12    Q.   Okay.  What does "not sustained" mean?
13    A.   Basically no violation occurred.
14    Q.   That's your understanding of it?
15    A.   Yes.
16    Q.   What is the difference then between -- you
17  know, there are four different outcomes, like we just
18  said.
19    A.   Uh-huh.
20    Q.   What is the difference between "not
21  sustained", "exonerated" and "unfounded"?
22    A.   I believe "unfounded" was nothing -- I mean, I
23  don't know the terms.  I'm not -- I don't work in that
24  section, but sometimes I find the terms confusing at
25  times --

Page 111

1    Q.   Uh-huh.
2    A.   -- but Unfounded, I believe, is just not
3  founded, nothing -- no evidence or no -- no information
4  that was given was founded to continue the
5  investigation.
6    Q.   Okay.  And then what does "exonerated" mean?
7    A.   "Exonerated", I guess after investigation, the
8  investigation was occurred and then just the officer was
9  basically cleared of the investigation against him.
10    Q.   It proved that the officer, you know, didn't
11  do anything wrong?
12    A.   Right.
13    Q.   Is what "exonerated" means?
14    A.   Yes.
15    Q.   And then "not sustained", correct me if I'm
16  wrong, but my understanding of "not sustained" is, you
17  know, Person A says that this happened and Person B says
18  that this happened.  We don't know who to believe.  So
19  we can't sustain the allegation against the officer.
20    A.   Basically, it states here:  The investigator
21  did not produce sufficient factual evidence to indicate
22  that Officer Henry did not take -- did not take the
23  appropriate action required during the arrest of Julius
24  Goldring.
25        So, I guess, what you said, yeah.

Page 112

1    Q.   Okay.  So basically if you believe -- you
2  know, if the person who's deciding, right, believes what
3  Miss Julius Goldring said happened, then you would have
4  done wrong, but if they believe what you said, then you
5  wouldn't have done anything wrong?  Is that more or less
6  it?
7    A.   I think that they have to have evidence of
8  that.  And if it states -- someone states in the
9  evidence, like if we did something wrong, admitted to
10  doing something wrong, then yes.
11    Q.   Okay.  So in order to, you know, have an
12  allegation be sustained, there needs to be, you know,
13  video proof or some kind of admission from the officer?
14    A.   Right.  Statement, yes.
15    Q.   All right.  Understood.
16    A.   Or a witness.
17    Q.   Independent witnesses?
18    A.   Right.
19    Q.   Right.  But a person just saying something
20  happened alone is not enough?
21    A.   No.  That happens all the time.
22    Q.   Right.  Did you ever undergo any voice stress
23  analysis in conjunction with this investigation?
24    A.   No.  I do not believe I did, no.
25    Q.   You've -- have you ever undergone a polygraph

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 113

1 or a voice stress analysis?

2    A.   Yes.

3    Q.   Under what circumstances have you done that

4 before?

5    A.   For pre-employment with either Miccosuke PD

6 and with Atlanta PD.  And an investigation of improperly

7 handling property that I was investigated for, I did

8 that as well.

9    Q.   Okay.  Do you know why there was no voice

10 stress analysis or polygraph used in this instance?

11    A.   No.  I don't know why.

12    Q.   Did you ask at any point that you be put under

13 voice stress analysis or a polygraph in connection with

14 this investigation?

15    A.   No.

16       (Plaintiff's Exhibit 7 was marked.)

17 BY MR. GREENAMYRE:

18    Q.   I'm handing you what has been marked as

19 Plaintiff's 7.  This appears to be a correspondence to

20 Lieutenant Zenelaj about -- that contains the

21 investigative summary about this OPS complaint.  Does

22 that sound right to you?

23    A.   Yes.

24    Q.   When you arrested Miss Goldring, did you

25 understand that she was a transgender individual?

Page 114

1    A.   No, I did not.

2    Q.   Was she -- so the name on her license was

3 what?

4    A.   I believe Julius.  I can't remember.

5    Q.   Julius Goldring; right?

6    A.   Right.

7    Q.   That's her legal name.

8    A.   Right.

9    Q.   Was she dressed as a male at the time that you

10 arrested her?

11    A.   I don't remember, to be honest with you.

12    Q.   You don't know whether she was wearing a dress

13 or not?

14    A.   Yeah.  I don't remember.  I'm sorry, but I

15 don't.

16    Q.   Tell me about what texture you would expect

17 powder cocaine to be.

18    A.   What texture?

19    Q.   Yeah.

20    A.   It's a powder substance.  That's basically it.

21 I mean, a powder substance.

22    Q.   So can you compare it to any, you know, common

23 powders that the jury or, you know, other people might

24 be familiar with who aren't familiar with cocaine

25 itself?

Page 115

1    A.   You're asking me if I could tell the

2 difference between --

3    Q.   I'm asking you if you could tell me what is a

4 substance that's similar to cocaine --

5    A.   Oh.

6    Q.   -- in terms of the texture.

7    A.   Oh, okay.

8    Q.   That people would be familiar with.

9    A.   See, I wouldn't know the texture of the

10 feeling it; but seeing, visual, making soda.  What's

11 that powder called that people use for headaches?

12    Q.   Goody's Powder?

13    A.   Yes.  Goody's Powder somewhat looks similar to

14 it.

15    Q.   Baby powder?

16    A.   Baby powder is kind of more thick, you know,

17 depending on what type of baby powder, because if you

18 get the brand baby powder, it's more thicker than versus

19 the Dollar Store baby powder.

20    Q.   So Dollar Store baby powder might be closer to

21 cocaine than --

22    A.   I would say that.  It's less -- not thick as

23 baby powder, regular baby powder.  I guess, less the

24 fragrance.  I don't know.

25    Q.   On any of the drug cases that you have been

Page 116

1 involved with, have you ever seen powder cocaine stored

2 inside of a stress ball?

3    A.   No, not that I can remember.

4    Q.   Have you discussed with any other officers in

5 Atlanta Police Department instances where powder cocaine

6 was stored in a stress ball?

7    A.   Not that I can remember.

8    Q.   What steps did you take, if any, to ensure

9 that the substance inside the stress ball wasn't

10 contaminated with anything from the time that you cut it

11 open on the hood or the trunk of the police car you were

12 driving until you turned it in to evidence at the annex

13 building?

14    A.   Placed it in the evidence bag, sealed it with

15 like a Ziploc.  And then we transport it to the CNN

16 Center, open it and take a little scoop of it to test

17 it, sealed it back, placed it in another evidence bag

18 where you seal it and you write the facts of it, and

19 place a bar code property sticker on it and then turn it

20 in to property for further analysis.

21    Q.   All of the substance inside of the balloon ball

22 would have been delivered to the GBI for analysis except

23 for the amount that you put inside the two test kits;

24 correct?

25    A.   Yes.

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 117

1    Q.   But nothing else should have happened with the
2  substance besides being put into the two test kits, once
3  at the CNN Center and once at the annex, before the
4  entirety of it was sent to the GBI?
5    A.   Right.
6    Q.   So one way we could figure out how much
7  substance you put into the test kit for measurement --
8  or, you know, for evaluation, was to compare the 60-gram
9  figure that we had at the warrant to whatever weight the
10 GBI came up with?
11   A.   Yes.
12        (Plaintiff's Exhibit 8 was marked.)
13 BY MR. GREENAMYRE:
14   Q.   Okay.  I'm handing you what has been marked as
15 Plaintiff's Exhibit 8.  It's a document in the Superior
16 Court of Fulton County.  It says Statement of Witness.
17 This is the document we were talking about earlier that
18 Officer Restrepo was writing and preparing while you
19 were doing the field drug test?
20   A.   This is the statement that I believe the ADA
21 in the complaint room prepared.
22   Q.   So this is something that the ADA prepared
23 after talking with you and Officer Restrepo?
24   A.   After -- yes.  After the signature has been
25 authorized with the warrant by the judge.

Page 118

1        (Plaintiff's Exhibit 9 was marked.)
2  BY MR. GREENAMYRE:
3    Q.   I'm handing you what has been marked as
4  Exhibit 9, which is a two-page document, two different
5  affidavits for arrest for Julius Goldring that you
6  signed; is that correct?
7    A.   Yeah.
8    Q.   And this is what you were talking about
9  earlier that Officer Restrepo --
10   A.   Was preparing.  Yes.  That he was preparing.
11 I'm sorry.
12   Q.   Okay.  Did you write your signature on that or
13 did Restrepo write the signature for you?
14   A.   I don't remember, to be honest with you, but I
15 believe I did it or I gave him permission to do it.  I
16 don't remember.
17   Q.   But you didn't talk to the judge --
18   A.   No.
19   Q.   -- and you didn't write that?
20   A.   No.  The narrative does --
21   Q.   Go ahead.  I don't want to interrupt you.
22   A.   No.  I'm saying sometimes we prepare the
23 narrative on the report and you can reuse it for the
24 warrant or vice versa.  And this is the report right
25 here.

Page 119

1    Q.   And going back to Exhibit 9 for a second, on
2  the second page where we have an arrest affidavit for
3  trafficking in cocaine, you would agree with me that
4  nowhere in this arrest affidavit does it say that there
5  was a faint positive?
6    A.   No.
7    Q.   You would agree that that doesn't exist;
8  right?
9    A.   Yeah.  Let me double-check.  No.  It doesn't
10 state that.
11   Q.   Okay.
12   A.   It just says positive.
13   Q.   Turning to -- I don't want to cut you off.
14   A.   No.
15   Q.   So if you've got more you want to say about
16 that, let me know.
17   A.   No.
18        (Plaintiff's Exhibit 10 was marked.)
19 BY MR. GREENAMYRE:
20   Q.   So turning to what you've been handed marked
21 as Plaintiff's Exhibit 10, looks to be page two and
22 three of a police report having to do with this
23 incident; is that right?
24   A.   Yes.
25   Q.   And did you write this police report?

Page 120

1    A.   Yes.
2    Q.   And would you agree with me that nowhere in
3  this police report is there any indication that there
4  was a positive -- a faint positive?
5    A.   Yes.
6    Q.   Okay.  You will agree with that?
7    A.   Yes, I agree.
8        (Plaintiff's Exhibit 11 was marked.)
9  BY MR. GREENAMYRE:
10   Q.   I'm handing you what has been marked as
11 Plaintiff's Exhibit 11 which is an indictment and then
12 final disposition in Julius Goldring's criminal case.
13 Is that what this appears to be to you?
14   A.   Yes.
15   Q.   And do you see the stamp on the bottom that
16 says:  The indictment upon motion of Assistant District
17 Attorney, and then some name, ADA Johnson, and for
18 satisfactory reasons is hereby nol-prossed in open court
19 this 21st day of March 2016?
20   A.   Yes, I see that.
21   Q.   Okay.  And you understand that that's how Miss
22 Goldring's criminal charges were disposed of?
23   A.   Now I know.
24   Q.   You didn't know before today?
25   A.   No.  I heard word by mouth, I didn't see it on

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 121

1   paper.
2         (Court reporter requested clarification.)
3         THE WITNESS:  On paper, the actual form.
4   BY MR. GREENAMYRE:
5      Q.   How did you hear word by mouth that Miss
6   Goldring's criminal charges were dismissed?
7      A.   When this lawsuit came up.
8      Q.   Okay.  But you didn't know before the lawsuit?
9      A.   No.
10        (Plaintiff's Exhibit 12 was marked.)
11  BY MR. GREENAMYRE:
12     Q.   I'm handing you what has been marked as
13  Exhibit 12, which is an employee statement made by you
14  during the OPS investigation.  Do you recognize this
15  statement as that?
16     A.   Yes.
17     Q.   Were you represented at that time by a Mike
18  Pulliam?
19     A.   Yes.
20     Q.   Is he an attorney with the police union?
21     A.   Yes.
22     Q.   And are the statements that are attributed to
23  you in this statement accurate to the best of your
24  knowledge as you read through them today?  And take your
25  time.

Page 122

1      A.   Yes.
2      Q.   So everything in that is, you know, true and
3   accurate to what you told the investigators when you
4   were interviewed?
5      A.   Yes.
6      Q.   And one follow-up question to one of the
7   questions that was in the interview is this:  If you
8   were confident that the field drug test was positive the
9   first time, why did you test it a second time?
10     A.   To confirm the results.  That's what I usually
11  do.
12     Q.   So you're saying whenever you do a field drug
13  test, you want to do the test twice?
14     A.   Yes.
15     Q.   Using the same test kit -- same type of test
16  kit?
17     A.   Yes.
18        MR. GREENAMYRE:  Understood.
19        (Plaintiff's Exhibit 13 was marked.)
20  BY MR. GREENAMYRE:
21     Q.   You've been handed what has been marked as
22  Plaintiff's Exhibit 13.  It says Register of Actions at
23  the top.  Do you see that?
24     A.   Yes.
25     Q.   And this appears to be the docket in the

Page 123

1   criminal case against Miss Goldring; is that correct?
2      A.   Yes.  Julius Goldring.
3      Q.   And we see that on March 31st, 2016, we have a
4   disposition in which the two charges of trafficking
5   cocaine and pedestrian in a roadway were nol-prossed.
6   Do you see that?
7      A.   Yes, I see that.
8      Q.   And that's consistent with what your
9   understanding is today about what happened to those
10  criminal charges?
11     A.   Yes.
12     Q.   Did you have any conversations with any
13  prosecutor or other law enforcement officer about the
14  dismissal of Miss Goldring's criminal charges?
15     A.   I don't think so.  I don't remember a
16  conversation.
17        (Plaintiff's Exhibit 14 was marked.)
18  BY MR. GREENAMYRE:
19     Q.   You are being handed what has been marked as
20  Plaintiff's Exhibit 14, Official Report from the Georgia
21  Bureau of Investigation or the GBI associated with your
22  investigation into Miss Goldring and the substance in
23  her stress ball; is that correct?
24     A.   Yes.
25     Q.   And you see under the Results and Conclusions

Page 124

1   where it says:  No controlled substances confirmed in
2   the sample?
3      A.   "Test as defined" -- yes, I see that.
4      Q.   And that's consistent with what your
5   understanding is of the GBI's test results?
6      A.   Yes.
7        (Plaintiff's Exhibit 15 was marked.)
8   BY MR. GREENAMYRE:
9      Q.   I'm handing you what's been marked as
10  Exhibit 15.  Can you take a look at this and tell me
11  what I'm looking at?
12     A.   This is the property item that we fill out any
13  time we turned in property or evidence to the annex
14  building, and which we print out the bar code that's
15  associated with the item that we fill out here.
16     Q.   So we have here, looks like, four pages and
17  four different items that would have been logged into
18  evidence; is that correct?
19     A.   Yes.
20     Q.   We have first a gray-and-black flower Protocol
21  purse; right?
22     A.   Yes.
23     Q.   And then a pink umbrella with green frogs
24  logo?
25     A.   Yes.

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 32 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 125

1    Q.   And then a white Samsung.  Presumably that's a
2    cell phone?
3    A.   Yes.
4    Q.   And then a cocaine contained in a "ballon"
5    ball.
6    A.   Balloon ball, yes.
7    Q.   Yes.  Okay.  And based on those items being
8    logged in to evidence, we should be able to track where
9    they are, where they've gone, et cetera?
10   A.   Yes.
11   Q.   Until they are finally disposed of?
12   A.   Yes.
13   Q.   By either being given back to the person?
14   A.   Yes.
15   Q.   Or being destroyed?
16   A.   Yes.
17        (Plaintiff's Exhibit 16 was marked.)
18   BY MR. GREENAMYRE:
19   Q.   I want to hand you what has been marked as
20   Plaintiff's 16.  This appears to be a short summary of
21   OPS investigations in which you were involved between
22   2015 and 2017.  Does that appear correct?
23   A.   Yes.
24   Q.   Okay.  Let's go through each of those
25   relatively briefly.  The first one says vehicle pursuit,

Page 126

1    resulted in some suspension?
2    A.   Yes.  One-day suspension.
3    Q.   One-day suspension?
4    A.   Yes.
5    Q.   Tell me about what happened with that vehicle
6    pursuit.
7    A.   We observed a vehicle going the -- first of
8    all, speeding, taking red lights and a stop sign and
9    turned in to a -- the exit ramp of a highway and it's
10   going the wrong way, entering the exit ramp, going the
11   wrong way on a one-way highway of I-75, I believe,
12   northbound.
13        We tried to warn the driver that's going the
14   wrong way, possible tourist, possibly don't know where
15   he's going.  And then he -- other vehicles was trying to
16   veer off, veer away from the vehicle so they won't get
17   hit.
18   Q.   You said "possible tourist"?
19   A.   I'm saying -- we're thinking it's a possible
20   tourist that's lost.
21   Q.   I understand.  So you're saying "tourist", not
22   "terrorist"?
23   A.   Oh, tourist.  Not terrorist.
24   Q.   Go ahead.  Sorry to interrupt.
25   A.   Did I say "terrorist"?  All right.  So we was

Page 127

1    trying to give him warning by sirens and lights, and
2    even the incoming traffic was trying place high beamers
3    and hazard lights to that vehicle.
4        I guess once it realized that it was going on
5    the one way on the wrong way, it turned around and
6    picked up speed and was going towards us and other cars
7    that was parked waiting for the stoplight to change from
8    that exit ramp.  So we had to move away so the vehicle
9    could pass us at a very high rate of speed.
10       And then at that point, I pursued the vehicle
11   and went through Atlantic Station, I believe, parking
12   area.  And the -- the spotlight of the vehicle was
13   broken.  So at that time, it was a vehicle -- I mean a
14   pursuit that was not approved by Atlanta policy and
15   procedure.
16   Q.   What was the reason that it was not approved
17   by policy and procedure?  Just --
18   A.   It stated that it wasn't -- it wasn't a
19   required action, to my understanding, of a -- I was new
20   at the time.
21   Q.   Right.
22   A.   The vehicle was coming at the police and
23   coming at, you know, the incoming traffic at a high
24   speed of rate [sic].  That was, like, to us endangering
25   us and others.  So we had to stop it before they

Page 128

1    continued to endanger the, you know, others.
2    Q.   But policy said that you got to behave
3    differently in those instances, so they gave you a one-
4    day suspension?
5    A.   Yes.
6    Q.   Okay.
7    A.   We did catch him, by the way --
8    Q.   Excellent.
9        (Court reporter requested clarification.)
10       THE WITNESS:  We did catch him later.
11   BY MR. GREENAMYRE:
12   Q.   Citizen complaint, exonerated, no actions
13   taken on February 7th.  Do you remember anything about
14   that?
15   A.   No.  I would have to read about it.  I don't
16   know just right offhand because of the dates.
17   Q.   What about the next one, which says there is
18   an issue with -- it was a sustained complaint resulting
19   in a written reprimand for something to do with
20   recovered property?
21   A.   I believe this is the one where I mentioned
22   earlier about --
23   Q.   Where you --
24   A.   -- property --
25   Q.   -- went under the polygraph?

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 129

1    A.    Yes.  Yes.  The voice stress.
2    Q.    And what -- what happened?
3    A.    What happened --
4    Q.    Yeah.
5    A.    -- to -- with the case --
6    Q.    Yes.
7    A.    -- itself?  What I remember, basically,
8    property was -- was handed to a partner of mine; did not
9    know what happened to that property.  Basically they
10   wanted to find out who was lying and who -- someone had
11   to know about the property.  And basically they found
12   nothing there.
13         I don't know what happened to that particular
14   officer, but with my case, it was a written reprimand.
15   If I'm not mistaken, if this is the one.
16   Q.    Yeah.  So you got a written reprimand at some
17   point for something to do with property.  What did they
18   say that you did wrong in the end?
19   A.    Basically, I guess -- I can't remember
20   exactly, but I believe it was something about not
21   properly handling the property, because it was a -- a
22   bar code that was done because, you know, I did hear
23   from my -- that day -- my partner on that night that
24   that property was given to him.  So I stated it -- I put
25   it on as a bar code that that property was placed and

Page 130

1    put in the annex building.
2    Q.    And it just went missing and disappeared?
3    A.    Yes.
4    Q.    What was the property?
5    A.    Forty dollars.  Basically it --
6          (Court reporter requested clarification.)
7          THE WITNESS:  The property was never turned
8    in.
9    BY MR. GREENAMYRE:
10   Q.    Going on to the second page.  Three more to go
11   through.  There was a vehicle accident that you were
12   involved in?
13   A.    Yeah.  That was with the person, the vehicle
14   pursuit with the -- the spotlight was broken of the
15   patrol vehicle.
16   Q.    Those are from different dates.  One is
17   from -- the chase was from October 21st, 2015, and it
18   looks like this vehicle accident is from February 8th,
19   2016?
20   A.    I don't remember me being in any vehicle
21   accident.
22   Q.    Well, you were exonerated for it, so maybe it
23   didn't happen.
24   A.    Okay.
25   Q.    Next, a citizen complaint from June 2016 that

Page 131

1    was not sustained.  Can you tell me anything about that?
2    A.    (Witness shakes head.)  Don't remember about
3    that either.
4    Q.    Okay.  You weren't interviewed by OPS or
5    anything like that that you can remember?
6    A.    Not that I can remember, no.  I'm sorry.
7    Q.    And then finally we have -- go ahead.
8    A.    I see a written reprimand.
9    Q.    For the last one, yes.
10   A.    Yeah.
11   Q.    Which is related to a citizen complaint in
12   October of 2017.  Tell me about that.
13   A.    I don't remember that one with either.  I'm
14   trying to remember where that came from.
15   Q.    A written reprimand for it appears to be
16   conformance to directives?
17   A.    Yeah.  I don't remember that.
18         MR. GREENAMYRE:  Okay.
19         (Plaintiff's Exhibit 17 was marked.)
20   BY MR. GREENAMYRE:
21   Q.    You've just been handed what has been marked
22   as Plaintiff's Exhibit 17, which appears to be the
23   standard operating procedure in the Atlanta Police
24   Department policy manual for property and evidence
25   control.  Does that appear correct?

Page 132

1    A.    Yes.
2    Q.    Without looking through all of it, does this
3    appear to be the policy in place as of October 2015 for
4    property in evidence?
5    A.    Says an effective date January 1st, 2016.
6    Q.    Okay.  All right.  Well, let me --
7    A.    And date signed December 16th, 2015.
8    Q.    Okay.  Understood.  I just wanted to ask you
9    just a couple of questions about this.  Would you look
10   on page 14 of 39 on the bottom?
11   A.    Final Disposition?
12   Q.    Yep.
13   A.    Yes.
14   Q.    Final Disposition.  If you look at seven --
15   all of seven, I guess --
16   A.    Okay.
17   Q.    Is that your understanding of what the policy
18   for evidence retention is effective today, to the best
19   of your knowledge?
20   A.    Yeah.
21   Q.    Okay.  This essentially says hold onto the
22   evidence until you can either give it back to the person
23   that it belongs to or get an order from the Superior
24   Court about something else to do with it?
25   A.    Yes.

Page 133

1    Q.   Okay.
2    A.   Or discarding it, I mean, or sale.
3    Q.   Once you have a Superior Court order to do so;
4  correct?
5    A.   I believe so, yes.  According to what it
6  states, yes.
7    Q.   If you turn to page 23 of this policy, will
8  you read 4.4 until we get to 4.5 on field drug testing?
9    A.   Yes.  (Witness complies.)  I reviewed it.
10   Q.   Okay.  Can you tell me if there are any ways
11  that you're aware of that you did not conform to Atlanta
12  Police Department policy on field drug testing?
13   A.   I followed it.
14   Q.   According to what you're just reading right
15  now?
16   A.   Yes, sir.
17   Q.   And your recollection of the facts?
18   A.   Yes.
19   Q.   Can I direct your attention to 4.4.5?
20   A.   Yes.
21   Q.   It reads:  Sworn employees making drug arrests
22  will list in the narrative of the incident reports the
23  step-by-step procedures followed to arrive at positive
24  or inconclusive results from field-tested drug evidence
25  samples after the remaining contraband has been secured

Page 134

1  in the Department's drug evidence locker.
2        Will you agree with me that you did not write
3  a step-by-step narrative of your administration of the
4  field drug test in your incident report in this case?
5    A.   Yeah.  Actual steps of unsealing the drug
6  packet -- the drug bag and placing the substance inside
7  the drug kit?  That's what you're saying, the step by
8  step?
9    Q.   That's what I'm asking.
10   A.   Yes.
11   Q.   You would agree --
12   A.   I agree that it was not in the report.
13   Q.   -- you did not do that?
14   A.   Yes.
15   Q.   And then did you do the disposal of the field
16  drug test by putting baking soda -- a tablespoon of
17  baking soda into the drug test kit?
18   A.   We don't have baking soda provided for us in
19  the precinct.
20   Q.   Okay.  So you didn't do that?
21   A.   No.
22   Q.   Where did you put the drug test kit when you
23  were done with it?
24   A.   I usually put it inside the glove that I used,
25  then put it in the bag, wrap it, and place it in the

Page 135

1  garbage.
2        (Plaintiff's Exhibit 18 was marked.)
3  BY MR. GREENAMYRE:
4    Q.   I'm handing you what has been marked as
5  Plaintiff's 18.  Do you recognize this to be the Atlanta
6  Police Department policy on drug testing and
7  destruction?
8    A.   Okay.  I'm looking at it now.
9    Q.   Do you recognize this to be the policy on drug
10  testing and destruction for the Atlanta Police
11  Department?
12   A.   Yes.
13   Q.   Is it your understanding, according to this
14  policy, that suspected narcotics, once there is no
15  longer any evidentiary use, are to be either incinerated
16  by the Georgia Bureau of Investigation or returned to
17  their owner, if not narcotics?
18   A.   Yes.
19   Q.   Okay.  Knowing what you know now about the GBI
20  test results, do you agree with the decision of the
21  prosecutor to nol-pros the charges against Miss
22  Goldring?
23   A.   Yes.
24   Q.   Do you understand that Miss Goldring was
25  incarcerated from October of 2015 through April of 2016

Page 136

1  as a result of this arrest?
2        MR. McCLENDON:  Objection to form, but you can
3    answer.
4        THE WITNESS:  Yes.
5    Q.   (By Mr. Greenamyre)  Knowing what you know now,
6  if confronted with the same situation, same facts as
7  what happened with Miss Goldring, would you do anything
8  differently from what you did on this day?
9    A.   No.  I followed every proper procedure.  I
10  would do the same.
11   Q.   Anything you would do differently knowing that
12  someone, following proper procedure, as you said, was
13  arrested and spent months and months in jail for an
14  offense they didn't do?
15       MR. McCLENDON:  Objection.  Asked and
16   answered.
17       THE WITNESS:  Do I still --
18   (Court reporter requested clarification.)
19       THE WITNESS:  No.  I was asking him if I still
20   have to answer.
21   I mean, yes.  I just did my part and my job to
22   that point of which I place Miss Goldring in
23   custody.  After -- what happened after that, you
24   know, I mean, I have no control over that.
25  BY MR. GREENAMYRE:

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

Page 137

1    Q.   I want to follow up on a couple of questions
2    that were asked of you in interrogatories.  Do you
3    remember helping your attorneys fill out answers to
4    questions that we sent you under oath?
5    A.   Okay.  I believe so, yes.
6    Q.   Do you -- have you had any discussions about
7    Miss Goldring or the facts of this case with anyone
8    besides your attorneys and -- with anyone besides your
9    attorneys?
10   A.   No.
11   Q.   At any point from October 2015 until today?
12   A.   I mean, I can't remember that far back, but
13   no.  Now, I do believe that when you -- I believe you
14   sent something to us for it to be signed or -- all I
15   remember, there was a form that had to be signed by a
16   supervisor and he was aware of the -- of the lawsuit.
17   Q.   Okay.
18   A.   So he may have some knowledge of this.
19   Q.   You may have talked to your supervisor about
20   it?
21   A.   I mean, he had the actual form and read it,
22   so --
23   Q.   Did you --
24   A.   I had to sign off and he had to sign off.
25   Q.   Do you remember anything about the

Page 138

1    conversation you had with your supervisor about this
2    case?
3    A.   No.  We didn't go in details, no.
4         MR. GREENAMYRE:  Can we go off for a second?
5         (Off-the-record discussion.)
6         MR. GREENAMYRE:  So we've gone off the record
7    and we have discussed that the City of -- the
8    defendants' attorneys intend to use their worldly
9    means and financial assets as a defense to a claim
10   of punitive damages.  That's correct, Reginald?
11        MR. McCLENDON:  Yes.
12   BY MR. GREENAMYRE:
13   Q.   So because of that, I got to ask you some
14   financial questions.  What is your current annual
15   salary?
16   A.   I believe 1300 every two weeks.  So annually
17   it would be 50 -- approximately 54, 55,000.
18   Q.   Okay.  What additional income do you have in
19   the last two years besides your base salary from the
20   Atlanta Police Department?
21   A.   The extra jobs that I've done.
22   Q.   Extra jobs.  Any extra compensation from
23   overtime?
24   A.   Yeah.  A bit of overtime as well, holidays.
25   Q.   So you get compensation for overtime and you

Page 139

1    get compensation for secondary jobs.  Anything else?
2    A.   That's it.
3    Q.   Okay.  Any rental income or anything like
4    that?
5    A.   No.
6    Q.   When you're working a second job, are you
7    typically paid in cash?
8    A.   Some jobs pay in cash.  Some pay in check.
9    Q.   Okay.  So some you will give a W-9 to and some
10   you'll just be paid under the table?
11   A.   Something like that, yes.
12   Q.   What -- for your 2018 taxes, what was your
13   adjusted gross income approximately?
14   A.   I don't remember.
15   Q.   What was your total income declared on your
16   taxes last year approximately?
17   A.   Before this promotion --
18        (Court reporter requested clarification.)
19        THE WITNESS:  I'm thinking out loud.  I'm
20   sorry.  I said "before this promotion".  Possibly I
21   think 46, 48, if I'm not mistaken.
22   BY MR. GREENAMYRE:
23   Q.   So you're making 54-ish now, but you were
24   making 46, 48 prior --
25   A.   To that, yes.

Page 140

1    Q.   And is that 46 or 48 not including any
2    overtime that you got during 2018?
3    A.   I believe so, yes.
4    Q.   It's not including the overtime?
5    A.   Oh, no.  Overtime is --
6    Q.   On top of that?
7    A.   I believe so, yes.
8    Q.   Where do you bank?
9    A.   Chase.
10   Q.   Is that the only place where you have a bank
11   account?
12   A.   Yes.
13   Q.   What's the approximate amount of money you
14   have in your Chase bank account?
15   A.   You talking about, like, my regular account?
16   Q.   Yeah.
17   A.   I don't know right offhand.
18   Q.   Approximately?
19   A.   Approximately.  I got to see if some bills
20   cleared or not, but probably --
21        (Court reporter requested clarification.)
22        THE WITNESS:  Hundreds.  Don't know exactly
23   the amount.
24   BY MR. GREENAMYRE:
25   Q.   Less than a thousand dollars?

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 36 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 141

1    A.    Yes.
2    Q.    Do you have any brokerage accounts or own any
3  stocks or investments?
4    A.    No.
5    Q.    Do you have any retirement accounts that have
6  money in them?
7    A.    No.  I do have a pension.
8    Q.    But you don't have anything besides your
9  pension?
10   A.    No.
11   Q.    Do you own a home?
12   A.    Yes.
13   Q.    Are you the owner or is it owned jointly with
14 anyone else?
15   A.    Jointly.
16   Q.    What is the address of that home?  We can go
17 off the record for this.
18        THE WITNESS:  Yeah, please.
19        (Off-the-record discussion.)
20 BY MR. GREENAMYRE:
21   Q.    What was the year of purchase of that home?
22   A.    2003, if I'm not mistaken.
23   Q.    What was the purchase price of that home?
24   A.    I don't remember.
25   Q.    Approximately?

Page 142

1    A.    A hundred and -- maybe a hundred and seventy.
2    Q.    I'm not holding you it, but ballpark?
3    A.    Yeah.
4    Q.    Are you aware of any photos or videos,
5  illustrations, anything like that that are in any way
6  related to this incident or this lawsuit?
7    A.    No, not that I'm aware of.
8    Q.    Have you ever written anything whatsoever
9  about this lawsuit to anyone other than to your
10 attorneys?
11   A.    No.  That I'm aware of, no.
12   Q.    Never sent an email about this lawsuit?
13   A.    Not that I can remember.
14   Q.    Have you ever made any comments on social
15 media about --
16   A.    No.
17   Q.    -- this lawsuit or this incident?
18   A.    No.  Because I don't have social media.
19   Q.    You don't have any social media accounts,
20 Facebook, Twitter, anything like that?
21   A.    No.
22        (Plaintiff's Exhibit 19 was marked.)
23 BY MR. GREENAMYRE:
24   Q.    I'm handing you what has been marked as
25 Plaintiff's Exhibit 19 which is an incident report dated

Page 143

1  February 28th, 2015.  This appears to be an incident
2  where you were working with Officer Restrepo in the same
3  area as where you encountered Miss Goldring.  Does that
4  sound correct?
5        MR. McCLENDON:  Objection to form.
6        THE WITNESS:  486 Ponce --
7        (Court reporter requested clarification.)
8        THE WITNESS:  I'm just reading this.  486
9  Ponce de Leon, Shell gas station.  That's a few --
10 I believe that's a quarter of a mile away.
11 BY MR. GREENAMYRE:
12   Q.    Close by?
13   A.    Yeah.
14   Q.    Can you read the narrative.  And I've just got
15 a couple of questions about that.
16   A.    (Witness complies.)
17   Q.    Let me know when you've had a chance to review
18 it.
19   A.    All right.  No problem.  Okay.
20   Q.    So in the beginning you say that there is --
21 this is a report that Restrepo authored; is that
22 correct?
23   A.    Yes.
24   Q.    He says that he smelled a strong odor of raw
25 marijuana coming from the Dodge Charger.  Could you

Page 144

1  smell the raw marijuana as well?
2    A.    I'm trying to remember this case.  I mean, I
3  don't remember this case specifically.  I have to go by
4  the --
5    Q.    The report?
6    A.    Yes.
7    Q.    So raw marijuana means marijuana that hasn't
8  been burnt; right?
9    A.    Right.
10   Q.    So marijuana that's still in leaf form?
11   A.    Exactly.
12   Q.    And what Restrepo writes is that he can smell
13 the raw marijuana from outside the car.  Is that what
14 his police report says?
15   A.    Yes.
16   Q.    And that ultimately four grams of marijuana
17 were found inside a clear bag in the driver's interior
18 left jacket pocket; is that correct?
19   A.    Yes.  According to the report, yes.
20   Q.    Is there any way that an officer can smell
21 four grams of marijuana from across a parking lot when
22 that four grams of marijuana is inside a baggie inside a
23 jacket pocket inside a vehicle?
24        MR. McCLENDON:  Objection to form.
25        THE WITNESS:  Depends how much of it, but

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 37 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 145

```
1    four grams, depending on how close we are.  And you
2    said how far we are?  Across the street?
3    Q.   (By Mr. Greenamyre) Across the parking lot.
4    A.   Across the --
5    Q.   In the same parking lot.  Yeah.
6    A.   That would be --
7         MR. McCLENDON:  Is the question across the
8    parking lot or in --
9    Q.   (By Mr. Greenamyre) In the parking lot?
10   A.   In the parking lot?  Yeah.  Especially if he
11   either has it out, because it depends on the substance
12   of the marijuana.  I have personal experience with
13   marijuana, but yes, you can.
14   Q.   But if the marijuana is inside a bag inside an
15   interior pocket inside a car, your testimony is that
16   it's possible for a police officer to smell that from
17   outside the car in the parking lot?
18   A.   Not if it's -- it's possible.
19   Q.   But it sounds kind of unlikely?
20   A.   Yeah.  But it's possible.  Depends.  If he
21   pulled it out and then put it back in the bag.
22   Q.   Yeah.  But the facts are, you know, at least
23   for our hypothetical, that it's in the bag inside the
24   pocket inside the car?
25   A.   Yes.  And if I'm not mistaken, with this case
```

Page 146

```
1    I believe we were outside the vehicle going inside the
2    gas station, if I'm not -- if this -- if my memory
3    serves correctly with this case.
4         (Plaintiff's Exhibit 20 was marked.)
5    BY MR. GREENAMYRE:
6    Q.   So I'm handing you what has been marked as
7    Plaintiff's Exhibit 20, which is an incident report from
8    August 14th, 2015, an incident involving you and Officer
9    Restrepo and a jaywalking infraction.  Does that look
10   right to you?
11   A.   Yes.
12   Q.   And essentially -- this is a police report
13   that you wrote; correct?
14   A.   Yes.
15   Q.   And you write:  The accused was within 1,000
16   feet from our patrol vehicle, in which we had to stop
17   our patrol vehicle trying to avoid him.  The accused was
18   taken into custody for Pedestrian In The Roadway under
19   state law; correct?
20   A.   Yes.
21   Q.   And then earlier you said that the person was
22   walking in the middle of the street towards our patrol
23   vehicle?
24   A.   Yes.
25   Q.   Okay.  And this is consistent with what we
```

Page 147

```
1    talked about earlier where, you know, if you see someone
2    committing the offense of jaywalking, generally you will
3    arrest them?
4    A.   Yes.
5    Q.   You want to take maybe just a three-minute
6    break and then I think we're just about done?
7    A.   Yeah.  You think we're almost done?
8    Q.   Yeah.  I think I may not have many or any
9    questions more, but I want to collect my thoughts for
10   two or three minutes and make sure.
11   A.   Okay.  I just need to make a phone call for
12   child care purposes.
13   Q.   Okay.
14   A.   Just in case we need to go any further.
15        MR. GREENAMYRE:  All right.
16        (Brief recess.)
17        (Plaintiff's Exhibit 21 was marked.)
18   BY MR. GREENAMYRE:
19   Q.   Let's get you to make this part of the record.
20   So we just put a sticker on the drawing that you did
21   earlier.  Will you sign and date that drawing?  Today is
22   April 9th.
23   A.   Okay.  Got to make sure that this is not how
24   much I filled up the --
25   Q.   Right.
```

Page 148

```
1    A.   That's not good.
2    Q.   But you said that for the record.
3    A.   Yes.  Date it, you said --
4    Q.   Yeah.
5    A.   -- for the 9th?
6    Q.   Yeah.  April 9th.
7    A.   (Witness complies.)
8    Q.   Thank you.  All right.  A few more questions.
9    Your testimony is you had probable cause to arrest Miss
10   Goldring for pedestrian in the roadway in violation of
11   state law and the cocaine trafficking offense?
12   A.   Yes.
13   Q.   Yes?
14   A.   Yes.
15   Q.   Any other offenses that you had probable cause
16   to arrest her for?
17   A.   For Miss Goldring?
18   Q.   Yeah.  For Miss Goldring.
19   A.   No.
20   Q.   And we touched on this earlier, but were there
21   any other facts besides the positive drug test result
22   from the stress ball that led you to believe that Miss
23   Goldring was involved in the drug trade or anything like
24   that?
25   A.   Okay.  You're asking if, due to the incident,
```

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

Page 149

1 if we believed Miss Goldring was any part of drug trade
2 or drug deal in that area?
3     Q.    You can answer that question.
4     A.    No.
5     Q.    Okay.  And just to be clear, the only fact
6 that you had that she was involved in drugs was the
7 positive stress ball; right?
8     A.    Yes.
9     Q.    Okay.  So she wasn't -- she didn't look like
10 she was high on cocaine or anything like that?
11     A.    I don't remember that, no.
12     Q.    Okay.  To what extent, if at all, is your
13 performance as a police officer measured or gauged by
14 how many arrests you make?
15     A.    Good standard.  You're asking -- you're asking
16 me if my performance --
17     Q.    How many --
18     A.    -- due to an arrest or due to my duties?
19     Q.    What effect does the number of arrests that
20 you personally make have on your performance evaluations
21 or anything like that?
22     A.    Not number of arrests, but it shows that I
23 have acted as a police officer, doing my job day in and
24 day out and engaging with members of the community,
25 criminals or no criminals.

Page 150

1     Q.    And one way that you demonstrate that is by
2 the number of arrests you make?
3     A.    No.  This is by the number of encounters or
4 answering the 911 calls appropriately or being engaged
5 in conducting requirements of investigating a case or
6 being there to assist officers and to find the
7 perpetrators that -- that, you know, are accusers of
8 committing a crime, such as an armed robbery or murder
9 or whatnot.  But just being active in helping and
10 assisting, but not just solely on arrests, no.
11     Q.    Is there now or has there at any time during
12 your tenure as an Atlanta Police Department officer been
13 an expectation about the minimum number of arrests an
14 officer should make over a given time period?
15     A.    No.
16     Q.    Is there now or has there ever been an
17 incentive for officers to -- who have made a sufficient
18 number of arrests to be able to go home early on Fridays
19 or something like that?
20     A.    None whatsoever.
21     Q.    So the number of arrests that you make is
22 purely based on your discretion and your judgment, not
23 based on any external pressure?
24     A.    No.
25     Q.    Is that correct?

Page 151

1     A.    Correct.
2          MR. GREENAMYRE:  We're good.
3          (Deposition concluded at 2:44 p.m.)
4          (Pursuant to Rule 30(e) of the Federal Rules of
5 Civil Procedure and/or O.C.G.A. 9-11-30(e), signature
6 of the witness has been reserved.)

Page 152

1
2                C E R T I F I C A T E
3
STATE OF GEORGIA:
4
COUNTY OF FULTON:
5
6     I hereby certify that the foregoing transcript was
7 reported, as stated in the caption, and the questions
8 and answers thereto were reduced to typewriting under
9 my direction; that the foregoing pages represent a
10 true, complete, and correct transcript of the evidence
11 given upon said hearing, and I further certify that I
12 am not of kin or counsel to the parties in the case; am
13 not in the employ of counsel for any of said parties;
14 nor am I in any way interested in the result of said
15 case.
16     This, the 29th day of April 2019.
17
                       -----------------------
18                     NANCY G. LUCAS
                       Certified Court Reporter
19                     Certificate No. B-1366
20
21
22
23
24
25

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

---

Page 153

DISCLOSURE OF NO CONTRACT

I, Nancy G. Lucas, Certified Court Reporter, do hereby disclose, pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, that I am a Georgia Certified Court Reporter; I was contacted by the party taking the deposition to provide court reporting services for this deposition; I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C of the Rules and Regulations of the Board; and I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c).

There is no contract to provide reporting services between myself or any person with whom I have a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, a party to this action or party having a financial interest in this action. Any and all financial arrangements beyond my usual and customary rates have been disclosed and offered to all parties.

---------------------------------
Nancy G. Lucas, CCR, 1366-B
Elizabeth Gallo Court Reporting

---

Page 154

1  CASE:  Julius Goldring vs Atlanta Police Department, et al.
2  NAME OF WITNESS:    Investigator Vladimir Henry
3         The preceding deposition was taken
4  in the matter, on the date and at the time and
5  place set out on the title page hereof.
6
7         It was requested that the deposition
8  be taken by the reporter and that same be
9  reduced to typewritten form.
10
11        It was agreed by and between counsel
12 and the parties that the deponent will read and
13 sign the transcript of said deposition.
14
15        Said jurat is to be returned within
16 30 days following receipt of the transcript to
17 the following address:
18
19        Elizabeth Gallo Court Reporting, LLC
20        2900 Chamblee Tucker Road
21        Building 13, First Floor
22        Atlanta, Georgia 30341
23
24
25

---

Page 155

1  NAME OF CASE:      Julius Goldring vs Atlanta Police Department, et al.
   DATE OF DEPOSITION: 04/09/2019
2  NAME OF WITNESS:    Investigator Vladimir Henry
3  EGCR Job No.:       57466
4
5         Before me this day personally
   appeared INVESTIGATOR VLADIMIR HENRY, who, being duly
6  sworn, states that the foregoing transcript of
   his/her deposition, taken in the matter, on
7  the date and at the time and place set out on
   the title page hereof, constitutes a true and
8  accurate transcript of said deposition.
9         _____
10                INVESTIGATOR VLADIMIR HENRY
11        SUBSCRIBED and SWORN to before me
12 this _____ day of _____ 20____.
13 in the jurisdiction aforesaid.
14
15 My Commission Expires      Notary Public
16    STATE OF _____
17    COUNTY/CITY OF _____
18
19    []   No changes made to the Errata Sheet;
20 therefore, I am returning only this signed,
21 notarized certificate.
22    []   I am returning this signed,
23 notarized certificate and Errata Sheet with
24 changes noted.
25

---

Page 156

1         Errata Sheet
2  NAME OF CASE:      Julius Goldring vs Atlanta Police Department, et al.
3  DATE OF DEPOSITION: 04/09/2019
4  NAME OF WITNESS:    Investigator Vladimir Henry
5  Reason Codes:  1. To clarify the record
6                 2. To correct transcription errors
7                 3. Other
   _____
8  _____
9  Page _____ Line _____ Reason _____
10 From _____ to _____
11 Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
14 From _____ to _____
15 Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
20 From _____ to _____
21 Page _____ Line _____ Reason _____
22 From _____ to _____
23
24  SIGNATURE:_____DATE:_____
25         Investigator Vladimir Henry

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

```
                                                          Page 157
1              Errata Sheet
2    NAME OF CASE:    Julius Goldring vs Atlanta Police Department, et al.
3    DATE OF DEPOSITION: 04/09/2019
4    NAME OF WITNESS:   Investigator Vladimir Henry
5    Reason Codes: 1. To clarify the record
6                  2. To correct transcription errors
7                  3. Other
     _____
8    _____
9    Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   SIGNATURE:_____DATE:_____
25              Investigator Vladimir Henry
```

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

| Exhibits |
|---|

**Plaintiff's Exhibit 01**
19:2,5

**Plaintiff's Exhibit 02**
61:9

**Plaintiff's Exhibit 03**
64:18,21 66:25

**Plaintiff's Exhibit 04**
76:14,15

**Plaintiff's Exhibit 05**
76:17

**Plaintiff's Exhibit 06**
109:21,24 110:4

**Plaintiff's Exhibit 07**
113:16

**Plaintiff's Exhibit 08**
117:12,15

**Plaintiff's Exhibit 09**
118:1,4 119:1

**Plaintiff's Exhibit 10**
119:18,21

**Plaintiff's Exhibit 11**
120:8,11

**Plaintiff's Exhibit 12**
121:10,13

**Plaintiff's Exhibit 13**
122:19,22

**Plaintiff's Exhibit 14**
123:17,20

**Plaintiff's Exhibit 15**
124:7,10

**Plaintiff's Exhibit 16**
125:17

**Plaintiff's Exhibit 17**
131:19,22

**Plaintiff's Exhibit 18**
135:2

**Plaintiff's Exhibit 19**
142:22,25

**Plaintiff's Exhibit 20**
146:4,7

**Plaintiff's Exhibit 21**
147:17

---

**Henry Exhibit Binder**
3:1

| $ |
|---|

**$200**  49:2,6,24

| 0 |
|---|

**04**  15:1

**07**  15:2

**0get**  9:22

| 1 |
|---|

**1**  19:2,5 89:12,15

**1,000**  146:15

**10**  119:18,21

**10th**  33:12 34:20

**11**  120:8,11

**12**  121:10,13

**13**  122:19,22

**1300**  138:16

**14**  123:17,20 132:10

**14th**  146:8

**15**  124:7,10

**16**  125:17,20

**16th**  132:7

**17**  131:19,22

**18**  135:2,5

**19**  142:22,25

**1990**  8:1,2

**1996**  8:8 9:16 12:25

**1997**  12:22 59:19

**1998**  8:9 10:22

**1:18-cv-1191-wmr**  4:6

**1st**  132:5

---

| 2 |
|---|

**2**  61:9,12

**20**  21:9 146:4,7

**2000**  10:24 15:8

**2003**  11:12 12:7 14:20
15:15 141:22

**2004**  14:20

**2010**  15:11,12

**2011**  9:14,16 15:11,16

**2012**  9:14 17:9,10 50:22
62:1

**2013**  62:1

**2014**  17:13 21:7,9 22:4,
9 50:24 51:1 52:6

**2015**  33:12 34:21 37:5
38:12 48:14 49:25 52:7
96:4,12 99:15 107:20
125:22 130:17 132:3,7
135:25 137:11 143:1
146:8

**2016**  120:19 123:3
130:19,25 132:5 135:25

**2017**  32:16,18 125:22
131:12

**2018**  21:8,9 22:5,10
31:23 61:13 139:12
140:2

**2019**  4:2

**21**  147:17

**21st**  120:19 123:3
130:17

**23**  133:7

**26**  53:15

**27th**  17:9

**28**  52:3 53:14,15

**28th**  143:1

**2:44**  151:3

---

| 3 |
|---|

**3**  64:18,21 66:25

---

**30**  108:11

**30(e)**  151:4

**39**  132:10

**3rd**  64:22 66:17 67:9,23
68:8

| 4 |
|---|

**4**  76:11,14,15

**4.4**  133:8

**4.4.5**  133:19

**4.5**  133:8

**46**  139:21,24 140:1

**48**  139:21,24 140:1

**486**  143:6,8

| 5 |
|---|

**5**  21:1,2,5,11,12,13,14
28:2 29:1,4 76:11,14,17
78:10

**50**  46:22 47:1,16
101:16,17,18 102:1,3
138:17

**506**  28:12

**54**  138:17

**54-ish**  139:23

**55,000**  138:17

| 6 |
|---|

**6**  109:21,24 110:4

**60**  82:7,16,20,21

**60-gram**  117:8

| 7 |
|---|

**7**  113:16,19

**7th**  128:13

| 8 |
|---|

**8**  117:12,15

---



www.GeorgiaReporting.com/Schedule
404.389.1155

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 42 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**8th** 130:18

---

**9**

**9** 4:2 118:1,4 119:1

**9-11-30(e)** 151:5

**911** 21:18 29:24 30:8 150:4

**9th** 147:22 148:5,6

---

**A**

**A&m** 8:4

**abide** 19:18

**absolutely** 65:9

**abuse** 8:16 12:16,20 13:25 14:4 59:5,18,22 60:6,7,8,14

**abused** 15:6,7

**academy** 16:23 17:12, 19 20:24 59:5,16 60:16 61:4,24 62:7,8,10

**acceptable** 73:1

**accepted** 12:11 17:21 62:10

**access** 58:16

**accident** 29:25 130:11, 18,21

**accidentally** 80:15

**account** 140:11,14,15

**accounts** 141:2,5 142:19

**accurate** 62:15,17 121:23 122:3

**accused** 146:15,17

**accusers** 150:7

**ACIC** 84:24

**acted** 149:23

**action** 45:5 111:23 127:19

**actions** 122:22 128:12

**active** 23:18 150:9

**activity** 35:4,9

**acts** 20:20,21

**actual** 97:23 121:3 134:5 137:21

**ad** 15:5,9,19 16:14

**ADA** 58:2,3,12 117:20, 22 120:17

**added** 47:12 48:4

**addition** 20:19

**additional** 84:12 138:18

**address** 141:16

**adjusted** 139:13

**administering** 102:25

**administration** 134:3

**admission** 112:13

**admit** 98:22

**admitted** 112:9

**admitting** 13:12

**advocate** 8:17,19 14:16 15:5

**aerial** 64:21 66:6

**affidavit** 82:8 119:2,4

**affidavits** 118:5

**aggravated** 38:24

**aggressive** 26:3

**aggressively** 26:5

**agree** 6:16 20:2,7,12, 17,18,21 27:23 44:17 53:23 62:14 73:6,16,22 75:17,20 76:6 77:7,11, 19 78:6 94:24 119:3,7 120:2,6,7 134:2,11,12 135:20

**agreement** 4:9

**ahead** 43:13 65:10 66:2 89:25 118:21 126:24 131:7

**alcohol** 44:13 55:24

**allegation** 111:19 112:12

**allowable** 4:10

**allowed** 65:22

**alma** 11:3

**Amazon** 76:18

**America** 19:13

**amount** 49:18 52:5 59:3 72:23 82:3,12,25 89:15 90:14 116:23 140:13,23

**amounts** 55:2,7

**analyses** 58:17

**analysis** 54:4,6 57:7,8, 12 58:11 112:23 113:1, 10,13 116:20,22

**and/or** 151:5

**annex** 81:22 85:18 86:6 116:12 117:3 124:13 130:1

**annual** 138:14

**annually** 138:16

**answering** 150:4

**answers** 5:21 24:23 137:3

**apartment** 67:14

**APD** 20:23 33:15 50:23

**apologies** 63:15

**apologize** 5:18

**appearance** 57:19

**appears** 109:24 110:4 113:19 120:13 122:25 125:20 131:15,22 143:1

**application** 94:3,22

**approach** 26:22 30:18 98:23

**appropriately** 56:15 57:4 150:4

**approved** 127:14,16

**approximate** 14:18 46:9 102:2,3 140:13

**approximately** 10:19 11:10 15:2 50:6 64:13 82:7,10,16,20 87:8 90:2 91:4 138:17 139:13,16 140:18,19 141:25

**approximations** 14:23

**April** 4:2 135:25 147:22 148:6

**Archbishop** 7:21 11:2 12:11 14:12

**archdiocese** 11:7 12:1

**area** 16:25 21:3,11,16, 18 22:15,16,17 23:10, 11,12,14,15,17,18 24:1, 2,5 25:7,21,22 26:6,12, 24 27:25 28:7,8,11,12, 13,14,17,18,24 29:25 30:3,11,13 38:23 45:16 62:8 66:6,12 93:10 104:17,18 127:12 143:3 149:2

**ARIDE** 61:21

**armed** 23:16 24:16,18 38:16 150:8

**arrest** 20:3,7,13 39:16, 23 40:3,11,15,16,18 41:2,9,22 43:2,3,13 44:20,24 45:1,8 47:9, 11,13,21 51:2 56:7,8,11 57:6 69:15 72:4 73:4 82:7 97:2,3,10 99:16 100:6 101:1 111:23 118:5 119:2,4 136:1 147:3 148:9,16 149:18

**arrestable** 40:9 41:18, 21 42:3,13,16,17 43:1, 2,12 44:1 45:17,21

**arrested** 10:9 18:11 46:3 48:7 49:5 50:13 71:8,14 72:13 113:24 114:10 136:13

**arrestee** 84:8

**arrests** 41:14 47:17 48:15 51:5,8,11 133:21 149:14,19,22 150:2,10, 13,18,21

**arrive** 133:23



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 43 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**asks** 72:22

**assault** 38:24

**assessment** 10:6,8

**assets** 138:9

**assigned** 21:1,5 22:15
28:12,24 29:14 33:9
62:8

**assist** 150:6

**assistant** 8:16 11:1,11,
13,21 12:10 120:16

**assisting** 150:10

**assume** 6:17

**Assuming** 99:19

**Atlanta** 14:14 16:25
17:5 19:6,18,25 20:4,
15,20 21:5 31:11 35:24
36:6 44:18 45:10 46:3
47:22 49:1,25 62:2
64:22 72:2 113:6 116:5
127:14 131:23 133:11
135:5,10 138:20 150:12

**Atlanta's** 27:22

**Atlantic** 127:11

**attempted** 36:11

**attention** 133:19

**attorney** 64:24 102:22
120:17 121:20

**attorneys** 4:23 137:3,
8,9 138:8 142:10

**attributed** 121:22

**August** 146:8

**authored** 143:21

**authorized** 117:25

**automatically** 37:1

**Avenue** 66:10

**avoid** 16:3 146:17

**aware** 96:18 133:11
137:16 142:4,7,11

---

**B**

---

**B-U-T-L-E-R** 53:1

**BA** 8:3

**baby** 115:15,16,17,18,
19,20,23

**bachelor's** 7:17 8:7,8

**back** 12:8,15 15:2,4
17:2 30:15 31:18 38:8
61:11 69:24 70:6,14,17
75:7 87:2 96:4 97:9
99:14 102:18 103:7
104:5 116:17 119:1
125:13 132:22 137:12
145:21

**background** 7:16
17:23 32:4 38:9

**bag** 55:14 77:3 79:2,4
116:14,17 134:6,25
144:17 145:14,21,23

**baggie** 144:22

**baggies** 55:11

**bags** 55:15,22,24

**bail** 48:15,25 49:6,18
57:18

**baking** 60:11 98:1,2,4
99:12,13 115:10
134:16,17,18

**ball** 53:24 54:18 74:8,
14,15,22 75:7,24 76:1,
21 77:8,21 78:3,12 79:7
84:2 100:2,3,21 107:25
116:2,6,9,21 123:23
125:5,6 148:22 149:7

**ballon** 116:21 125:4

**Balloon** 125:6

**ballpark** 47:16 142:2

**balls** 74:23 76:24 100:1

**bank** 140:8,10,14

**Bankruptcy** 18:4

**bar** 32:10 116:19
124:14 129:22,25

**base** 138:19

**based** 55:1,8 82:19
96:10 99:15 125:7
150:22,23

**basic** 17:15 20:24 42:2

59:13,16 60:16

**basically** 13:6,8 21:20
22:16 23:1,9,13 25:8,
12,14 26:2 29:24 30:7,9
35:22 36:5 39:2 44:2
57:10 74:23 76:20
94:14 110:13 111:9,20
112:1 114:20 129:7,9,
11,19 130:5

**beamers** 127:2

**bearing** 31:9

**beat** 22:15 24:8,11
28:2,5,12,22 38:12
47:22

**beats** 28:4

**beginning** 17:14 32:17
86:8 143:20

**behave** 128:2

**behavior** 13:9 26:13

**behavioral** 8:20 12:16,
24 13:2,6,8

**behold** 99:14

**believed** 149:1

**believes** 112:2

**belongs** 132:23

**bench** 103:19,21 105:1,
17

**big** 87:12,20 103:24
104:1,2,4,22

**bigger** 87:17,20

**bills** 140:19

**bit** 6:22 7:8 9:22 14:16
23:4 24:13 25:10 38:8
48:5 63:2 87:8,14 98:1
100:3 104:5 138:24

**black** 85:6 86:18,19,23
87:3,22 88:5

**blue** 33:17

**Blues** 32:6

**bluish** 92:1,4,24 93:17,
18

**bluish-purple** 91:17
92:2

**body** 31:9,10,14,16,21
32:2,15 68:12,15

**bond** 47:25 48:11

**booked** 48:11

**bottle** 55:25

**bottom** 66:20 75:14
88:19 120:15 132:10

**bought** 55:7

**bounce** 7:7

**box** 85:3

**BP** 67:15

**brand** 115:18

**break** 6:20,23 65:13,17
102:6,18,19,22 147:6

**break-ins** 23:16

**breaking** 26:17 38:19

**brew** 97:15

**briefly** 9:21 125:25

**bright** 93:1,7 103:7

**broad** 56:8

**broken** 26:19 30:19,21
31:2 33:1 34:7,8 36:3,9,
18 37:2,8,11 55:22
127:13 130:14

**brokerage** 141:2

**brought** 83:6,11,14

**buddy** 108:14

**building** 67:8,14 81:22
85:18 86:6 116:13
124:14 130:1

**bunch** 85:11

**Bureau** 123:21 135:16

**burnt** 144:8

**bus** 60:25

**business** 30:3 32:9
38:23

**Butler** 52:24

**buys** 27:1

---



Case 1:18-cv-01191-WMR  Document 54  Filed 07/17/19  Page 44 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

## C

**call** 38:19 58:2,3 83:3 92:6 102:7 104:13,16, 23 107:4,7,8 147:11

**called** 10:3,5,7 13:3 57:19 103:17 115:11

**calls** 21:18 24:17,19 29:24,25 30:8 54:13,20 150:4

**cam** 36:17 106:18 107:5,8

**camera** 31:10,14,16, 17,21 32:2,15,21 33:20, 25 34:3,4,9,10 36:14 37:7,11 68:12,15,17

**cameras** 34:7 37:1 107:16,19,22

**cams** 33:1 36:18

**canceled** 17:18

**canvass** 25:7

**capture** 24:20 27:1 79:3

**car** 21:22,23,24 22:9 24:12 26:17,18,22 32:21 33:2,8 34:10,20, 23,24 35:7,13 37:14,22 38:19 68:4,17 70:14,18, 21 78:15,17,18 116:11 144:13 145:15,17,24

**care** 147:12

**carjacking** 23:17 24:18 38:24

**carrying** 72:14

**cars** 23:22 24:4 26:21 32:22 33:5 34:6 64:17 68:1,3 127:6

**case** 4:6 8:23 22:2 36:13 52:12,19 53:20 54:24 56:7 57:24 75:6 80:15 95:24 99:2 102:21 120:12 123:1 129:5,14 134:4 137:7 138:2 144:2,3 145:25 146:3 147:14 150:5

**cases** 38:13,21 40:10 51:21 52:21 58:13,14 59:4 60:20 115:25

**cash** 139:7,8

**catch** 38:18,19 128:7, 10

**categories** 59:9

**Catholic** 11:8

**caught** 56:3

**causing** 30:5,6 38:22 44:12

**cell** 125:2

**center** 10:8,11,14,15, 17 13:7,12,13 29:3,7 49:25 57:13 78:10 116:16 117:3

**certificate** 12:5

**certified** 17:11,13

**cetera** 125:9

**chair** 103:19

**chance** 143:17

**change** 11:25 48:14 91:16 127:7

**changed** 17:3,4 91:13, 17

**charge** 50:6 56:14 57:4,9 84:11,12

**charged** 18:11

**Charger** 143:25

**charges** 47:12 48:4 49:17 84:5 120:22 121:6 123:4,10,14 135:21

**chase** 130:17 140:9,14

**check** 26:8 139:8

**Chevron** 67:8,11

**child** 8:17,19 14:16 15:5 147:12

**children** 15:6 16:20

**choose** 41:13

**church** 23:25

**Churches** 23:24

**circumstance** 43:22 98:15

**circumstances** 41:14 50:5 96:5,10,19 97:6,8 113:3

**citation** 40:15 41:3,15

**citizen** 128:12 130:25 131:11

**city** 9:2 10:1 19:25 20:4, 14,20 21:2,20 31:4 44:18 45:24,25 46:3 47:22,24 48:1,18,19 49:1,8,10,11,25 138:7

**civil** 4:10 18:17,18 151:5

**civilians** 24:3 26:3

**claim** 138:9

**clamp** 88:6

**clarification** 6:11 9:3,9 10:4 26:15 44:3 45:23 47:3 51:16 52:23 60:21 70:16 79:19 85:17 88:11 89:13 93:24 98:7, 25 121:2 128:9 130:6 136:18 139:18 140:21 143:7

**Clayton** 14:15,18 15:3, 10,17,20,23 16:14

**clear** 6:4 144:17 149:5

**cleared** 111:9 140:20

**client** 34:15 37:6 50:17 66:1

**client's** 19:23 65:1,3

**clip** 74:16,20 75:1,3 76:2,23 77:2

**close** 62:18 64:11 74:24 143:12 145:1

**closer** 115:20

**club** 23:21 32:7

**CNN** 29:3,4,7 78:10 108:3 116:15 117:3

**co-lead** 51:4

**Churches** 23:24

**co-primary** 51:8

**coach** 11:15,16

**coaches** 11:17

**cocaine** 51:6,7,12,14 52:5,14,21 53:5,13,24, 25 54:5,9,12,19 55:3,8, 15,16,17,21,25 56:3,17, 21 60:9,10 82:2,22 85:22 91:8,12 92:9,11 98:2,3,5 99:14,17 100:4,6,7,9,10 101:1,6, 7,9,10,11,20 103:3,11 114:17,24 115:4,21 116:1,5 119:3 123:5 125:4 148:11 149:10

**code** 116:19 124:14 129:22,25

**collect** 147:9

**collective** 69:7

**college** 7:17 8:2

**color** 77:4,6 79:13 91:9, 10,16,17 92:2,4,12,15, 17,19 93:1,6,8,17 94:1, 13,15,19 95:1

**colors** 79:23 91:14 93:13

**combination** 25:17 101:11

**comfortable** 16:17

**comment** 74:7 75:21

**comments** 65:22 142:14

**commit** 39:17

**commits** 40:11 41:20

**committed** 39:11 40:24 41:1 44:23

**committing** 147:2 150:8

**common** 56:24,25 114:22

**communication** 58:16

**community** 16:19 23:19 30:2,10 149:24

**company** 13:2



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 45 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry                                                April 09, 2019

compare 93:5,6 114:22
117:8

compensation
138:22,25 139:1

complaint 94:8 109:11,
17 113:21 117:21
128:12,18 130:25
131:11

complete 39:12 43:19
45:4 62:15,20

completing 20:24

complies 87:11,22
133:9 143:16 148:7

computer 107:8

computers 103:18
104:8

concentrate 45:14

concentrating 77:25

concerts 32:7

concluded 57:15
151:3

Conclusions 123:25

conduct 104:16

conducted 103:10

conducting 103:16
106:12 107:24 108:3,15
150:5

confer 65:22

confident 122:8

confirm 83:23 84:23
122:10

confirmation 58:5,8

confirmed 57:16 58:9
124:1

confiscated 51:3,20
55:14

conform 133:11

conformance 131:16

confronted 136:6

confusing 6:7,9
110:24

conjunction 112:23

connection 113:13

consent 98:19 99:1,8,
18,24 100:19

consistent 123:8
124:4 146:25

Constitution 19:13,14
20:4,14,19

Constitutions 20:1

contact 15:3 58:19,23
69:17,18

contacted 58:24

contained 91:23 125:4

container 98:4

contaminated 116:10

context 25:25 95:10

continue 108:7 111:4

continued 63:8 128:1

contraband 73:8,18
133:25

contributes 31:4

control 131:25 136:24

controlled 124:1

conversation 5:3,8
72:1 74:10 76:4,5 77:25
78:2 123:16 138:1

conversations 123:12

convicted 14:10

correct 27:6 39:24,25
54:19,24 66:13,18,23
68:18 75:23 85:22 86:3
99:19 104:14 110:7
111:15 116:24 118:6
123:1,23 124:18 125:22
131:25 133:4 138:10
143:4,22 144:18
146:13,19 150:25 151:1

Correctional 14:1,8
59:19

Corrections 14:9

correctly 146:3

correspondence

113:19

counseling 7:19
12:16,20 14:5 59:24

counselor 8:16 59:6,
18 60:14

County 9:25 10:2
14:15,17,19 15:3,10,17,
18,20,23 16:14 49:8,16
117:16

couple 4:24 25:24
31:18 48:3 68:25 132:9
137:1 143:15

court 5:4 6:3,11 8:20
9:3,6,9 10:4 13:10
14:15,19 15:3 18:19
26:15 29:9 44:3 45:23
47:3 48:22,23 49:7,13,
14 51:16 52:23 57:23
58:2 60:21 70:16 79:19
85:17 88:11 89:13
93:24 98:7,25 102:6
117:16 120:18 121:2
128:9 130:6 132:24
133:3 136:18 139:18
140:21 143:7

crack 51:7,13,14 56:16,
21 60:9 87:3 101:9,20

cream 77:4

create 36:7

created 42:25

credential 11:20

crime 18:12 21:19
22:18,21,24 23:5,9,15
24:11 29:13,19,23
37:18 38:11 40:11,24,
25 41:20 44:23 45:7,16
150:8

crimes 14:10 18:16
23:11 24:16 26:9 39:10
42:16

criminal 18:21,25
20:21 41:11 120:12,22
121:6 123:1,10,14

criminals 149:25

cross 67:23,24

cross-dressing 50:12

crossed 67:19,20

crossing 63:5 68:8
69:12

crosswalk 63:6 64:16
68:2

crush 90:20,23 91:1,2

crushed 103:3

crystalline 81:15,16

cubby 98:9,12 99:18

cup 97:14

cupboard 97:25 99:12

Curley 11:2 12:11
14:12

Curley-notre 7:22

current 27:4 138:14

custody 63:9 69:21
70:11,12 136:23 146:18

cut 5:11 63:15 75:24
76:1 78:12 79:3 85:8
86:8 116:10 119:13

cycle 56:7

cylinders 103:4

**D**

DA 58:12

Dade 10:2

daily 35:4,9

damaged 36:9 37:8

damages 138:10

Dame 7:22

dark 33:17 77:5 79:16
91:10 92:8,10 93:7
94:15

darker 92:13,15 93:1,3,
23,25 94:13 103:7

dart 27:20

darting 41:7 45:18

dash 33:1 36:17,18
37:7

Elizabeth Gallo
COURT REPORTING, LLC

Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 46 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**dashboard** 32:21
33:20,25 36:14

**date** 17:8,10,14 33:1,11
36:22 48:24 49:7 58:2
132:5,7 147:21 148:3

**dated** 142:25

**dates** 128:16 130:16

**day** 28:5,6 30:11,12
33:3,13 37:13,15,25
38:14 39:8,20 48:10,12,
22 50:5,8 59:10 78:5
120:19 128:4 129:23
136:8 149:23,24

**days** 22:3 48:3 50:3,10

**de** 143:9

**deal** 26:24 40:9 149:2

**dealing** 15:5 16:19
59:2 72:22

**dealt** 10:2 51:5

**December** 17:9 132:7

**decide** 40:2 69:4

**decided** 16:22 17:3
47:11

**deciding** 112:2

**decision** 47:13 69:5,7,
14 135:20

**declared** 139:15

**defective** 36:1,2,9 37:8

**defend** 19:13

**defendant** 4:4 18:7
22:2

**defendants'** 138:8

**defense** 138:9

**defined** 124:3

**degree** 7:18 8:7 11:22
12:2

**delivered** 116:22

**demographic** 106:13

**demonstrate** 150:1

**department** 9:4 14:9
19:6,19 31:11 35:7,12,
24 36:6 44:18 45:11

62:2 116:5 131:24
133:12 135:6,11 138:20
150:12

**Department's** 72:2
134:1

**dependency** 59:25

**depending** 23:15
36:10 38:18 39:6 58:13
98:9 115:17 145:1

**depends** 22:12 27:14
32:25 38:17 39:1 43:5
94:16 144:25 145:11,20

**deponent** 7:12

**deposition** 4:1,4,8,18
6:6 7:3 65:2,24 68:20
151:3

**describe** 86:9,20

**describing** 38:13

**description** 24:24
25:5,6 77:1

**desk** 104:6 105:10

**destroy** 76:9

**destroyed** 125:15

**destroying** 76:7

**destruction** 135:7,10

**detail** 26:7 32:7 39:6
45:14,15 79:6 85:11
87:14

**detailed** 8:14

**details** 9:22 23:14
62:21 138:3

**detection** 61:18

**detention** 10:14,17
49:25

**determine** 34:16 40:14

**determines** 84:7

**determining** 93:6

**device** 41:6

**DFCS** 8:24 14:17,24
15:23

**diagonally** 68:1

**difference** 24:10 29:22
60:4,8,10 101:19
110:16,20 115:2

**differently** 45:1 128:3
136:8,11

**difficult** 5:15

**direct** 32:11 133:19

**direction** 67:5,20

**directives** 131:16

**disappeared** 130:2

**discarding** 133:2

**discretion** 41:14 43:24
44:10,15,22 45:1,6,12
150:22

**discuss** 102:21

**discussed** 44:21 116:4
138:7

**discussion** 22:7 61:8
66:24 138:5 141:19

**discussions** 137:6

**dismissal** 56:9 123:14

**dismissed** 121:6

**disorderly** 38:22

**dispatched** 39:5,6

**disposal** 134:15

**disposed** 120:22
125:11

**disposition** 110:10
120:12 123:4 132:11,14

**distinction** 42:13,25

**distributed** 55:3,5 56:5

**Distributing** 55:6

**district** 4:7 27:25
120:16

**diving** 35:7

**divorce** 18:2

**docket** 122:25

**document** 19:9,11,23
117:15,17 118:4

**documentation** 34:15

**documents** 68:22
102:19

**Dodge** 143:25

**Dollar** 115:19,20

**dollars** 83:1 130:5
140:25

**Donald** 81:23 85:19

**double-check** 119:9

**Downtown** 21:5 22:17
28:22 47:23

**Downtown/midtown**
21:3

**dozens** 39:10

**draw** 87:7,15,17,20
89:21 90:2

**drawing** 147:20,21

**drawn** 98:18

**dress** 114:12

**dressed** 114:9

**drinking** 27:9,10 31:2
38:22

**drive** 33:9

**driver** 84:14,21 126:13

**driver's** 144:17

**driving** 34:24 35:13
38:2,3,4,7 40:8 42:4,5,8
44:12 64:7,11 72:4
116:12

**drop** 90:10

**drove** 33:2,5

**drug** 20:2 26:24 51:3,5,
20 54:4,7,8,11 56:7,12
57:1,11,15 58:6,9,20
59:4,25 61:18 84:25
85:3,5,14 86:1,5,11,17
92:12,19 95:10,13,17
96:20 97:2,4,22,23
98:11,12,17 103:23
105:18 106:15 107:11,
24 108:15 115:25
117:19 122:8,12 133:8,
12,21,24 134:1,4,5,6,7,
16,17,22 135:6,9
148:21,23 149:1,2



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 47 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**drugs** 20:3 44:13 56:12
57:7 59:1,3,5,7,11,24
60:2,3,24 61:1 100:11
101:2,4 149:6

**drunk** 27:15 42:7

**due** 148:25 149:18

**DUI** 45:3

**duly** 4:13

**Durant** 110:5

**duties** 62:9 149:18

——————————

**E**

**ear** 65:1,4

**earlier** 30:17 32:4
117:17 118:9 128:22
146:21 147:1,21 148:20

**early** 150:18

**easily** 74:24

**east-west** 66:17

**ecstasy** 52:22

**ectasy** 51:17

**education** 12:2

**educational** 7:16 8:22

**effect** 108:14 149:19

**effective** 132:5,18

**eluding** 48:4

**email** 142:12

**embracing** 63:21,24

**employed** 15:16 32:9
46:3 62:2

**employee** 121:13

**employees** 133:21

**employer** 13:1,24

**EMS** 27:16

**encounter** 59:4

**encountered** 143:3

**encounters** 35:25
150:3

**end** 82:6 83:13 129:18

**endanger** 40:7 128:1

**endangered** 45:5

**endangering** 127:24

**ended** 82:6

**ending** 17:9 32:17

**enforcement** 8:11,25
19:25 100:17 123:13

**engaged** 150:4

**engaging** 149:24

**enrolled** 12:3

**ensure** 116:8

**entered** 17:12

**entering** 126:10

**entirety** 117:4

**envision** 66:10

**equipment** 35:25 36:8,
16,17

**equipped** 32:21

**essentially** 92:4
132:21 146:12

**estimate** 46:2 89:7

**evaluation** 117:8

**evaluations** 149:20

**event** 23:22 25:21 26:4
32:8,11

**events** 23:2,24 25:22

**evidence** 111:3,21
112:7,9 116:12,14,17
124:13,18 125:8 131:24
132:4,18,22 133:24
134:1

**evidentiary** 135:15

**exact** 25:1 46:5,9,12,23
51:24 52:10 53:10 66:6
77:1 82:12 101:15
108:6

**EXAMINATION** 4:15

**examine** 76:7

**examined** 4:14

**Examples** 97:1

**Excellent** 128:8

**exercise** 41:13 44:25
45:11

**Exhibit** 19:2,5 61:9
64:18,21 66:25 76:14,
15,17 109:21,24 110:4
113:16 117:12,15
118:1,4 119:1,18,21
120:8,11 121:10,13
122:19,22 123:17,20
124:7,10 125:17
131:19,22 135:2
142:22,25 146:4,7
147:17

**Exhibits** 76:11,14

**exist** 68:12 119:7

**exit** 126:9,10 127:8

**exonerated** 109:7
110:21 111:6,7,13
128:12 130:22

**expect** 47:23 49:24
114:16

**expectation** 150:13

**expected** 13:21

**experience** 55:2,9
56:4,16,21 82:19 96:11
98:21 145:12

**experienced** 57:14

**exposed** 59:10

**extent** 76:5 149:12

**external** 150:23

**extra** 24:1 31:24
138:21,22

**extra-job** 23:23

**extradition** 70:8

——————————

**F**

**Facebook** 142:20

**facility** 10:3 14:1,5,8
60:2

**facing** 67:4 103:21

**fact** 149:5

**facts** 62:18 63:3 100:5,
14 102:21 116:18
133:17 136:6 137:7
145:22 148:21

**factual** 111:21

**faint** 94:12,13,14,18,23,
24 103:8 119:5 120:4

**fair** 6:17 50:16

**fake** 60:20,24 61:1

**fall** 41:11

**falls** 90:17

**false** 95:17,21

**falsehood** 62:25

**falsified** 63:11

**falsifying** 20:2

**familiar** 11:23 19:9
30:19 114:24 115:8

**families** 13:21 16:20

**family** 13:11 17:2

**February** 128:13
130:18 143:1

**Federal** 4:10 151:4

**feel** 31:3 80:24

**feeling** 115:10

**feet** 64:14 146:16

**females** 70:25

**field** 21:6 22:19,22,24
25:11 29:13,20,23
31:15 56:19 78:7,9
96:5,12 97:9,18 98:2
100:25 101:5 103:11
105:7 106:1 107:24
108:3,15 117:19 122:8,
12 133:8,12 134:4,15

**field-tested** 133:24

**Fifty** 47:2,6

**fight** 24:19 38:23

**figure** 5:17 117:6,9

**file** 36:16 37:7 69:24

**filing** 37:12



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 48 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**fill** 90:6 124:12,15 137:3

**filled** 90:3,4 147:24

**filling** 106:13

**final** 120:12 132:11,14

**finally** 125:11 131:7

**finance** 17:4

**financial** 138:9,14

**find** 25:7 97:25 100:10
110:24 129:10 150:6

**finds** 97:3 99:12

**fine** 8:18 14:22 18:18
48:1,23 49:12,13,15
65:7 81:1

**fingerprint** 69:25 70:1

**fingerprinted** 70:1,2,4

**fingerprinting** 48:20

**fingerprints** 70:5

**fingers** 80:12,23 86:22

**finish** 54:15 77:15 99:5

**finished** 5:10

**fired** 16:1,6,7

**fix** 37:2

**fixed** 36:4,10,12,17,23

**flag** 25:14

**flagged** 70:7

**floor** 26:19

**Florida** 8:4 9:23 14:2
18:16,24

**flour** 81:5,6

**flower** 124:20

**fluids** 72:10

**focused** 77:25 108:21

**folks** 30:12

**follow** 137:1

**follow-up** 122:6

**food** 29:9 72:11

**foot** 21:22

**Ford** 36:25 67:19 69:19

70:3,4,7 77:25 83:22
84:21 105:1,16 107:10

**forget** 70:2

**forgive** 14:21

**forgot** 10:6

**form** 20:9 40:19 41:17
42:19 54:2,13,20 77:13,
17 121:3 136:2 137:15,
21 143:5 144:10,24

**formal** 58:25

**Forty** 130:5

**forward** 63:2

**found** 38:18 52:6,14
53:5 56:11 69:23 75:13,
17,22 109:3,4 129:11
144:17

**founded** 111:3,4

**Fox** 23:22 28:14,16

**fragrance** 115:24

**Fridays** 150:18

**frogs** 124:23

**front** 39:11 104:6

**fuchsia** 92:6

**full** 70:8

**fully** 76:25

**Fulton** 14:17 15:23
49:8,16 117:16

---

**G**

**garbage** 135:1

**Garnett** 28:10,11

**gas** 23:20 67:13,15
143:9 146:2

**gauged** 149:13

**gave** 94:11 118:15
128:3

**GBI** 57:13 58:11,16,19,
24 116:22 117:4,10
123:21 135:19

**GBI's** 124:5

**geared** 61:17

**general** 40:1

**generally** 8:13 29:12
31:10,21 32:9 33:2
36:15 42:15,17 43:3,23
45:10 48:9 62:12 76:8
105:5 147:2

**gentleman** 69:22

**Georgia** 4:7 15:16,22,
24 18:20 19:14 20:1
44:19 123:20 135:16

**give** 4:23 5:21 25:1
26:22 40:5 42:7 43:9
44:10,15 46:7,8 57:14
58:2,12,17 100:19
108:14 127:1 132:22
139:9

**giving** 4:18

**glass** 26:19 31:2 87:4,
24 88:17 90:20 91:23
103:4

**glove** 134:24

**Goldring** 4:5 28:19
37:17 50:17 51:2 52:8
53:21 63:4,10 64:11
67:19 69:19,23 71:17
74:9 76:4 77:8,11,20
78:2 83:21 94:7 105:1,
16 107:10 111:24 112:3
113:24 114:5 118:5
123:1,2,22 135:22,24
136:7,22 137:7 143:3
148:10,17,18,23 149:1

**Goldring's** 54:18
57:24 73:8,19,24 75:13,
17 120:12,22 121:6
123:14

**good** 32:3 99:19,20
107:17 148:1 149:15
151:2

**Goody's** 115:12,13

**governing** 19:18,24

**grabbing** 88:23

**graduate** 7:25

**graduated** 7:17 10:21

**graduating** 8:10

**Grady** 27:16 28:13

**gram** 55:12,13,22
89:11,17,19

**grams** 52:3 53:11,14,
16 55:9 82:7,16 89:7,
12,15 144:16,21,22
145:1

**grams'** 82:21

**grand** 57:21

**grant** 14:4 59:19

**grants** 13:17,20

**Gray** 77:5

**gray-and-black**
124:20

**great** 85:8

**green** 124:23

**Greenamyre** 4:3,16
6:14 7:11,14,15 9:5,12
10:13 19:3 20:11 22:8
27:3 40:21 41:2,23
42:20 44:9 46:1 47:5
51:18 52:25 54:3,15,17,
23 61:2,6,10 64:19,25
65:5,9,10,14,18,21
66:3,19 67:1 70:19
76:12 77:15,19 79:21
85:20 88:13 89:16 90:1
94:2 98:14 99:3 102:10,
14,17 109:22 113:17
117:13 118:2 119:19
120:9 121:4,11 122:18,
20 123:18 124:8 125:18
128:11 130:9 131:18,20
135:3 136:5,25 138:4,6,
12 139:22 140:24
141:20 142:23 143:11
145:3,9 146:5 147:15,
18 151:2

**Greyhound** 28:9

**gross** 139:13

**ground** 4:24

**guardian** 15:5,9,19
16:14

**guess** 11:5 15:8 24:13
27:4 43:14 46:16,25
90:24 109:5 111:7,25
115:23 127:4 129:19



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 49 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

132:15

**guessing** 34:3 82:24

---

**H**

**Half** 55:12,13

**half-gram** 55:22

**hand** 125:19

**handcuffed** 103:20 105:2

**handcuffs** 70:12

**handed** 119:20 122:21 123:19 129:8 131:21

**handing** 61:11 64:20 67:2 76:13 109:23 113:18 117:14 118:3 120:10 121:12 124:9 135:4 142:24 146:6

**handling** 113:7 129:21

**hands** 63:21,24

**hands-on** 60:18,19 61:5

**happen** 105:5 130:23

**happened** 64:8 78:5 91:7 95:24 96:16 111:17,18 112:3,20 117:1 123:9 126:5 129:2,3,9,13 136:7,23

**hard** 102:2

**hazard** 127:3

**hazardous** 72:10

**head** 5:22 53:22 101:12 103:1 105:22 131:2

**headaches** 115:11

**health** 8:23

**hear** 17:20 108:13 121:5 129:22

**heard** 30:17 31:6,7 95:4 97:6 98:13 120:25

**hearing** 49:13 57:13, 17,18,22 58:5,8

**hearings** 57:20

**helpful** 5:23

**helping** 52:11 137:3 150:9

**helps** 67:10

**Hennessey** 55:24,25

**Henry** 4:1,4,5,13,17 111:22

**heroin** 51:7,14

**hidden** 98:12

**high** 7:20,21,22 11:8 14:12 28:13 45:16 58:13 89:22 127:2,9,23 149:10

**highway** 126:9,11

**hire** 17:7,10

**hired** 14:7 20:23 50:22

**hiring** 17:5

**history** 36:11,20

**hit** 31:18 40:6 41:25 126:17

**hold** 65:16 132:21

**holding** 47:17 63:21,23 142:2

**holidays** 23:1 138:24

**home** 13:6 141:11,16, 21,23 150:18

**homeless** 27:22 30:4 49:22 71:17,19,21

**honest** 46:24 62:15,24 106:10 107:18,21 114:11 118:14

**honestly** 75:10 80:16

**hood** 78:15,19,25 116:11

**horses** 22:3

**hotel** 27:25

**hour** 43:20 44:8

**house** 98:19 99:8,10

**housing** 17:5

**Howell** 81:23 85:19

**huh-uhs** 5:22

**hundred** 38:5 46:10, 14,16,20 47:1,16 64:14 142:1

**hundred-fifty** 64:14

**hundreds** 39:10,19 140:22

**hurting** 27:12

**hypothetical** 145:23

---

**I**

**I-75** 126:11

**ID** 69:21

**identification** 61:18

**identifying** 59:23

**illegal** 101:2,4

**illustrations** 142:5

**imagine** 35:6 39:8

**immediately** 70:18

**impacted** 16:19

**impacts** 16:18

**implemented** 34:13

**important** 62:21

**improperly** 67:23,24 68:8 113:6

**in-car** 32:20

**inappropriate** 62:25

**incarcerated** 135:25

**incentive** 150:17

**incident** 19:21 33:11 34:15 45:5 53:7 62:22 63:3 119:23 133:22 134:4 142:6,17,25 143:1 146:7,8 148:25

**incinerated** 135:15

**including** 140:1,4

**income** 138:18 139:3, 13,15

**incoming** 127:2,23

**inconclusive** 133:24

**increase** 29:18

**Independent** 112:17

**Indian** 9:10 16:15

**indicating** 67:4 80:17 87:19,23 88:2 90:8,9, 12,23 93:10 105:13

**indication** 120:3

**indictment** 120:11,16

**individual** 113:25

**individuals** 63:5,16

**influence** 43:10,20 44:11

**information** 25:1 58:13,17 111:3

**infraction** 18:18 146:9

**infractions** 18:17 49:21

**initially** 62:2

**inside** 29:7 72:15,18 73:8,19 78:10 79:7 86:21 87:4,25 88:17 99:8,12 116:2,9,21,23 134:6,24 144:17,22,23 145:14,15,23,24 146:1

**instance** 47:10 84:18 85:1 109:18 113:10

**instances** 116:5 128:3

**instructions** 95:14

**insufficient** 96:22

**intend** 138:8

**intentionally** 6:7

**interact** 37:17

**interaction** 37:6 71:16

**interior** 144:17 145:15

**interjecting** 99:4

**interrogatories** 137:2

**interrupt** 56:20 118:21 126:24

**interruption** 89:23

---



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 50 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

intersection 43:21
64:22,23 66:4 67:9

interview 122:7

interviewed 122:4
131:4

intoxicated 27:11,12,
17

inventories 73:11,13

inventory 72:3,5,7,11,
18,23,25 73:2

investigate 63:11

investigated 109:1
113:7

investigating 150:5

investigation 24:23
52:12 63:9 84:10,12,17,
19,20,22 94:8 109:2,6
110:6 111:5,7,8,9
112:23 113:6,14 121:14
123:21,22 135:16

investigations 125:21

investigative 22:19,
22,25 25:11 29:14,20,
23 110:10 113:21

investigator 4:1,13
21:8 25:13,16,17 31:12,
15,22 111:20

investigator's 25:13

investigators 58:22
122:3

investments 141:3

involved 17:24 52:11
53:6 116:1 125:21
130:12 148:23 149:6

involving 146:8

issue 40:14 99:23
128:18

issued 31:22 32:14

issues 27:5,22

issuing 41:3,15

item 86:20,22,23 87:3
98:11 124:12,15

items 72:19,25 98:11

124:17 125:7

_____

**J**

J-A-C-S 10:7

jacket 144:18,23

JACS 10:3,7

jail 47:23 48:1,19 49:8,
10,11,16 83:25 84:8,13,
15 136:13

January 132:5

jaywalk 27:20

jaywalked 71:9

jaywalking 18:21
27:13 39:12,22 40:13,
18 41:3,12 42:17 44:20
45:2,8,17 46:4 47:10,
17,18,21 48:7 49:5,23
50:13 146:9 147:2

Jefferson 14:1,8 59:19

job 12:11,12,19 16:10,
24 17:22 24:1 31:24,25
40:11 41:19 62:9
136:21 139:6 149:23

jobs 8:10,11 9:15 15:25
16:17 32:5,6 138:21,22
139:1,8

Johnson 120:17

join 62:7

joining 29:17

jointly 141:13,15

JONES 7:13 20:9 65:3,
7,12,16,25 77:13,17
102:7,13

judge 48:22 57:10
106:14,17,22 107:1,4,7
117:25 118:17

judgment 150:22

Julius 4:5 111:23 112:3
114:4,5 118:5 120:12
123:2

jump 63:2

jumping 30:15

June 130:25

Juniper 28:14

jury 57:21 114:23

juvenile 8:15,19,20
10:6,8 12:9,19 14:15,19
15:3

juveniles 10:2,8 15:6

_____

**K**

key 5:2

kids 13:12,13,21

kind 27:13 30:16,17
32:4 33:12 36:7,16 37:7
42:18 49:21 56:6,8
58:25 60:12 62:25 64:1
73:2 74:17 76:23 79:2
80:23 81:5 86:1 91:19
92:5 103:24 104:17,20,
25 112:13 115:16
145:19

kit 54:7,8,11 56:19 83:6,
11,14 84:1,25 85:3,4,5,
6,12,13,15,16 86:5,9,
12,17 87:2,4,6,9,10,18
88:9 92:20 93:8 95:10,
13 97:19,22 98:2 99:13
100:4,25 101:3,6,23,24,
25 102:25 103:23
105:18 106:1 117:7
122:15,16 134:7,17,22

kitchen 97:25

kits 78:7 83:16 85:1,5,
14 95:17 116:23 117:2

knew 11:16

knowing 34:19 84:23
135:19 136:5,11

knowledge 13:23
34:22 82:19 97:13
121:24 132:19 137:18

_____

**L**

label 66:25

laced 56:3

lacing 56:2

laid 60:3

large 28:4 55:20 72:23

largest 51:3,20 52:5

lateral 17:17

law 8:11,25 19:24 39:20
44:19 49:1 50:7 100:17
123:13 146:19 148:11

lawsuit 18:6 121:7,8
137:16 142:6,9,12,17

lay 41:12

lead 43:6 51:4 52:19

leaf 144:10

leaking 75:7

learn 25:15 58:10 71:16

leave 26:23 84:22

leaves 97:16,19

leaving 14:12

led 148:22

Lee 81:23 85:19

left 12:9 102:24 104:7
144:18

legal 17:24 114:7

Leon 143:9

lesser 39:20

level 40:3 48:15

license 44:13 114:2

lieu 16:1

Lieutenant 109:25
110:5 113:20

life 16:19 25:20,24 27:4
30:16 40:7 45:15 56:6

lifting 11:16

lighter 72:10

lights 126:8 127:1,3

liquid 91:19 92:1

list 8:12 133:22

listed 35:1

litem 15:5,9,19 16:14



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 51 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

**live** 60:1

**lives** 16:18

**lo** 99:14

**location** 84:14

**locker** 134:1

**lockers** 104:19

**log** 35:4,10 36:4,7,16 72:17,21,22,24

**logged** 124:17 125:8

**logging** 13:8

**logo** 124:24

**loiter** 26:11,13

**long** 10:23 44:11 47:23 49:24 108:2,4,6

**longer** 135:15

**looked** 61:17 73:9 74:15 76:21 79:7,9,10, 11 81:12

**loose** 75:4 76:2

**loose-leaf** 97:15

**lost** 42:6 126:20

**lot** 24:6 25:13 26:9,12, 14 27:21 32:25 47:15 52:13,14 55:10 59:6 60:19 90:11 144:21 145:3,5,8,9,10,17

**lots** 26:8

**loud** 139:19

**low** 40:3 48:15

**lower** 19:17

**lower-level** 31:1

**lying** 129:10

---

**M**

**machine** 103:19,22

**made** 16:17 51:5,7,11 69:7,14,18 75:21 83:18 86:23 94:7 121:13 142:14 150:17

**main** 27:25 29:6

**maintain** 25:22

**Major** 110:5

**make** 4:24 6:3 10:16 24:5 26:14,16 39:15 40:3,15 41:14 44:19,23 45:1,8,14,16 49:6 51:2 56:7,11 60:23 61:6 65:21 69:17 72:4,9,25 74:7 77:16 85:4 87:12, 17,20 91:11 97:10 99:18 147:10,11,19,23 149:14,20 150:2,14,21

**makes** 31:3 69:5 89:9 97:2

**making** 20:7,13 23:20 24:2,3 26:8 55:1 72:17 133:21 139:23,24

**male** 114:9

**manager** 8:24

**manual** 131:24

**map** 64:21 66:21 67:16, 18

**March** 120:19 123:3

**marijuana** 51:12,22 52:21 56:3,17,18,21 97:16,19,21 143:25 144:1,7,10,13,16,21,22 145:12,13,14

**mark** 82:13

**marked** 19:2,4 33:15 61:9,12 64:18,20 76:11, 13 109:21,23 113:16,18 117:12,14 118:1,3 119:18,20 120:8,10 121:10,12 122:19,21 123:17,19 124:7,9 125:17,19 131:19,21 135:2,4 142:22,24 146:4,6 147:17

**master's** 7:18 8:5,7,9 11:22 12:2

**mater** 11:3

**matter** 4:5 40:2

**matters** 17:2

**Mcclendon** 40:19,22 41:17 42:19 54:2,13,20

**136**:2,15 138:11 143:5 144:24 145:7

**meaning** 25:24 62:17, 20,24

**means** 93:20,22 95:9 111:13 138:9 144:7

**measured** 149:13

**measurement** 117:7

**media** 142:15,18,19

**meet** 84:14,20

**members** 23:25 149:24

**memorandum** 109:24 110:5

**memory** 146:2

**mental** 8:23

**mentioned** 28:1 43:8 128:21

**met** 28:19

**metal** 74:17,20 75:1,3 76:23

**metro** 16:25

**Miami** 7:24 9:2,24 10:1 11:7 15:13 16:15,23,25 17:2,4

**Miami-dade** 9:25

**Miccosuke** 9:2,4,11 113:5

**middle** 5:17 64:16 105:14 146:22

**Midtown** 21:5 22:16 23:10,11 28:23 29:19 31:13 32:6 33:24 34:6 38:12 39:9 47:22

**Mike** 121:17

**mile** 143:10

**miles** 43:20 44:7

**mind** 17:4 89:24

**mine** 129:8

**minimum** 150:13

**minutes** 147:10

**misdemeanor** 18:22

**missed** 17:17

**missing** 9:20 10:10 130:2

**mistaken** 10:22,24 14:20 38:3 69:8 74:1,19 92:19 106:9 109:4 129:15 139:21 141:22 145:25

**mixed** 79:18,23

**mobile** 22:14 23:3 29:14,19,21,22,24 30:7 31:13 69:25

**model** 32:25

**Mollys** 51:15,17

**moment** 41:24

**money** 60:23 72:23 140:13 141:6

**monitoring** 13:9

**Monroe** 28:13

**months** 136:13

**motion** 120:16

**mouth** 120:25 121:5

**move** 6:21 17:2 40:5 44:16 127:8

**moved** 14:14 22:18 28:22 29:16

**movement** 17:17

**moving** 17:1 63:6 68:1, 3 69:12

**multiple** 50:10 89:3

**murder** 150:8

---

**N**

**N-A-R-C** 86:15

**N-A-R-K** 86:14,15

**names** 69:22 70:10

**narcotic** 96:7,15,24 97:12

**narcotics** 58:15 135:14,17


Elizabeth Gallo
COURT REPORTING, LLC

Case 1:18-cv-01191-WMR  Document 54  Filed 07/17/19  Page 52 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry                                                April 09, 2019

**NARK** 86:13 95:13 96:12 98:2 99:13 100:4 101:5,21 102:25

**narrative** 106:4 118:20, 23 133:22 134:3 143:14

**natural** 5:8

**needed** 83:4 108:22

**negative** 56:14 92:15, 18,22 93:20 108:24

**neighborhood** 30:7

**night** 129:23

**nobody's** 45:4

**nods** 53:22 101:12 103:1 105:22

**nol-pros** 135:21

**nol-prossed** 120:18 123:5

**non-arrestable** 42:14 43:1,4

**normal** 5:3,8

**north** 66:13 67:5,9

**north-south** 66:21

**northbound** 126:12 141:19

**Northern** 4:7

**nos** 5:22

**notation** 75:16,21

**notice** 4:8 26:12,13,18 74:8,12

**noticed** 31:8 64:15

**noticing** 26:19

**nowadays** 48:6

**number** 4:6 28:4 47:18 85:13 149:19,22 150:2, 3,13,18,21

**numbers** 53:14

**numeral** 110:9

---
**O**
---

**O.C.G.A.** 151:5

**oath** 5:5 19:5 41:19 137:4

**object** 20:9 54:13 77:13,17

**Objection** 40:19 41:17 42:19 54:2,20 136:2,15 143:5 144:24

**objectively** 96:21

**observed** 126:7

**obstruction** 48:4

**occasion** 22:3 52:15

**occurred** 44:14 110:13 111:8

**occurring** 26:9

**occurs** 24:5

**October** 21:8,9 31:23 33:12 34:20 37:5 38:12 52:7 61:13 96:4,12 99:15 107:20 130:17 131:12 132:3 135:25 137:11

**odor** 143:24

**off-the-record** 22:7 61:8 64:24 66:24 138:5 141:19

**off-white** 79:17,20

**offenders** 48:2

**offense** 18:21,25 38:17 40:3,4,8 41:8,18,21 42:2,3,4,13,14,16 43:1, 2,8,12 44:1 45:21,24 47:24 48:18 57:9 69:11 136:14 147:2 148:11

**offenses** 30:18 39:17 41:11 42:17 43:3,4 44:21 45:17 47:19 48:16 50:14 57:1 148:15

**offhand** 128:16 140:17

**office** 19:5 104:19 106:3

**officer** 8:16 9:1,23 12:9,19 16:15,16 19:6 21:1,13,14 22:1,11 24:12 25:17,18 35:25

40:25 41:13,19 44:23 46:4 50:24 51:4,9 52:10,17,19,22 53:2,3, 4,6 55:2 59:3 62:3 69:6 77:7,20 78:6 80:4,8,11 96:11,22 99:8,12 102:8 105:25 107:3 108:13,17 111:8,10,19,22 112:13 117:18,23 118:9 123:13 129:14 143:2 144:20 145:16 146:8 149:13,23 150:12,14

**officers** 19:25 23:23,25 35:19 45:11 98:23 116:4 150:6,17

**official** 58:25 123:20

**oftentimes** 55:21

**one-** 128:3

**One-day** 126:2,3

**one-way** 42:6,8 66:12 126:11

**open** 74:24 75:24 76:1 78:13 79:3 100:2,24 104:17,18 116:11,16 120:18

**opener** 87:3

**operating** 131:23

**opinion** 107:24

**opposed** 41:15 45:2 84:8

**OPS** 94:8,23 109:1,6 110:6 113:21 121:14 125:21 131:4

**order** 8:17 73:2 112:11 132:23 133:3

**ordinance** 45:25 49:1, 11

**organized** 23:10

**oriented** 66:19 67:10

**original** 51:19

**originated** 30:25

**ounce** 52:1 53:17

**ounces** 53:11 55:15

**out-of-pocket** 13:22

**outcome** 109:2

**outcomes** 109:6 110:17

**Overhead** 66:5

**overtime** 138:23,24,25 140:2,4,5

**owned** 141:13

**owner** 100:18 135:17 141:13

**owners** 23:20 30:3

---
**P**
---

**p.m.** 151:3

**packaging** 93:13 95:14

**packet** 134:6

**pages** 68:25 124:16

**paid** 13:14 139:7,10

**paired** 23:2

**panhandled** 26:5

**panhandlers** 26:2

**panhandling** 26:7

**paper** 121:1,3

**paperwork** 37:7,13

**paragraph** 19:17

**parents** 10:18 13:14

**parked** 127:7

**parking** 26:8,9,12,14 127:11 144:21 145:3,5, 8,9,10,17

**part** 31:10 37:18 60:5 63:10 67:7 88:3 136:21 147:19 149:1

**part-time** 14:16

**parties** 4:9

**partner** 22:20 129:8,23

**parts** 90:20

**party** 17:25 63:19

**pass** 27:18 127:9



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 53 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

passed 16:23 19:4

passenger 38:2

passing 63:7

patrol 21:16,17,18,21
22:9 23:10,14,18 24:8,
10 25:18,21 28:2 29:12,
16,25 33:14,15 50:24
130:15 146:16,17,22

pause 5:16

pay 13:14 18:18 29:19
48:1,22 49:12,14 139:8

PD 9:2 113:5,6

peace 25:22

Peachtree 28:16

Peachtree-forsyth
28:11

pebble 60:10

pedestrian 41:5,6
43:11 44:20 45:18
48:16,25 123:5 146:18
148:10

pending 4:6

pension 141:7,9

people 14:10 23:21
26:4,10,11 28:6 30:6
31:2,3 39:19 43:2,3
47:9 56:3 64:4 70:24
71:4,9 107:12,14
108:20 114:23 115:8,11

people's 16:18

percent 38:5

perfect 7:14 17:7 97:1

performance 149:13,
16,20

perimeter 24:20,25
25:4

period 21:4 22:4 51:1,
10 52:6 150:14

permission 118:15

perpetrator 24:25 25:4
27:2 38:19

perpetrators 24:21
25:5,6 26:13 83:25

103:20 106:14 150:7

person 24:21 39:16,23
49:5,22 56:12 63:10
64:12 74:7,11 78:7
99:16 111:17 112:2,19
125:13 130:13 132:22
146:21

personal 17:24 145:12

personally 40:2
149:20

persons 50:12

perspective 56:10

Petrie 53:2

phone 89:24 107:4
125:2 147:11

photos 142:4

phrase 95:4,9

physically 15:7 29:7
103:15 107:3

pick 37:13 86:21 87:1

picked 127:6

pieces 91:23

Piedmont 64:22 66:9,
10,12,14 67:9,24 68:8

pink 92:14,19,22,25
93:1,3,7,15,20 94:14
103:7 124:23

pinkish 94:1

place 41:21 48:15 70:5
78:22 86:21 87:2 90:15
93:10 103:20 116:19
127:2 132:3 134:25
136:22 140:10

placing 134:6

plaintiff 18:6

plaintiff's 19:2 61:9,12
64:18,21 66:25 76:11,
14 109:21,24 110:4
113:16,19 117:12,15
118:1 119:18,21 120:8,
11 121:10 122:19,22
123:17,20 124:7
125:17,20 131:19,22
135:2,5 142:22,25
146:4,7 147:17

plan 17:1

planning 83:15

plastic 55:24

pleasure 4:17

pocket 144:18,23
145:15,24

point 34:19 36:19
37:12,16,20 53:23
63:13 69:14 70:12,20
71:16 78:2 91:13,19,25
100:24 102:11 113:12
127:10 129:17 136:22
137:11

points 6:6 31:19

police 9:4 16:14,16,22
19:6,18 21:1 30:25
31:11 35:1,19,20,24
36:6 40:25 41:19 44:18,
23 45:11 46:4 48:4
59:3,4,12 60:16 61:3
62:2,7,8,12,14 68:22
69:1 72:2 75:18,22
94:3,22 96:22 116:5,11
119:22,25 120:3 121:20
127:22 131:23 133:12
135:6,10 138:20 144:14
145:16 146:12 149:13,
23 150:12

policing 23:19 24:2
26:1 30:2,10,18,24

policy 20:5,15,20 35:24
36:6 44:18 72:2 127:14,
17 128:2 131:24 132:3,
17 133:7,12 135:6,9,14

polygraph 112:25
113:10,13 128:25

Ponce 28:14 67:9
143:6,9

population 27:23

portion 88:24

posed 65:6,18

position 11:1 15:23

positive 16:17 56:14
57:16 58:6 74:2 91:8,
10,11 92:8,11,14 93:2,3
94:1,4,12,13,18,19,23,
24,25 95:2 96:6,13,20

97:5,10,18,19,23 98:3
99:14 100:4 103:8
108:19 119:5,12 120:4
122:8 133:23 148:21
149:7

positives 95:17,22

possession 99:17
100:6

possibly 47:4,6 89:14
126:14 139:20

POST 17:11,12 61:12,
22

pouch 55:14 86:18,22
88:22 89:21 90:2 91:21
103:3 108:2

pour 88:18,19

powder 51:12 52:5
55:3,8,16,17,21 60:10
79:9,10,11 81:6,10,13,
17 82:21 84:2 88:16
89:22 90:3 100:3 101:9,
10,11,20 114:17,20,21
115:11,12,13,15,16,17,
18,19,20,23 116:1,5

powdered 81:7

powders 114:23

pre-employment
113:5

precinct 28:25 29:1,5,6
78:10 81:19,21 83:15,
21 84:6,9,17 85:15 86:5
103:17,24 104:3,6,23
107:22 108:3 134:19

preliminary 57:22

preparation 68:19

prepare 118:22

prepared 117:21,22

prepares 25:12

preparing 117:18
118:10

presence 23:14,18
24:4 25:21

preserve 19:12

pressure 150:23



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 54 of 59

Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

presumptive 95:4,6,7

prevent 23:11

price 141:23

primarily 21:24 22:10, 23

primary 51:8 52:9 73:10

principal 8:17 11:1,11, 13,21 12:10

print 124:14

prior 139:24

prison 14:2,3,10 18:22 59:20

private 11:5,6

probable 20:3 40:12 73:7,14,17 96:6,14,23 97:20 98:3,16 99:16,21 100:5,25 148:9,15

probation 8:15 9:23 12:9,19

problem 6:23 13:7 14:24 37:3 100:19 143:19

procedure 4:11 127:15,17 131:23 136:9,12 151:5

procedures 133:23

proceeding 17:24

process 48:19,20 84:5 106:13

processed 10:9,10,12

processing 10:14

prod 6:1

produce 111:21

profile 61:13

program 12:4 14:5,6

programmed 107:8

progress 24:19

promoted 21:7

promotion 29:18 139:17,20

pronounce 109:25 110:3

proof 112:13

proper 84:5 136:9,12

properly 129:21

property 57:8 72:7,8, 12 73:1 76:8,9 81:20,21 113:7 116:19,20 124:12,13 128:20,24 129:8,9,11,17,21,24,25 130:4,7 131:24 132:4

prosecute 20:3

prosecution 20:8,13 56:9

prosecutor 123:13 135:21

protect 19:12

Protocol 124:20

proved 111:10

provided 134:18

proximity 64:11

psych 8:3

psychiatrist 13:11

psychologist 13:11 14:4

psychology 7:18

public 27:7,9,10 31:3 38:22

pulled 145:21

Pulliam 121:18

punishable 18:22

punitive 138:10

purchase 141:21,23

Pure 79:15

purely 150:22

purple 92:1,5,24 93:22

purplish 92:14 93:16, 18

purposes 4:9 147:12

purse 53:24 72:14,15, 18 73:3,8,19,25 75:14,

17,22 124:21

pursuant 4:8 151:4

pursued 127:10

pursuit 125:25 126:6 127:14 130:14

put 17:5 29:12 35:20 36:4 55:24,25 56:13 57:8 70:12,14,17 79:2 80:19 88:16,21,22 89:3, 8,22 98:1 100:3 103:2 113:12 116:23 117:2,7 129:24 130:1 134:22, 24,25 145:21 147:20

puts 99:13

putting 134:16

**Q**

qualities 45:15

quality 25:20,23 27:4 30:15 94:16

quality-of-life 23:13 27:5,22 38:21 45:13 49:21

quantities 55:2

quantity 51:3,20,23,24 52:10,13 53:5 55:20 81:25

quarter 143:10

question 5:9,16,18,24 6:7,8,15,18 20:10 39:18 41:10 42:22 44:25 46:13 49:19 51:19 53:19 54:9,16 58:23 65:6,15,18,19 66:3 73:16 77:14,15,18 96:8 107:17 122:6 145:7 149:3

questions 8:14 43:15 63:15 102:12 122:7 132:9 137:1,4 138:14 143:15 147:9 148:8

quick 60:23 108:8

quickly 6:21 17:3

**R**

radio 25:1 34:23 83:3

ramp 126:9,10 127:8

random 33:7,8

range 46:7,8,9 47:14

rate 21:19 95:16,18 127:9,24

raw 143:24 144:1,7,13

re-marked 67:3

reaching 23:20

read 7:12 121:24 128:15 133:8 137:21 143:14

reading 133:14 143:8

reads 133:21

real 94:15 108:6

realized 127:4

reason 12:9 13:9 47:11 71:7 127:16

reasonable 73:7,13,17 96:22

reasoning 16:13

reasons 39:16 120:18

receive 31:16 60:15

received 7:17 8:9 13:17 14:15 16:23,24 17:6 58:8 60:13 95:12

receiving 109:19

recent 48:14

recently 21:7 71:18,24

recess 102:16 147:16

reckless 40:8 42:4 44:12

recognize 64:23 66:4, 5,8 121:14 135:5,9

recollection 71:4 133:17

record 4:24 6:3 36:7 61:11 77:16 99:6



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 55 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

102:19 138:6 141:17
147:19 148:2

**recover**  56:12

**recovered**  128:20

**recruit**  62:7,9

**red**  33:17 126:8

**reduce**  21:19

**refer**  94:4

**regard**  19:23

**Reginald**  138:10

**Register**  122:22

**regular**  66:21 74:15
97:3 115:23 140:15

**related**  27:22 50:14
131:11 142:6

**relationship**  64:1

**relay**  62:17

**released**  10:18 48:9
49:7 50:1

**relocation**  16:11

**remaining**  133:25

**remarks**  64:24

**remember**  5:2 7:3 8:24
9:7 13:5 15:12 35:17
37:9 38:6 52:20 53:6,8,
15 57:25 58:7 63:23
64:6 67:21,22,25 68:3,
6,10 69:3,20 71:2,19,
20,25 74:13,25 75:10,
12,15 76:3 77:1,5,10,
22,24 78:1,4,21 79:4,5,
11 80:7,13,14,16,25
82:12 83:7,8,12,19,20
86:16 88:9,23,25 93:9
103:22 105:3 106:10
107:2,12,13 108:1
109:2,19,20 114:4,11,
14 116:3,7 118:14,16
123:15 128:13 129:7,19
130:20 131:2,5,6,13,14,
17 137:3,12,15,25
139:14 141:24 142:13
144:2,3 149:11

**remembered**  7:5,8

**rental**  139:3

**repeat**  39:18 42:22
48:2

**report**  35:1,20 56:13
68:21,23 69:1 75:18,22
94:4,22 106:15 118:23,
24 119:22,25 120:3
123:20 134:4,12 142:25
143:21 144:5,14,19
146:7,12

**reporter**  5:5 6:11 9:3,6,
9 10:4 26:15 44:3 45:23
47:3 51:16 52:23 60:21
70:16 79:19 85:17
88:11 89:13 93:24 98:7,
25 102:6 121:2 128:9
130:6 136:18 139:18
140:21 143:7

**reporter's**  6:3

**reports**  35:19 62:12,14
133:22

**repositioned**  66:25

**represent**  33:12 67:7

**represented**  121:17

**reprimand**  128:19
129:14,16 131:8,15

**requested**  6:11 9:3,9
10:4 26:15 44:3 45:23
47:3 51:16 52:23 60:21
70:16 79:19 85:17
88:11 89:13 93:24 98:7,
25 102:6 121:2 128:9
130:6 136:18 139:18
140:21 143:7

**require**  44:19

**required**  111:23
127:19

**requirements**  150:5

**reservation**  9:10

**reserved**  151:6

**resign**  16:1,3

**resigned**  16:6,10

**rest**  13:5

**restaurant**  32:10

**Restrepo**  22:1 34:20
37:17,23 53:2 69:6
74:1,4,9 75:25 76:1,3
77:7,20 78:6 80:4,8,11,
12 83:19 102:8 105:25
107:3 117:18,23 118:9,
13 143:2,21 144:12
146:9

**Restrepo's**  68:15

**result**  96:6,13,20
103:13 136:1 148:21

**resulted**  126:1

**resulting**  128:18

**results**  20:2 58:11,19
87:5 122:10 123:25
124:5 133:24 135:20

**retention**  132:18

**retirement**  141:5

**returned**  135:16

**reuse**  118:23

**review**  102:19 143:17

**reviewed**  68:19 133:9

**Rice**  50:7,10 83:22

**Richard's**  76:15 99:25
100:12

**ride**  22:14,15,19

**ring**  74:17

**Road**  66:9

**roadway**  41:6 43:12
44:20 45:18 48:16 49:1
123:5 146:18 148:10

**robbery**  23:16 24:16,18
38:16 150:8

**rocks**  60:9

**role**  11:14 20:24 21:12

**roll**  41:25 104:13,16

**rolling**  24:23

**Roman**  110:9

**romantic**  64:1

**room**  103:18 104:4,7,
13,16,23,25 105:8,14,
20 106:2 107:9,16

117:21

**rooms**  103:24 104:2

**Round**  76:22

**rude**  6:2

**Rule**  151:4

**rules**  4:10,24 11:25
19:18,24 44:18 151:4

**run**  69:21

**runaways**  10:10

**running**  24:1 66:17
83:24

**runs**  41:24 66:13

---

**S**

**safely**  24:4

**safer**  31:3,4

**salary**  138:15,19

**sale**  100:6 133:2

**sales**  27:1 60:20

**sample**  124:2

**samples**  133:25

**Samsung**  125:1

**sand**  81:5

**satisfactory**  120:18

**scale**  81:23

**scanner**  69:25 70:1,6

**scenarios**  61:24

**scene**  24:22 78:13
81:17,18 83:4 84:14

**schedule**  48:15

**school**  7:20,21,22 11:5,
6,8 14:12 28:13

**scoop**  86:25 87:1
88:10,12,25 116:16

**scoops**  89:1,3

**seal**  57:8 85:6 86:18
87:2,3 88:5,6,14 116:18

**sealed**  74:18,21,22,23
116:14,17



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 56 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**search** 25:4,15 73:3 98:6,8,9,19 99:10,19, 20,24 100:18

**searches** 72:3

**seated** 105:17

**secondary** 31:25 32:5 51:9 52:11 139:1

**seconds** 108:9,10,11

**section** 22:16 110:24

**secured** 133:25

**security** 32:6

**sell** 56:4 60:23,24 61:1 82:20

**selling** 55:21 100:11

**send** 56:13 57:7 72:8

**sense** 39:15 83:18

**separate** 84:17

**series** 33:5 109:6

**serves** 146:3

**set** 24:20,25 25:3 49:18

**setting** 8:22,23

**seventy** 142:1

**sexually** 15:6

**shake** 87:4 108:2,4,5,7, 8

**shakes** 131:2

**shaking** 5:22 27:24

**shape** 87:15,17

**sheets** 35:14,15

**Shell** 143:9

**shelter** 71:18,23 77:21

**shift** 39:9

**shook** 92:3 103:4

**shooting** 24:18

**shop** 36:5 37:3

**short** 125:20

**show** 18:19 23:14,18 25:21 61:22

**showed** 61:23 92:22,24 96:5

**showing** 24:4 96:13

**shows** 91:9 97:18,19, 22 98:3 100:4 149:22

**sic** 81:23 85:19 127:24

**side** 87:13

**sidewalk** 27:18 45:19

**sign** 7:12 16:22 39:12 40:5,6 41:25 42:5,15 43:8,18 44:6 45:2 47:25 48:23 106:7 126:8 137:24 147:21

**sign-in** 35:14,19

**signature** 47:25 48:11 117:24 118:12,13 151:5

**signed** 57:10 118:6 132:7 137:14,15

**significant** 53:5 81:24 82:3,25 90:11

**signs** 39:21

**silver** 33:18

**similar** 43:15 115:4,13

**simply** 66:4

**single** 37:13 39:16,23

**sir** 133:16

**sirens** 127:1

**sit** 26:18

**sitting** 103:17,21

**situation** 27:13 42:9 43:5,6 44:4 136:6

**size** 87:16,19 105:12

**sleep** 26:10,11

**slowed** 68:4

**small** 55:10,15,22 60:9 86:18,19,23 87:7,18 88:24 90:14

**smell** 56:18 80:4,6 144:1,12,20 145:16

**smelled** 143:24

**smelling** 80:7

**smoothly** 4:25

**soap** 60:9

**social** 142:14,18,19

**soda** 60:11 98:1,2,4 99:13 115:10 134:16, 17,18

**sold** 55:8,13,16

**solely** 150:10

**someone's** 40:7 44:6 72:4 73:3 97:24 98:19

**sound** 24:6 61:19 89:9 94:9 113:22 143:4

**sounds** 27:21 42:12,25 145:19

**special** 23:2

**specialist** 8:21 12:16, 24 13:2,8

**specific** 32:11 45:5 59:1 61:17 63:15

**specifically** 55:17 144:3

**speculation** 54:14,21

**speed** 127:6,9,24

**speeding** 18:21 39:11, 21 126:8

**spell** 9:6

**spelling** 9:8

**spend** 48:3 50:8

**spent** 136:13

**spitting** 45:19

**spoke** 106:14

**spotlight** 127:12 130:14

**spree** 21:19 23:15,17

**stamp** 120:15

**standard** 131:23 149:15

**stands** 10:7

**start** 24:23 27:16 51:1 56:8 70:23 87:13

**started** 7:16 22:24 28:21 50:23 73:19,24 74:4

**starting** 38:23 50:24

**state** 5:24 11:24 13:15, 16,17 15:16,22,24 19:14 44:19 49:1,16 50:7 119:10 146:10 148:11

**stated** 127:18 129:24

**statement** 94:11 112:14 117:16,20 121:13,15,23

**statements** 108:18 121:22

**states** 19:13,17 20:1 111:20 112:8 133:6

**stating** 71:19

**station** 23:20 28:9 67:8,13,15 127:11 143:9 146:2

**stay** 47:23 49:25 100:14

**stayed** 71:23

**staying** 71:17 77:21

**step** 65:13,17,20 134:7, 8

**step-by-step** 133:23 134:3

**steps** 116:8 134:5

**Stick** 44:9

**sticker** 66:20,22 116:19 147:20

**stocks** 141:3

**stop** 10:16 15:9 39:12, 21 40:5,6 41:24 42:5,15 43:8,18,19 44:6,15 45:2,4 47:11 69:5,20 102:15 126:8 127:25 146:16

**stoplight** 127:7

**stopped** 63:8 68:5 69:13 71:8

**stopping** 69:20 102:11



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 57 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**store** 76:15 99:24,25 100:12,15,18 115:19,20

**stored** 116:1,6

**story** 19:21 43:11

**straight** 84:8,13

**straw** 86:24

**street** 27:12,18 38:23 50:7,10,23 59:10 61:4 63:5 64:16,17,22 67:19, 20,23 68:9 69:12 82:21 83:22 145:2 146:22

**streets** 31:13 59:2

**stress** 53:24 54:18 74:8,14,15,22,23 75:6, 7,24 76:1,21 77:8,21 78:3,12 79:7 84:2 100:1,2,3,21 107:25 112:22 113:1,10,13 116:2,6,9 123:23 129:1 148:22 149:7

**strokes** 56:8

**strong** 94:18 143:24

**stuff** 25:14 27:19 93:8 104:14

**Subpoena** 58:3

**substance** 8:16 12:15, 20 13:24 14:4 54:18 59:5,6,18,22 60:6,7,8, 14 75:7,8,11,13,16,21 79:3,7,9,10,12 80:5,6,7, 9,12,16 81:6,13 83:4 84:2,18 85:2,21 86:21 87:2,4,25 88:22 90:19 91:9,11 94:16 96:6,7, 13,15,23 97:3,4,5,11 107:25 114:20,21 115:4 116:9,21 117:2,7 123:22 134:6 145:11

**substances** 124:1

**sucker** 60:24

**sufficed** 11:22

**sufficient** 111:21 150:17

**sugar** 81:5,7,10

**summary** 113:21 125:20

**Superior** 117:15 132:23 133:3

**supervisor** 137:16,19 138:1

**supervisor's** 104:19

**supplement** 85:9

**supporting** 52:17

**supposed** 36:8

**supposedly** 68:7 96:1

**suppression** 22:18,21, 24 23:6,9 24:11 29:13, 20,23 37:18 38:11

**suspected** 59:23 103:3,11 135:14

**suspend** 44:13

**suspension** 126:1,2,3 128:4

**suspicion** 73:7,13,17 98:18 100:15

**suspicious** 100:1,10, 22

**sustain** 111:19

**sustained** 109:11,13 110:10,12,21 111:15,16 112:12 128:18 131:1

**swear** 4:12

**switch** 66:22

**switched** 28:22

**swore** 41:19

**sworn** 4:14 19:6 21:6 62:3 133:21

**system** 10:11 13:10

---

**T**

**table** 103:19,23 105:10, 12 139:10

**tablespoon** 134:16

**takes** 12:7

**taking** 15:15 40:4 42:5 43:8 44:6 84:9 126:8

**talk** 5:11 19:22 23:22,25 34:16 49:10 62:11 107:1 118:17

**talked** 4:22 15:25 29:21 45:3 69:9 106:21 137:19 147:1

**talking** 9:15 30:16 39:21 49:21 53:10,20 54:6 81:2 101:14 102:24 104:10 107:10 108:20,21 110:6 117:17,23 118:8 140:15

**Tallahassee** 8:4

**tan** 79:25

**targeted** 24:14

**taste** 80:8

**Taurus** 37:1

**taxes** 139:12,16

**tea** 97:15,16,19,20

**teacher** 11:18 12:3

**teachers** 11:17

**teaching** 11:20

**team** 22:19,22,25 23:6, 9 24:11 25:11 29:13,14, 20,23 37:18 38:11

**teams** 29:15,17

**teenagers** 13:7

**telephone** 89:23

**tells** 20:12 42:21

**ten** 102:4,5

**tenure** 150:12

**term** 30:20 31:6 89:7

**termination** 16:2,4

**terms** 23:5 55:9 81:9 110:23,24 115:6

**terrorist** 126:22,23,25

**test** 20:2 54:4 56:12,18, 19 57:4,13 58:20 78:7 83:4,6,11,13,16,17 84:1,3,25 85:1,14,24 86:1,5,9,11,17 88:9 94:4 95:10,13,17 96:5, 12,21 97:4,9,16,18

**98**:1,2,13 99:13 100:4, 24,25 101:3,6,23,25 102:25 103:11 105:7 106:1 107:24 108:3,15, 19,24 116:16,23 117:2, 7,19 122:8,9,13,15 124:3,5 134:4,16,17,22 135:20 148:21

**tested** 57:15 58:6 85:21 91:12

**testified** 4:14

**testify** 57:19

**testimony** 40:17 41:23 63:16 64:7 65:23,25 70:23,24 84:16 94:17 102:22 145:15 148:9

**testing** 78:9 84:18 95:5,7 103:16,23 105:18 106:15 107:11 133:8,12 135:6,10

**text** 67:3

**texture** 80:24 81:1,9 114:16,18 115:6,9

**Theatre** 28:14

**Theatre-type-of-thing** 23:22

**theory** 30:24 31:7

**thick** 115:16,22

**thicker** 115:18

**thing** 5:2 7:2,3,4 28:1 50:6 63:14 72:7 73:11

**things** 19:12,19 24:6 25:16 26:19 30:16 31:1 38:16,25 59:8,9 72:15

**thinking** 96:4 126:19 139:19

**thought** 41:23

**thoughts** 147:9

**thousand** 140:25

**thousands** 83:1

**three-minute** 147:5

**threshold** 51:25 53:13

**ticket** 40:5 42:2,7 43:9, 23,24 44:10,16

---



Case 1:18-cv-01191-WMR   Document 54   Filed 07/17/19   Page 58 of 59
Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry
April 09, 2019

**tickets** 84:4,5

**time** 4:20 6:20,22 10:3
11:16,25 15:11 16:21
21:4 31:13 32:18 34:17
35:7,13,16 36:19 37:13
57:11,16 58:7 59:5 64:8
68:13,17 69:4 73:21
74:25 78:7,8 79:8 83:9,
12,17,20 91:4 94:11
98:20 103:2,4 105:7,25
107:13 112:21 114:9
116:10 121:17,25 122:9
124:13 127:13,20
150:11,14

**timeline** 14:21

**times** 25:24 43:5 45:16
46:2,5,6 72:23 89:1
96:16 101:5,13 102:1,4,
5 103:10,13 110:25

**tip** 100:11

**today** 7:5 31:9 34:16
68:20 120:24 121:24
123:9 132:18 137:11
147:21

**told** 17:21 39:4 58:1
77:12,20 122:3

**tongue** 80:19

**top** 47:18 74:17 88:4
122:23 140:6

**tops** 76:24

**total** 139:15

**totally** 27:17 33:7 49:9

**touch** 80:12,18 81:11

**touched** 148:20

**touching** 80:16

**tourist** 126:14,18,20,
21,23

**towed** 72:6

**town** 26:4 60:25 66:12

**toxicology** 58:11

**track** 125:8

**trade** 98:17 148:23
149:1

**traffic** 18:14,16 27:20

32:7,11 38:17 40:4,8
41:6,7,8 42:2 43:8
44:15 45:18 68:1,4
69:11 127:2,23

**trafficking** 51:22,25
53:12,13 119:3 123:4
148:11

**trained** 59:24 80:10,13,
21

**training** 17:15 20:24
21:6 55:1,8 58:25 59:4,
6,12,13,16,18,22,23
60:1,2,5,12,15,16 61:17
95:12,15 96:11

**transgender** 20:14
50:12 113:25

**transport** 83:25 84:15
116:15

**tribe** 16:15

**trim** 33:18

**trouble** 30:5,6

**true** 122:2

**trunk** 78:20,25 116:11

**truth** 62:18

**turn** 75:8 116:19 133:7

**turned** 92:1 116:12
124:13 126:9 127:5
130:7

**turning** 119:13,20

**turns** 97:5

**TV** 103:19

**TVS** 104:8

**Twitter** 142:20

**two-page** 118:4

**type** 77:1 115:17
122:15

**typical** 38:13

**typically** 55:3,4,7
139:7

---

**U**

**uh-huh** 5:22 13:4 31:20

49:3 56:22 85:10 86:14
90:13 97:17 106:23
109:8 110:19 111:1

**ultimately** 144:16

**umbrella** 14:7 41:12
124:23

**undercover** 26:6,25

**undergo** 112:22

**undergone** 112:25

**undergrad** 8:11

**understand** 19:21
20:16 31:5 42:24 43:16
44:5 61:7 85:12 94:7,
20,21 95:16 96:8
100:13 113:25 120:21
126:21 135:24

**understanding** 19:24
37:3 48:13,17 49:4
58:18 92:21 99:15
110:14 111:16 123:9
124:5 127:19 132:17
135:13

**understood** 5:6 6:17
16:12 31:8 42:10
112:15 122:18 132:8

**unfounded** 109:15
110:21,22 111:2

**union** 121:20

**unique** 45:12

**unit** 22:18 58:15

**United** 19:13 20:1

**units** 58:15,21

**University** 8:4

**Unlike** 18:20

**Unruly** 27:10

**unsealing** 134:5

**unsustainable** 109:4

**update** 57:17

**upwards** 67:4

**urinating** 27:7

---

**V**

**V-A-S-H-T-I** 13:3

**Valorri** 7:11 64:25
102:14

**variety** 38:15,24 39:16
76:15 99:25 100:12

**Vashti** 13:3,5,18

**veer** 126:16

**vehicle** 25:6 33:10,13,
14,15,17,20 34:17
35:15 36:21 37:5 72:5
125:25 126:5,7,16
127:3,8,10,12,13,22
130:11,13,15,18,20
144:23 146:1,16,17,23

**vehicles** 33:1,24 36:13,
25 37:10 63:6 69:12
126:15

**vending** 103:19,21

**verbal** 5:21

**versa** 16:18 118:24

**versus** 4:5 29:23 30:5
86:22 115:18

**vice** 16:18 118:24

**victim** 24:24

**victims** 25:2

**video** 5:23 60:1 61:23
68:11 106:18 107:5,6,8,
16,19 112:13

**videos** 60:17 142:4

**violate** 20:14

**violates** 20:4 40:11
45:7

**violating** 20:19 39:19
69:11

**violation** 18:14 43:18
44:14 45:3,21 110:13
148:10

**violations** 18:16 39:10

**visible** 31:1

**visual** 115:10



Julius Goldring vs Atlanta Police Department, et al.
Investigator Vladimir Henry

April 09, 2019

**Vladimir** 4:1,4,5,13

**voice** 112:22 113:1,9, 13 129:1

**volunteering** 11:15,16

---

**W**

**W-9** 139:9

**wagon** 83:24 84:14,21

**wait** 5:9 48:21 49:6,17 87:5 99:5

**Waited** 91:9

**waiting** 127:7

**walk** 27:11 103:25 104:6

**walking** 23:21 26:20 30:4 63:6,19 64:2,3,4, 15 70:25 71:1,3,5 146:22

**wanted** 15:4 16:16 84:1,3,6 129:10 132:8

**warn** 126:13

**warning** 26:23 41:16 127:1

**warrant** 57:9 70:7 82:7 84:23 94:3,22 98:6,8,10 106:12 117:9,25 118:24

**warrants** 25:15 106:3, 5,7

**wasted** 27:17

**watch** 22:14 23:3 29:14,19,22,24 30:7 31:13

**ways** 35:12,18 39:20 133:10

**wear** 31:10,24

**wearing** 114:12

**weed** 51:7

**weeks** 50:3,10 138:16

**weigh** 81:17,20

**weight** 53:10 117:9

**weight-** 11:15

**whatnot** 42:6 150:9

**whatsoever** 95:15 142:8 150:20

**whisper** 65:1,3

**white** 77:2,3,4 79:14, 15,16,20,23 80:1,2 125:1

**window** 30:21

**windows** 30:19,22

**witnesses** 112:17

**women's** 14:3 59:20

**word** 120:25 121:5

**wore** 31:21

**work** 5:18 11:10 14:18 26:6,25 28:2,4 30:11 31:11 32:5 110:23

**working** 10:19 15:9 21:10 22:2,10,24 24:12 28:5,8 31:25 32:10 34:11,12 36:14 37:16 39:8 59:19 139:6 143:2

**worldly** 138:8

**worth** 82:21

**wow** 9:7

**wrap** 55:24 134:25

**write** 43:23,24 84:6 116:18 118:12,13,19 119:25 134:2 146:15

**writes** 144:12

**writing** 106:4 117:18

**written** 128:19 129:14, 16 131:8,15 142:8

**wrong** 27:6 42:6,8 54:11 111:11,16 112:4, 5,9,10 126:10,11,14 127:5 129:18

**wrote** 146:13

---

**Y**

**y'all** 104:13

**year** 7:25 9:13 12:21 17:14 18:22 31:17

139:16 141:21

**years** 8:6 10:19 11:10 14:18,25 51:11 62:1,6 138:19

**yellowish** 79:25

**yeses** 5:21

**York** 30:25 70:8

**younger** 16:22

---

**Z**

**Zenelaj** 110:1,3,5 113:20

**Ziploc** 116:15

**zone** 21:1,2,5,11,12,13, 14 28:2 29:1,4 31:15 78:10

