## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JULIUS "JUJU" GOLDRING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | |
| OFFICERS VLADIMIR HENRY and | ) | 1:18-cv-01191-WMR |
| JUAN RESTREPO, in their individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' brief omits conclusive and overwhelming evidence that the field drug test performed by Officer Henry yielded a negative result, and that both Officers knew it. Defendants also omit binding authority and evidence that forecloses their argument that an arrest for jaywalking justifies Plaintiff's nearly six-month incarceration.

If Defendants prevail here, it will mean that when performing the field drug test, an officer is free to depart from the directions printed on the test kit, and to perform the test and interpret the results in an arbitrary and haphazard fashion. Then, even if the officer gets a *negative* result, the officer is still free to charge the citizen with drug trafficking, and to incarcerate that person for months, pending the

results of a GBI lab test, even in absence of any other reason to believe the tested substance was contraband. It would also mean that officers could arrest a person for jaywalking simply for standing on a street corner.

Contrary to Defendants' position, this conduct violates clearly established Fourth Amendment rights, and Defendants' motion should be denied.

## STATEMENT OF FACTS[1]

On October 10, 2015, Plaintiff, her boyfriend, and their two companions were walking on the sidewalk of 3rd Street in Atlanta as they approached Piedmont Avenue. Pl. SMF ¶ 53–54; Exhibit K at 1. Plaintiff was holding hands with her boyfriend, and the group stopped at the intersection as they prepared to cross the street. *Id.* ¶ 21.

Officers Henry and Restrepo were sitting in a nearby patrol car.[2] Their car was parked, and lights were off. Pl. SMF ¶ 18–19. As Plaintiff and her companions

---

[1] Plaintiff has presented a brief summary of the relevant facts in this section, followed by additional detail *infra* where necessary to respond to Defendants' specific arguments.

[2] Both Officers worked on the City's "crime suppression unit," which is a police unit that focuses on crime observed on the street, rather than responding to 911 calls. Pl. SMF ¶ 8. Officer Henry and Restrepo worked together frequently, and their primary duties in Zone 5 (midtown), was to enforce "quality of life" offenses, which are generally related to policing the homeless population due to complaints from residents. *Id.* ¶¶ 12, 14, 15. Officers frequently arrested for crimes such as jaywalking, given that the Pine Street shelter "encroaches everywhere." *Id.* ¶ 13. The Officers were specifically on the lookout for prostitution. *Id.* ¶ 12.

stood on the sidewalk at the intersection, the Officers got out of their car and shined a flashlight at them. *Id.* ¶ 26 The Officers separated Plaintiff and her boyfriend, and told Plaintiff's other two companions they should leave, threatening them with arrest if they did not. *Id.* ¶¶ 49–50. One Officer said to Plaintiff that they were stopped for jaywalking. *Id.* ¶ 34. Plaintiff responded that they were on the sidewalk the entire time, which was true. *Id.* ¶¶ 40--42. One of the officers grabbed Plaintiff by her arm, and said he was going to search her "because you all jaywalked." *Id.* ¶ 41.

Officer Restrepo went through Plaintiff's purse and found a stress ball. *Id.* ¶ 54. The obvious implication was that Plaintiff had been caught; however, the item appeared to be a normal stress ball, like one would find for sale in a variety store or gas station. *See* Exhibit E. As Officer Restrepo said, "It just seemed like a stress ball." *Id.* ¶ 58. Officer Restrepo then said he was going to cut the ball open, and Plaintiff acquiesced. *Id.* ¶ 55. Meanwhile, Officer Henry detained Plaintiff's boyfriend.

At that point, the Officers had no idea whether the ball contained cocaine or sand or some other substance. Officer Restrepo later testified that he can't tell the difference between cocaine, sand, baking powder, or much of anything else—after all, he explained, there are "a jillion" powders that could be white. Pl. SMF ¶ 153.

The Officers had no other reason to suspect that Plaintiff was a drug dealer, or otherwise carrying a large quantity of drugs. Pl. SMF ¶ 130. Nevertheless, since the only way for the Officers to tell if something is cocaine was to test it with a field drug test, the Officers handcuffed and arrested Plaintiff and her companion and took them to the CNN Center precinct, where the officers had access to field drug test kits. *Id.* ¶ 69–73.

Officer Henry performed a field test, which requires reading simple directions on a package which instruct the officer to place a small amount of the substance to be tested into the test kit. The officer must then sequentially break three ampoules, agitating the package between each break, and then observe the color of the resulting liquid. *See* Pl. SMF ¶¶ 120, 129. If the result is a positive, the officer will see a clear separation between a pink solution which sits atop a blue solution. If it is negative, then there will be no color separation. *Id.* ¶ 96. It is not difficult to perform the test, and both the drug test manufacturer, Sirche, Inc., and the City of Atlanta take the position that training on how to perform this field drug test is not necessary. *Id.* ¶ 109–108, 131. Instead, Officers should simply read and follow the directions. *Id.*

Officer Henry disregarded the directions. When he performed the test, he: (1) filled the bag nearly half full with the sand from the stress ball, instead of using

the tiny amount of a sample that he was supposed to use, *id.* ¶¶ 76, 92; (2) broke all three ampoules at the same time, *id.* ¶ 77; and (3) interpreted the test by looking to whether the resulting color was "*darker than light pink*," *id.* ¶ 78. In so doing, he ignored the directions and performed the test in a way that would have invalidated even a positive test result. *Id.* ¶ 127. In addition to incorrectly performing the test, Henry incorrectly interpreted the result. A positive result requires the appearance of both a pink and blue solution, and a clear color separation between the two. *Id.* ¶ 102. Officer Henry testified that the result he observed was a single color that was "darker than light pink." *Id.* ¶ 78. Both the City of Atlanta and the drug test manufacturer agreed that the result described by Henry was *negative*. *Id.* ¶¶ 101, 104. And Officer Henry's own partner agrees: if the resulting color is "darker than light pink," then the test is negative. *Id.* ¶ 128. Finally, the instructions on the package itself clearly show that it was negative. *Id.* ¶ 96.

Other evidence suggests that both officers actually knew that the test results were negative, and that the decision to change Plaintiff with cocaine trafficking was the product of malice. For example, Plaintiff was present when Officer Henry performed the field test where Officer Henry showed visible frustration at the results he was getting from the test, another officer said to him, "Give it up, buddy.

There's nothing there." *Id.* ¶ 149.[3] In addition, Officer Henry disregarded City policy which required him to "list the step-by-step procedures used when performing a field drug test." *Id.* ¶ 108. Instead, Officer Henry listed nothing other than that the test was positive. *Id.* ¶ 165. Later, during an internal affairs investigation, he would claim that the result was a "faint positive," although there is no such thing as a "faint positive" on the NARK II test—there is either a clear color separation, or there isn't. *Id.* ¶ 102. Moreover, the test must be performed in the proper sequence and the officer performing the test must actually observe four separate color changes. *Id.* ¶ 124. If those changes are not observed, then the test is negative. *Id.* ¶¶ 124, 127.

If Officer Henry had any doubt about how to perform and interpret the test, he simply had to look at the instructions on the test package itself. Instead, he consciously decided not to consult those directions when deciding whether to

---

[3] There are two reasons this statement is not hearsay. First, it is a present sense impression under Fed. R. Evid. 803(1)—the officer who made the statement made it while seeing Officer Henry perform the tests, and the statement was made during the event (the drug test process) that the declarant was observing. Second, it is not hearsay because it is not offered for the truth of the matter asserted (i.e., that the test was negative), but as evidence that was available to Officer Henry when assessing probable cause for additional charges. *See Smart v. City of Miami*, No. 13-CIV- 24354, 2015 WL 11202640, at *2 (S.D. Fla. May 28, 2015) ("[O]ut of court statements are not hearsay to the extent they are being offered to demonstrate the information available to police officers in determining whether there was probable cause to arrest.").

charge Plaintiff with a serious felony offense. *Id.* ¶ 103, 113. As for Restrepo, he gave a statement that he knew the test results firsthand because he personally observed them. *See* Exhibit A, Restrepo Statement to OPS.[4]

Despite the clear evidence of Plaintiff's innocence, Defendants then obtained arrest warrants for walking in the roadway and trafficking in cocaine. *See* Exhibit F, Warrants. As a result of the cocaine trafficking charge, Plaintiff's bail was set at $25,000. Pl. SMF ¶ 143. Unable to post that bond, she spent over five months in the Fulton County Jail. Doc. 50-11. Her charges were finally dismissed after the GBI's crime lab established that the substance in the stress ball was not a drug. *Id.* ¶ 150; Def. SMF ¶¶ 27–28.

## ARGUMENT AND CITATION OF AUTHORITY

## I.   STANDARD OF REVIEW

Summary judgment is appropriate only when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as

---

[4] Officer Restrepo's role in this process is less than clear. At his deposition, he testified that the test method used by Henry was invalid, and the result described by Officer Henry was negative, but that he did not see Henry perform the test, or the test result itself. Pl. SMF ¶ 152. But during an internal affairs investigation, Officer Restrepo swore that he had seen the results, and that it had shown a "faint positive." *Id.* ¶ 153. A jury will have to decide which version they believe. If Officer Restrepo knew of the negative test, assisted in preparing the warrant for Plaintiff's arrest charging her with cocaine possession, then he can be held liable for participating in her arrest.

a matter of law." Fed. R. Civ. P. 56(a). In making that determination, a court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under this standard, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 659 (2014).

## II.   PLAINTIFF'S EVIDENCE SUPPORTS HER FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIM

Defendants have raised the following arguments in support of summary judgment: (A) there was probable cause for cocaine trafficking; (B) there was probable cause for walking in the road; (C) probable cause for walking in the road bars a malicious prosecution claim for cocaine trafficking, even if there was no probable cause for the trafficking charge; (D) Restrepo did not initiate Plaintiff's prosecution, and (E) the Defendants are entitled to qualified immunity.

### A.   *There was no probable cause for trafficking in cocaine*

Defendants' argument that there was probable cause to prosecute Plaintiff for trafficking in cocaine in violation of O.C.G.A. § 16-13-31 is based solely on their contention that two field drug test kits showed that the substance inside the stress ball found within Plaintiff's purse was cocaine. In support, Defendants repeatedly represented to this Court that they obtained a "positive" result from the

field drug test kits. Doc. 50 at 6, 19–20. This is false, and the evidence shows beyond any shadow of a doubt that Defendants *did not* obtain a positive result.

      i.      Overwhelming evidence showing a lack of probable cause

The field drug test kit in question is known as the "NARK II" brand "#2007 Scott Reagent Modified - Cocaine Salts & Base Reagent." It is a small pouch that has three glass cylinders (or "ampoules") inside, each containing a chemical compound for use in testing. The instructions state:

1. The officer will weigh the substance and note whether weight is net or gross.
2. The officer must have an opinion, "based upon [1] circumstances of seizure and [2] appearance of the substance," that the substance is "Cocaine HCl/Cocaine Base (Crack/Freebase)."
3. "Hold the test with the printed side facing the operator."
4. "Check that all three (3) ampoules within the test are intact and are located in the left to right color sequence of Pink, Clear, Clear."
5. "Wearing disposable gloves, remove the plastic clip, open the test pouch and insert a small sample of the suspect material along with the plastic loading device into the bottom of the test pouch."
6. "Tap the pouch on a firm surface to move the suspect material and loading device into the bottom of the pouch and replace the closure clip."
7. "Break the left ampoule (Pink), at the middle of the ampoule and agitate for ten (l0) seconds."
8. "Observe the development of a Blue Presence (Blue solution, Blue line along the bottom of the pouch, Blue in the corner of the pouch or a Pink field with small Blue flecks). IF NO BLUE COLOR IS PRESENT PROCEED TO STEP #14."
9. "Break the middle ampoule (Clear) and agitate for ten (10) seconds."

10.    "Blue Presence will clear to a Pink solution. IF NO PINK COLOR IS PRESENT, GO TO STEP #14."

11.    "Break the right ampoule (Clear) and agitate for ten (10) seconds."

12.    "Observe the immediate BURSTING of BLUE throughout the pouch. Then tap the pouch firmly on one side to clear the field and gently roll the pouch back in the opposite direction to a 45° angle and allow the liquid to settle. Observe the color layering. Upper level Pink, lower level Blue."

13.    The officer is to mark a "POSITIVE" test for Cocaine HCl or Cocaine Base.

14.    The officer is to note that the test is "INCONCLUSIVE" for Cocaine/HCL/Freebase.

15.    Finally, the officer is to "[n]eutralize the test and dispose of using approved Department procedures."

*See* Exhibit B, Nark II Checklist.

Thus, in short, officers are to break each of the three ampoules in a specific sequence.[5] The instructions state that after each breaking, an officer must agitate the test kit and look for and note a specific color change—first blue; then pink; then blue; and then, finally, pink over blue.[6] If—and only if—all four of those color changes are clearly present can the test be considered positive.[7]

Based on these simple instructions, it is obvious that an officer should not break all ampoules at the same time and then determine whether the resulting

---

[5] *See id.*; *see also* Doc. 50-6; Sirchie Rule 30(b)(6) Dep. 55:12–15.

[6] *See* Exhibit B, Nark II Checklist; *see also* Doc. 50-6; Sirchie Rule 30(b)(6) Dep. 38:6–16.

[7] *See* Exhibit B, Nark II Checklist; *see also* Doc. 50-6; Sirchie Rule 30(b)(6) Dep. 38:6–16.

liquid is "darker than light pink."[8] But that is exactly what Officer Henry did. *See* Henry Dep. 103:2–14.

At its deposition, Sirchie, Inc.'s representative watched a video clip of this portion of Henry's testimony, and was asked to assess his performance of the test. He affirmed that Henry did not perform the test properly. Sirchie Rule 30(b)(6) Dep. 61:24–62:19.[9] Sirche also stated the obvious: if the result of the test was not followed sequentially, and the end result was not pink over blue, then the test was negative. Pl. SMF ¶¶ 101, 127.

The Atlanta Police Department, via its representative Major Mason, who is head of training on these field drug test kits, testified that this is not how the test is done, and that the results that Officer Henry claimed to have observed would mean that the test was negative for cocaine. Mason Dep. 26:16–27:5.

Officer Restrepo testified that Officer Henry did not test the substance even close to properly and that if he got the result that Henry testified he obtained, he would conclude *there was no cocaine*. Restrepo Dep. 87:17–23; 82:14–87:23.

---

[8] Sirchie Rule 30(b)(6) Dep. 58:17–59:21.

[9] *See also* Sirchie Rule 30(b)(6) Dep. 59:22–60:4 ("Q. Would you agree that breaking all three ampules at once is not a proper administration of this drug test kit? A. Yes, I would agree. Q. And the results of such an administration of the test would not lead to any meaningful finding? A. I would agree.").

It is important to bear in mind that the officers testified that they had no reason to suspect Plaintiff of any involvement in criminality or narcotics other than the presence of the stress ball in her purse, and the purportedly positive result they obtained. Henry Dep. 73:16–21; 149:5–8.

Based upon this dearth of evidence, along with additional evidence showing that the stress ball was normal in appearance[10] and did not contain any contraband,[11] there was no probable cause.

ii.   Henry recklessly swore the field test kit produced a positive result, when every reasonable officer would have known that the tests were negative

In *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978), the Supreme Court held that an officer violates the Fourth Amendment by knowingly or recklessly including false material information in a search warrant application. This rule has been extended by this Circuit to arrest warrants. *See United States v. Martin*, 615 F.2d 318, 327–29 (5th Cir. 1980); *see also Kelly v. Curti*s, 21 F.3d 1544, 1554 (11th Cir. 1994) (denying qualified immunity to an officer who obtained an arrest warrant based on a knowingly false statement that the substance the plaintiff

---

[10] Restrepo Dep. 108:2—23 ("[I]t just seemed like a stress ball."); Henry Dep. 74:14–16 ("Q. What did the stress ball look like? A. Looked like a regular stress ball that had a clip, I believe, on it."); *id*. at 109:1–8 & Exhibit E, Isoflex Stress Balls.

[11] Doc. 50-9, GBI Report.

possessed was cocaine); *Holmes v. Kucynda*, 321 F.3d 1069, 1084 (11th Cir. 2003) ("[T]he law was clearly established in [1998] that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest.").

The reasoning in *Franks* applies equally "to information *omitted* from warrant affidavits." *Madiwale v. Savaiko,* 117 F.3d 1321, 1326 (11th Cir. 1997) (emphasis added). "[A] warrant violates the Fourth Amendment when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" *Id.* at 1326–27 (quoting *United States v. Martin,* 615 F.2d 318, 329 (5th Cir. 1980)). Therefore, an officer will not receive qualified immunity if a reasonable officer should have known that the statements in the affidavit were included with a reckless disregard for the truth or that facts were recklessly omitted from the affidavit supporting probable cause. *See Kelly,* 21 F.3d at 1554; *Daniels v. Bango*, 487 F. App'x 532, 537 (11th Cir. 2012); *Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) ("It is well established in 1989 that fabricating incriminating evidence violated constitutional rights.").

In a wholly conclusory affidavit, Henry swore that Plaintiff violated O.C.G.A. § 16-13-31 because Plaintiff "had the possession of Cocaine sixty grams

worth" that "was found in the Accused purse contained in a ballon [sic] ball." *See* Exhibit F. This statement was either knowingly or recklessly false.

While Officer Henry is liable even if his sworn statement was reckless, there is evidence that supports a jury finding that the statement was knowingly false. Plaintiff testified that she saw Defendant Henry administer the test and that she saw that he knew the test was negative.[12] The *only* evidence supporting probable cause is Henry's own objectively unreasonable position, which all other evidence contradicts.

The Officers had no objectively reasonable basis for believing that Plaintiff's stress ball contained cocaine. Defendants' failure to read the instructions associated with the field drug test kit, or worse, their failure to abide by the instructions of which they were aware, is grossly reckless and wholly unreasonable. Officer Henry's failure to even review the test's directions constitutes a failure to uncover readily available exculpatory evidence. [13]

---

[12] *See* Goldring Dep. 44:11–25 (testifying that she observed Henry growing frustrated with the negative results and that the test kit "looked the same once he brought it out. It looked like as if it never -- like it never changed to anything" as it was supposed to); *see also* Exhibit H, Goldring Responses to Interrogatories at ¶ 11 (testifying that she "further observed that another Atlanta Police Department officer observed what was happening and stated to Defendants, 'Give it up buddy. There's nothing there,' or something substantially similar").

[13] *See Kingsland v. City of Miami*, 382 F.3d 1228 (11th Cir. 2004) (charging officers with a duty to assess readily available exculpatory evidence when assessing probable cause and denying qualified immunity because "without further

**B.      There was no probable cause to prosecute Plaintiff for walking in the roadway**

"Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime and the operative fact pattern." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137–38 (11th Cir. 2007) (citation omitted). Defendants argue there is no factual dispute concerning whether there was probable cause to arrest Plaintiff for walking on or along the roadway, under O.C.G.A. § 40-6-96. They are mistaken.

O.C.G.A. § 40-6-96 provides in relevant part that "[w]here a sidewalk is provided, it shall be unlawful for any pedestrian to stand or stride along and upon an adjacent roadway unless there is no motor vehicle traveling within 1,000 feet of such pedestrian on such roadway or the available sidewalk presents an imminent threat of bodily injury to such pedestrian." Plaintiff's conduct—even as alleged by Defendants—does not violate this statute. O.C.G.A. § 40-6-96 applies to sustained walking in the road, or walking along the road when there is a sidewalk that is available but not used. There is no testimony that Plaintiff was walking "along and

---

factfinding, it is impracticable to conclude that arguable probable cause existed for [the plaintiff's] arrest when it is unclear how much of the proffered evidence tending to support a finding of arguable probable cause was manufactured or misrepresented, or what further knowledge, if any, would be attributed to the defendants if they had investigated reasonably"). *See also Cozzi v. City of Birmingham*, 892 F.3d 1288 (11th Cir. 2018).

upon" the roadway. This statute does not criminalize crossing the street.[14]

There is a separate statute that applies to the offense traditionally known as jaywalking. *See* O.C.G.A. § 40-6-92. Defendants did not charge Plaintiff with that offense. Defendants have not argued that there was probable cause to arrest Plaintiff for violating that statute.

Moreover, there was no probable cause for jaywalking under O.C.G.A. § 40-6-92. Plaintiff unequivocally testified that neither she nor her companions jaywalked.[15] Goldring was on the sidewalk or in a crosswalk at all times while

_____

[14] O.C.G.A. § 40-6-92 applies to the offense of crossing the street unlawfully. That offense does not bar crossing the street where a car is within 1,000 feet. To interpret O.C.G.A. § 40-6-96 to bar crossing the street within 1,000 feet of another vehicle even when in a crosswalk, rather than walking in and along the street, would run contrary to numerous other provisions of Georgia law. *See, e.g.*, O.C.G.A. § 40-6-92(a); O.C.G.A. § 40-6-91(a) (providing the vehicles must yield to pedestrians in a crosswalk); O.C.G.A. § 40-6-90 (pedestrians obligated to follow traffic control signals where they exist).

Most directly, the actual jaywalking statute, O.C.G.A. § 40-6-92, does not provide a distance limitation for pedestrians other than that "[e]very pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection *shall yield the right of way* to all vehicles upon the roadway *unless he has already, and under safe conditions, entered the roadway*."

Notably, Goldring was *not required* to use the crosswalk at this particular intersection because there were not traffic lights at the immediately adjacent intersections. *Compare* O.C.G.A. § 40-6-92(c), *with* Exhibit K, Google Maps Images (no traffic light at Piedmont Avenue and Third St. and no traffic light at Piedmont Avenue and Fourth St.).

[15] Plaintiff testified only that Henry and Restrepo *falsely* claimed she and her friends were jaywalking. Exhibit J, Goldring Decl. ¶ 3.

walking on the evening in question. Goldring Decl. ¶¶ 2, 4–5. Plaintiff did not cross Piedmont Road as alleged by Defendants. *Id.* ¶ 4. At the time she approached the intersection to cross the street, no vehicles were approaching her or required to slow down or otherwise alter their path. *Id.* ¶ 5. No matter the statute relied upon by Defendants, summary judgment on this ground must be denied.

### C.   *Even if there was probable cause for walking along the roadway, that does not impact Plaintiff's malicious prosecution claim*

Defendants argue that so long as there was probable cause to charge Plaintiff with jaywalking, it would be constitutionally permissible to prosecute Plaintiff for any other offense without regard to the presence of probable cause, even a very serious offense such as trafficking in cocaine, which calls for a mandatory minimum ten-year prison sentence and $200,000 fine. *See* Doc. 50 at 17–18. This is a dangerous contention without the support of precedent within the Eleventh Circuit.

Defendants' argument fails in the first instance because the undisputed evidence shows that Plaintiff did not commit the pedestrian offense with which she was charged and because, on Plaintiff's evidence, she did not commit the offense of jaywalking. This is independently sufficient to defeat this argument at summary judgment.

Defendants' argument also fails because it conflates claims for false arrest (which Plaintiff has not brought) and claims for malicious prosecution. In *Elmore v. Fulton Cty. Sch. Dist.*, 605 F. App'x 906, 915 (11th Cir. 2015), the Eleventh Circuit explained the difference between false arrest and malicious prosecution claims as well as the rule that "*in contrast to false-arrest claims, 'probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking*.'"[16] The court explained the distinction in this way: "when an individual is arrested, the seizure is the same whether the arrest was based on one or multiple grounds; but once an individual is prosecuted, each additional charge imposes additional costs and burdens." *Id.* (citing *Holmes*, 511 F.3d at 682–83). This principle is based on binding precedent. *See Kelly v. Curti*s, 21 F.3d 1544, 1557 (11th Cir. 1994) (explaining that probable cause as to one offense will not bar a malicious prosecution claim based on the absence of probable cause for another, related charge). *See also Uboh v. Reno*, 141 F.3d at 1005.[17]

_____

[16] (Emphasis added) (quoting *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007); *Johnson v. Knorr*, 477 F.3d 75, 83 (3d Cir. 2007); *cf. Uboh v. Reno*, 141 F.3d 1000, 1005 (11th Cir. 1998) (conviction on some charges in indictment does not preclude malicious prosecution claim based on dismissal of other charges)).

[17] The need for the rule is simple: if probable cause for a minor offense like jaywalking allowed an officer to charge a citizen with whatever he wanted, officers would have unchecked authority to charge people who commit minor offenses

Here, Defendants are faced with the commonsense conclusion, backed by their own testimony, that Plaintiff suffered significantly more severe damages as a result of being charged with trafficking cocaine as opposed to a pedestrian offense. Officer Henry testified that when a person is arrested for jaywalking, in his experience they are not jailed for more than several hours: "Usually, I see them out the next day." Henry Dep. 47:21–50:5. Plaintiff spent close to half a year in jail.  A reasonable jury would easily conclude that extended detention was a result of the additional charge of trafficking in cocaine.

### D.   A jury could find that Officer Restrepo participated in the drafting of the arrest warrant application and knew that the test results were negative, and therefore liable for Plaintiff's arrest

Officer Restrepo argues that he cannot be held liable for malicious prosecution because he did not initiate or continue Plaintiff's prosecution. Doc. 50 at 9–10. It is well established that applying for a warrant can give rise to malicious prosecution liability because it begins the judicial process. "A police officer who applies for an arrest warrant can be liable for malicious prosecution . . . ." *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016); *see also Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994).[18] To be liable for participating in an unlawful arrest,

---

(e.g., speeding) with even heinous crimes (e.g., rape or murder) with no probable cause whatsoever.

[18] Defendants claim that judicial process did not begin until indictment, Doc. 50 at 9–10. That is wrong. The Eleventh Circuit has held that the issuance of an

an officer must have "the requisite information to put him on notice that an unlawful arrest was occurring or had occurred." *Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013) (citing *Jones v. Cannon*, 174 F.3d 1271, 1283-84 (11th Cir. 1999)).

Henry's testimony is that it was Restrepo who authored the warrant and spoke with the judge about the warrant. "I know for sure he was the one who was conducting the warrant, doing the process, filling out the name and the demographic of the perpetrators and he was the one who spoke to the judge." Henry Dep. 106:11–14. Henry then signed the warrant in his name (even though he never spoke to the judge). *See* Henry Dep. 107:1–2; Exhibit F, Warrants. Restrepo was aware of the negative test results because he personally observed them. *See* Exhibit A, Restrepo Statement to OPS. Based on the conduct of authoring the warrant and testifying before the judge about the warrant, Restrepo is sufficiently

---

arrest warrant constitutes the initiation of a prosecution. *See Black*, 811 F.3d at 1267 ("But the illegal seizure cannot be just any seizure: unlike the torts of false arrest and false imprisonment, the tort of malicious prosecution requires a seizure pursuant to legal process. *Legal process includes an arrest warrant.*" (emphasis added) (citations and internal quotation marks omitted)). *See also Jones v. Barrett*, No. 3:17-CV-13 (CDL), 2018 WL 1384646, at *9 (M.D. Ga. Mar. 19, 2018) ("although Plaintiff was initially arrested without a warrant, she presented evidence that she remained incarcerated after Palmer obtained the arrest warrant at Barrett's direction. Therefore, the Court finds that Plaintiff has presented sufficient evidence of a seizure in relation to the prosecution and pursuant to legal process"); *Johnson v. Dekalb Cty.*, Georgia, No. 1:17-CV-2601-TWT, 2019 WL 2409659, at *13 (N.D. Ga. June 7, 2019) (same).

culpable to be held responsible for initiating the criminal process.[19]

### E.    Defendants are not entitled to qualified immunity

"The essence of qualified immunity analysis is the public official's objective reasonableness, regardless of his underlying intent or motivation." *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004). The defense "does not protect 'the plainly incompetent or those who knowingly violate the law.'" *Id.* at 1231–32 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). The critical inquiry under this objective analysis is whether the right was clearly established. *Id.*

Plaintiff puts forward two paths by which she can overcome the qualified immunity defense. First, she prevails if she shows that Defendants knowingly or recklessly included false information in the warrant application and there was a lack of *actual* probable cause. *See Kelly* v. Curtis, 21 F.3d at 1555. This is because the knowing or reckless provision of false information in connection with a warrant itself violates clearly established law. *Id.*

Second, Plaintiff prevails if she can show an absence of "arguable probable cause." *Kingsland*, 382 F.3d at 1232. The arguable probable cause inquiry asks "whether 'reasonable officers in the same circumstances and possessing the same

---

[19] Defendants have not made any other arguments in favor of summary judgment for Defendant Restrepo specifically. Plaintiff has not, and cannot, respond to any arguments not advanced.

knowledge as the Defendant[ ] *could have believed* that probable cause existed to arrest." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

Plaintiff easily satisfies both standards. For the pedestrian offense, she shows that she was on the sidewalk or in a crosswalk at all times and did not unlawfully cross the street or walk in the street, in direct contravention of Defendants' testimony. *See* Exhibit J, Goldring Decl. at ¶¶ 2–6. Defendants falsely swore the opposite when there was no justification to believe that she violated the offense charged.

For the trafficking charge, the drug test was incorrectly performed and negative, and there is evidence that the Officers *knew* the test was negative. No objectively reasonable officer could fail to read or follow the provided instructions. No reasonable officer would break all three ampoules at once instead of one by one in the correct sequence. And no reasonable officer could look to see whether the resulting color was "darker than light pink" when assessing whether the test was positive. The presentation of the arrest warrant for Plaintiff relied on recklessly false information, and there was no probable cause absent the Officers' misrepresentations. *See Kelly*, 21 F.3d at 1555 ("If [the officer] knew of the contents of the lab report—and for present purposes we must assume that she did

—then the information she swore to in the affidavit was not 'believed or appropriately accepted by the affiant as true.' Her affirmative misstatement violates *Franks*. Accordingly, [the officer] is not protected by qualified immunity from [plaintiff's] section 1983 malicious prosecution claim.").

## II.   PLAINTIFF'S FACTS GIVE RISE TO AN INFERENCE OF ACTUAL MALICE, DEFEATING OFFICIAL IMMUNITY FOR STATE CLAIMS

Plaintiff has presented more than enough evidence to create a question of fact as to the issue of actual malice sufficient to pierce official immunity under Georgia law.[20] Under Georgia law, "[o]fficial immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice or corruption." *Bateast v. Dekalb Cty.*, 258 Ga. App. 131, 132 (2002) (internal citations and alterations omitted) (emphasis added). To overcome official immunity, a plaintiff must show "actual malice" which "requires a deliberate intention to do wrong." *Id.*

Plaintiff's evidence includes that (1) she was illegally and intentionally arrested and prosecuted for jaywalking when she was on the sidewalk about to cross the street in a crosswalk (when she was not required to cross in the crosswalk

---

[20] Defendants have not moved for summary judgment as to Plaintiff's derivative claims for punitive damages or attorneys' fees under O.C.G.A. § 13-6-11. Plaintiffs have not responded to, and are not able to respond to, arguments that have not been advanced. Defendants have waived these arguments.

under state law); (2) she was targeted because of her status as a transgender individual because of the comments from the officers and because the officer let her two other companions who were also with her go free;[21] (3) she was arrested and prosecuted for possession of cocaine despite the officers knowing that the field drug test kit was negative; (4) there was a total want of probable cause.

Under facts far less egregious than these, the Georgia Court of Appeals has held that the question of malice is for the jury. *See City of Atlanta v. Shavers*, 326 Ga. App. 95, 98–99 (2014) (finding that if the defendant officer knew that the plaintiff committed no crime but arrested anyway, a jury could find that the officer deliberately intended to do a wrongful act); *Bateast v. Dekalb Cty.*, 258 Ga. App. 131, 132 (2002) (same); *Medoc Corp. v. Keel*, 166 Ga. App. 615, 618 (1983) (initiating criminal proceeding without investigation "served as proof of malice, independent of any inference drawn from a total want of probable cause"). Other district courts have applied this rule in the context of making deliberate misrepresentations in arrest warrants. *See also Jones v. Barrett*, 3:17-CV-13 (CDL), 2018 WL 1384646, at *8 (M.D. Ga. Mar. 19, 2018) (denying official immunity where defendant manufactured probable cause); *Johnson v. Dekalb Cty.*, Georgia, No. 1:17-CV-2601-TWT, 2019 WL 2409659, at *1 (N.D. Ga. June 7,

---

[21] Goldring Dep. 27:14–21.

2019) (denying official immunity where a jury could find an officer knowingly obtained an arrest warrant based on false information and falsified his police report).

Plaintiff has presented evidence that would allow a jury to a infer that both Officers deliberately wrongfully charged Plaintiff with drug trafficking, and her state law claims should proceed to trial.

## CONCLUSION

Plaintiff requests that Defendants' motion for summary judgment be denied.

Respectfully submitted, this 19th day of July, 2019.

| | |
|---|---|
| **Zack Greenamyre** | **Jeffrey R. Filipovits** |
| Georgia Bar No. 293002 | Georgia Bar No. 825553 |
| | |
| MITCHELL & SHAPIRO LLP | FILIPOVITS LAW FIRM, P.C. |
| 3490 Piedmont Road, Suite 650 | 2900 Chamblee-Tucker Rd., Bldg. 1 |
| Atlanta, Georgia 30305 | Atlanta, Georgia 30341 |
| 404.812.4747 | 678.237.9302 |
| zack@mitchellshapiro.com | jeff@law.filipovits.com |

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record: Staci Miller and Brenda Raspberry.

This 19th day of July, 2019.

**Jeffrey R. Filipovits**
Georgia Bar No. 825553

FILIPOVITS LAW FIRM, P.C.
2900 Chamblee-Tucker Rd., Bldg. 1
Atlanta, Georgia 30341
678.237.9302
jeff@law.filipovits.com